No. 26-2217

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

WISCONSIN ELECTIONS COMMISSION, et al.,

Defendants-Appellees

COMMON CAUSE, et al.,

Intervening Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
Dist. Ct. No. 3:25-cv-1036-JDP
The Honorable Judge James D. Peterson

BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
KELSEY E. McGEE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 251-0053

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 2

STATEMENT OF THE ISSUE ................................................................ 2

STATEMENT OF THE CASE ................................................................. 3

SUMMARY OF ARGUMENT ................................................................ 10

STANDARD OF REVIEW ...................................................................... 11

ARGUMENT

I.     The DOJ is entitled to Wisconsin's SVRL under the CRA. ........................................................................ 11

    A.     Wisconsin's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA. ............................................ 13

        1.     The plain text of Title III covers an SVRL. ........ 13

        2.     There is no conflict between Title III and HAVA. ............................................................. 23

    B.     The DOJ satisfied the CRA's requirements. ............. 27

II.     Defendants' privacy-related arguments lack merit ............. 41

    A.     The DOJ's demand complied with the Privacy Act. ................................................................. 41

**TABLE OF CONTENTS (continued):**                    **PAGE**

      B.    Federal law preempts any contrary
            Wisconsin law ................................................................ 44

CONCLUSION ............................................................................ 47

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

SHORT APPENDIX

**TABLE OF AUTHORITIES**

CASES:                                                                    PAGE

*Abramski, Jr. v. United States*, 573 U.S.C. 169 (2014)...........34

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848
    (M.D. Ala. 1960), *aff'd sub nom. Dinkens v.*
    *Attorney General of the U.S.*, 285 F.2d 430 (5th Cir. 1961)...........28

*American Oversight v. Department of Just.*,
    45 F.4th 579 (2d Cir. 2022).......................................44

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).......45-47

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................11

*Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*,
    116 F.3d 814 (7th Cir. 1997) .......................................32

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) ..........35, 44

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .............47

*CFTC v. Monex Deposit Co.*, 824 F.3d 690 (7th Cir. 2016) ...................31

*Chaidez v. Ford Motor Co.*, 937 F.3d 998 (7th Cir. 2019).......................11

*Coleman v. Kennedy*, 313 F.2d 867
    (5th Cir. 1963) (per curiam) ...........................30-31, 33, 34

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000) .................................................46

*Doe v. Chao*, 540 U.S. 614 (2004)........................................41

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) .......................32

*EEOC v. A.E. Staley Mfg. Co.*, 711 F.2d 780 (7th Cir. 1983).................32

**CASES (continued):**                                                                **PAGE**

*Ex parte Siebold*, 100 U.S. 371 (1880) ...............................................45-46

*Fischer v. United States*, 603 U.S. 480 (2024) .......................................23

*Foster v. Love*, 522 U.S. 67 (1997) ..........................................................45

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ...............................34

*Heckler v. Chaney*, 470 U.S. 821 (1985)..................................................30

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ...............................30

*Judicial Watch, Inc. v. Lamone*,
    399 F. Supp. 3d 425 (D. Md. 2019) ..............................................14

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)...............................28, 30

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).............................*passim*

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ...................................46

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ........................20

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ......................................................................33

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    587 U.S. 601 (2019) ......................................................................36

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) .........14

*Project Vote/Voting for Am., Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ....................................................14-15

*Public Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) .......................................................13-14

**CASES (continued):**              **PAGE**

*Public Int. Legal Found., Inc. v. Nago,*
174 F.4th 664 (9th Cir. 2026) ........................................................ 13

*Russello v. United States,* 464 U.S. 16 (1983) ......................................... 34

*South Carolina v. Katzenbach,* 383 U.S. 301 (1966) .............................. 3-4

*United States v. Benson,* No. 26-1225, 2026 WL 1815425
(6th Cir. June 24, 2026) ........................................................ *passim*

*United States v. Benson,* 819 F. Supp. 3d 753
(W.D. Mich. 2026) ................................................................ *passim*

*United States v. Bryan,* 524 U.S. 184 (1998) ........................................ 25

*United States v. Fontes,* No. 2:26-cv-66,
2026 WL 1172244 (D. Ariz. April 28, 2026) ............................... 9, 24

*United States v. Insurance Consultants of Knox, Inc.,*
187 F.3d 755 (7th Cir. 1999) ...................................................... 40-41

*United States v. Lynd,* 301 F.2d 818 (5th Cir. 1962) ............................ 29

*United States v. Mississippi,* 380 U.S. 128 (1965) ...................... 20, 36-37

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950) ............... 30-31, 33

*Voter Reference Found., LLC v. Torrez,*
160 F.4th 1068 (10th Cir. 2025) ..................................................... 24

*WaterKeepers N. Cal. v. AG Indus. Mfg.,*
375 F.3d 913 (9th Cir. 2004) ........................................................ 32-33

*Webster v. Doe,* 486 U.S. 592 (1988) ..................................................... 30

*Wyeth v. Levine,* 555 U.S. 555 (2009) .................................................... 46

**CONSTITUTION:**                                                                   **PAGE**

U.S. Const. Art. I, § 4, Cl. 1 ................................................. 45

U.S. Const. Art. VI, Cl. 2 ...................................................... 47

**STATUTES:**

Civil Rights Act of 1960 (CRA)
     52 U.S.C. 20701 *et seq.* ................................................. 3
     52 U.S.C. 20701 ............................................... *passim*
     52 U.S.C. 20701-20706 ..................................... 34
     52 U.S.C. 20702 ............................................ 23-24
     52 U.S.C. 20703 ............................................... *passim*
     52 U.S.C. 20704 ....................................................... 4
     52 U.S.C. 20705 .......................................... 4, 12, 29
     Pub. L. No. 86-449, § 301, 74 Stat. 86 (1960) ................... 3

Help America Vote Act of 2002 (HAVA)
     52 U.S.C. 21083 ................................................. 24
     52 U.S.C. 21083(a)(1)(A) .................................... 5
     52 U.S.C. 21083(a)(1)(A)(i) ............................... 25
     52 U.S.C. 21083(a)(1)(A)(iv) .............................. 25
     52 U.S.C. 21083(a)(1)(A)(vi) ........................... 25-26
     52 U.S.C. 21083(a)(1)(A)(viii) ........................... 25
     52 U.S.C. 21083(a)(2)(A) ................................. 6, 38
     52 U.S.C. 21083(a)(2)(A)(i) ............................... 38
     52 U.S.C. 21083(a)(2)(A)(ii) .............................. 38
     52 U.S.C. 21083(a)(2)(A)(iii) ............................ 6, 38
     52 U.S.C. 21083(a)(4) ................................... 6, 37-39
     52 U.S.C. 21083(a)(5)(A)(i)-(ii) ......................... 6
     52 U.S.C. 21083(a)(5)(A)(iii) ............................. 6
     52 U.S.C. 21111 ............................................. 42
     Pub. L. No. 107-252, 116 Stat. 1666 (2002) ................ 35

National Voter Registration Act of 1993 (NVRA)
     52 U.S.C. 20501(b) .......................................... 24
     52 U.S.C. 20501(b)(3) .................................... 5, 35

**STATUTES (continued):**                                    **PAGE**

52 U.S.C. 20503(b)(2) ............................................... 5, 37
52 U.S.C. 20507(a)(3)(B) ............................................... 38
52 U.S.C. 20507(a)(4)(A)-(B) ............................................... 5
52 U.S.C. 20507(c)(2)(A) ............................................... 38
52 U.S.C. 20507(d) ............................................... 38
52 U.S.C. 20507(i) ............................................... 36
52 U.S.C. 20507(i)(1) ............................................... 5, 24
52 U.S.C. 20510 ............................................... 35

Privacy Act of 1974
5 U.S.C. 552a ............................................... 7
5 U.S.C. 552a(a)(5) ............................................... 42
5 U.S.C. 552a(e)(4) ............................................... 42
5 U.S.C. 552a(e)(7) ............................................... 42

8 U.S.C.1445(f) ............................................... 18

8 U.S.C.1449 ............................................... 18

8 U.S.C. 1454 ............................................... 18

8 U.S.C.1454(a) ............................................... 18

10 U.S.C. 130c(d)(2)(C) ............................................... 17

13 U.S.C. 214 ............................................... 16

28 U.S.C. 1291 ............................................... 2

28 U.S.C. 1331 ............................................... 2

28 U.S.C. 1343 ............................................... 2

30 U.S.C. 1732(b) ............................................... 16

44 U.S.C. 3572(f) ............................................... 16

**STATUTES (continued):**  **PAGE**

Wis. Stat. Ann. § 6.50 (2026)..................................................................39

**REGULATIONS:**

28 C.F.R. 0.50(a) .....................................................................................43

68 Fed. Reg. 47,610 (Aug. 11, 2003) ..................................................43-44

70 Fed. Reg. 43,904 (July 29, 2005) .......................................................43

82 Fed. Reg. 24,147 (May 25, 2017).......................................................43

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 7767 (1960) .....................................................................30

**RULES:**

Fed. R. App. P. 2 ......................................................................................48

Fed. R. App. P. 40(a)(1) ...........................................................................48

Fed. R. App. P. 41(b)................................................................................48

Fed. R. Civ. P. 12(b)(6) ...........................................................................11

**MISCELLANEOUS:**

2024 EAVS report, https://www.eac.gov/sites/default/files/2025
 07/2024_EAVS_Report_508.pdf...............................................27-28

U.S. Dep't of Just., Justice Manual § 9-11.151 (Jan. 2020),
 https://www.justice.gov/jm/jm-9-11000-grand-jury# ..................44

Report of the United States Commission on Civil Rights (1959),
 https://www.usccr.gov/files/historical/1959/59-001-U.pdf ........20-21

**MISCELLANEOUS (continued):**           **PAGE**

The Federalist No. 59 (C. Rossiter ed. 1961) (A. Hamilton)................... 45

U.S. Dep't of Just., Mem. of Understanding between the
United States and Texas (May 13, 2008), *available at*
https://www.justice.gov/media/1173461/dl?inline
(last visited July 1, 2026) ........................................................... 26

U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1,
https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/
HAVA_1-Pager_10-27-22_508.pdf .................................................. 35

*Webster's New World Dictionary of the American Language*
(8th coll. ed. 1960) ...................................................................... 15

*Webster's Third New International Dictionary*
(1966 ed. unabridg.)..................................................................... 16

Wisconsin Elections Commission,
Voter Registration and Proof of Residence,
https://elections.wi.gov/Register .................................................. 15

# INTRODUCTION

The American people deserve elections they can trust, and accurate voter rolls are an essential precondition for that trust. As with its efforts nationwide, the Department of Justice (DOJ) seeks to obtain Wisconsin's statewide voter registration list (SVRL) to ensure that our federal elections are deserving of such trust. In so doing, DOJ is not doing anything extraordinary. DOJ's request for the State's SVRL is a lawful exercise of its authority under Title III of the Civil Rights Act of 1960 (CRA), and it is made for the lawful purpose of ensuring the State's compliance with the list-maintenance requirements of the Help America Vote Act of 2002 (HAVA).

The district erred in dismissing the case on the ground that an SVRL is not a record covered by Title III. The district court added atextual limitations onto the relevant statutory provisions, 52 U.S.C. 20701 and 20703, and concluded that the United States' legal arguments created a conflict, which does not in fact exist, between the CRA and other statutes. This Court should reverse the dismissal order and remand with instructions directing the district court to compel the Wisconsin Elections

Commission (WEC) to produce the unredacted version of Wisconsin's SVRL to the DOJ forthwith.

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1343. That court entered a final Order granting defendants' Motions to Dismiss on May 21, 2026. SA1-10.[1] The United States filed a timely Notice of Appeal on June 5, 2026. Doc. 91. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUE

The Civil Rights Act of 1960 requires "[e]very officer of election" to "retain and preserve . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election" for a prescribed period after that election. 52 U.S.C. 20701. Upon proper demand from the Attorney General or his representative, any "person having custody,

---

[1] "Doc. __, at __" refers to the number of the document on the district court docket in this case and the corresponding page number. "Doc. 5-__, at ___" refers to the district court's document number 5 and ECF header pagination therein. "SA_" refers to the page number of the Short Appendix.

possession, or control of such record or paper" must make it "available for inspection, reproduction, and copying." 52 U.S.C. 20703.

The question presented is whether a statewide voter registration list qualifies as such a "record[]" or "paper[]."

## STATEMENT OF THE CASE

1. a. Title III of the Civil Rights Act (CRA) of 1960 is entitled "Federal Election Records." Pub. L. No. 86-449, § 301, 74 Stat. 86 (1960). It imposes a "sweeping" obligation on election officials to preserve and, on request, to produce voter registration records pertaining to federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962).

The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). To that end, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Section 301 of Title III requires that

[e]very officer of election . . . retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application,

- 3 -

registration, payment of poll tax, or other act requisite to voting in such election.

52 U.S.C. 20701.

The key provision at issue here, Section 303, authorizes the Attorney General or his representative to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying." 52 U.S.C. 20703. Such demand "shall contain a statement of the basis and the purpose therefor." *Ibid.*

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court, which may "compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *South Carolina,* 383 U.S. at 313, Congress has since enacted additional laws that affect what "records and papers . . . come into [election officials'] possession," 52 U.S.C. 20701. Relevant here are the

National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA), which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and thus "protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3).

While the NVRA "does not apply" to States like Wisconsin that have, since the NVRA's passage, continuously allowed voters to "register . . . at the polling place at the time of voting in a general election for Federal office," 52 U.S.C. 20503(b)(2), it is important in this context because the HAVA builds upon the requirements of the NVRA. The NVRA's requirements include recordkeeping obligations, 52 U.S.C. 20507(i)(1), and the duty to make reasonable efforts to maintain lists of eligible voters that do not include the names of ineligible voters, 52 U.S.C. 20507(a)(4)(A)-(B).

HAVA requires States to implement a centralized computerized SVRL, and to engage in reasonable efforts at maintaining that list by removing ineligible voters. 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" a numeric identifier—namely, an applicant's "driver's license number" if he or she

has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii). The HAVA also imposes various protocols that must be followed prior to removing individuals from an SVRL but exempts from these protocols states like Wisconsin that, for the reasons described above, are exempt from not just the requirements, but also the protections for registrants included in the NVRA. 52 U.S.C. 21083(a)(2)(A). For these exempt states like Wisconsin, to protect registrants from improper removal from voter rolls, removal must be done "in accordance with State law." 52 U.S.C. 21083(a)(2)(A)(iii).

2. On June 4, 2025, the Attorney General sent a letter to the WEC stating its obligations under HAVA. Doc. 5-5. It stated that the "Wisconsin Elections Commission has refused to provide any administrative complaint process or hearing regarding HAVA complaints against the Commission" and by not responding, the WEC had "left

complainants alleging HAVA violations by the Commission without any recourse." Doc. 5-5, at 3.

On June 17, 2025, the Attorney General sent yet another letter to the WEC Administrator, Administrator Wolfe, seeking information regarding Wisconsin's compliance with federal election law. Doc. 5-1. The letter stated that the DOJ had "received several complaints" alleging the WEC'S failure "to comply with [HAVA's] list maintenance" requirements; the letter requested, *inter alia*, a copy of Wisconsin's SVRL. The letter also requested that Wisconsin provide a current electronic copy of its computerized SVRL, containing "all fields" required under Section 303 of HAVA. *Ibid.* The letter asked for the requested information and records by email or regular mail within 20 days. *Ibid.*

In response, Administrator Wolfe offered the publicly available SVRL and partial responses to the Attorney General's written requests. Doc. 5-2. On December 2, 2025, the Attorney General replied, again demanding the requisite information pursuant to HAVA (including identifiers such as a driver's license numbers or the last four digits of the social security number) to ensure HAVA compliance. Doc. 5-3. The email also included a Memorandum of Understanding (MOU) between the

United States and Wisconsin that reiterated that Title III of the CRA authorized the Attorney General's demand for the purpose of testing, analyzing, and assessing Wisconsin's SVRL for proper list maintenance and compliance with federal law. Doc. 72-1, at 3.

On December 11, 2025, Administrator Wolfe sent a response to the Attorney General. Doc. 5-4. In the letter, Administrator Wolfe stated that the legal underpinning of the Attorney General's argument did not override Wisconsin's state privacy laws. Doc. 5-4, at 3-4.

3. On December 18, 2025, the United States filed a Complaint (Doc. 1) against the WEC and a Motion to Compel Production of Documents (Doc. 2). The Wisconsin Alliance for Retired Americans (WARA) and Forward Latino (FL) (collectively WARA-FL), as well as Common Cause successfully moved to intervene. Doc. 7; Doc. 33; Doc. 53. WEC and Common Cause moved to dismiss, and WARA-FL filed a brief in support of WEC's motion. Doc. 56; Doc. 58; Doc. 62; Doc. 63. Defendants argued: that an SVRL is "not a record subject to production under Title III"; that "the government ha[d] not provided an adequate statement of basis and purpose"; that "the government ha[d] not explained why it needs an

unredacted copy of the voter list"; and that federal and state privacy laws "barred" the Attorney General's request. SA5.

On May 21, 2026, the district court entered an order denying the United States' Motion to Compel and granting the Motions to Dismiss. SA1-10. The district court held that an SVRL is not a record subject to production under Title III, relying heavily on district court decisions in *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (*Benson I*), and *United States v. Fontes*, No. 26-cv-66, 2026 WL 1177244 (D. Ariz. April 28, 2026). First, the court held that the text of Title III only covers documents received from an outside source because "come into his possession" in 52 U.S.C. 20701 "is most naturally read as a synonym of 'receive' or 'acquire.'" SA 6. Second, the court asserted that Title III could not require state election officers to "retain" or "preserve" an SVRL, "which is a living document that state election officials regularly update." SA6 (citation omitted). Concluding otherwise, the court insisted, would be inconsistent with provisions of HAVA and the NVRA. SA7. The district court therefore found it unnecessary to address defendants' other arguments.

The United States filed its Notice of Appeal on June 5, 2026. Doc. 91.

**SUMMARY OF ARGUMENT**

The district court erred in dismissing the United States' Title III claim on the ground that an SVRL falls outside the scope of the CRA because it is a self-generated document that does not "come[] into [the] possession" of a state election official. The CRA's text does not exclude self-generated documents. At most, the distinction between records "com[ing] into [one's] possession" and being "in [one's] possession," is a temporal one—not a distinction between obtaining records from an outside source and through self-generation. Thus, the Attorney General, or his representative, is entitled to reproduction and copying of a state's SVRL through the CRA to assess a state's compliance with HAVA.

There are no alternative bases to affirm. Contrary to Wisconsin's arguments, the DOJ's demand stated a sufficient basis and purpose that cannot be second-guessed by courts. Nor was DOJ restricted from using the CRA to investigate matters such as Wisconsin's compliance with HAVA. Relatedly, and again contrary to Wisconsin's arguments below, HAVA applies to the State of Wisconsin. And while the district court did

not reach any of defendants' various privacy-related arguments, this Court should reject those facially meritless contentions once and for all.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo and accepts "as true the complaint's well-pleaded allegations and drawing all reasonable inferences in the plaintiffs' favor." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

A motion to dismiss must be denied so long as the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid*. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679.

## ARGUMENT

**I.    The DOJ is entitled to Wisconsin's SVRL under the CRA.**

Section 301 of Title III of the CRA imposes a "sweeping" obligation

on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General, or his representative, with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, if the State election officer has rejected it, the Attorney General may seek an order from a federal district court "to compel the production of such record or paper." 52 U.S.C. 20705.

The requested SVRL qualifies among the "records and papers" that election officials must "retain and preserve" under Section 301 and that the Attorney General may demand under Section 303. The district court was wrong to conclude otherwise.

**A. Wisconsin's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA.**

Section 301 of the CRA requires an election official to "retain and preserve, for a period of twenty-two months from the date of any" covered election, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Those same records or papers are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703.

**1. The plain text of Title III covers an SVRL.**

According to the district court, the SVRL is not such a "record[]" or "paper[]" because it is self-generated by the State and therefore does not "come[] into [the] possession" of election officials, SA6; 52 U.S.C. 20701. In the district court's view, Section 20701 applies only to those "records received from prospective voters or other outside sources, not records created by the state itself." SA6.

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. *See Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024); *contra Public Int. Legal Found., Inc. v. Nago*, 174 F.4th 664 (9th Cir. 2026). In *Bellows*, the First Circuit held

that Section 8(i)(1) of the NVRA applies to the state voter file because it was as electronic report generated from the central voter registration system, and it reflects the additions and changes made by Maine election officials in carrying out voter list registration and maintenance activities. *See Bellows*, 92 F.4th at 49. Similarly, in *Judicial Watch, Inc. v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court disagreed. It explained that Maryland misunderstood the NVRA's requirements and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations" encompassed by the Act. *Id.* at 442 (citation and internal quotation marks omitted). The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id.* at 440 (citing *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1329, 1343 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir.

2012) (finding "all records" under Section 8(i)(1) included voter registration records) (emphasis and citation omitted).

Contrary to the district court (SA6), an external-source limitation is not the most natural reading of the statutory phrase "come into his possession." *See United States v. Benson*, No. 26-1225, 2026 WL 1815425, at \*10 n.3, \*11 n.7 (6th Cir. June 24, 2026) (*Benson II*) (Nalbandian, J., dissenting). An officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). The WEC and Administrator Wolfe acquired the relevant records from individual voters in the course of carrying out their duties as the WEC. The WEC "comes into . . . possession" of a covered "record" every time an individual voter adds or changes their registration information electronically, at the DMV, at a local polling place, or through a volunteer voter drive.[2] By coming into possession of those

---

[2] Wisconsin Elections Commission, Voter Registration and Proof of Residence, https://elections.wi.gov/Register.

individual records, the WEC merely aggregates them together into a simple record, the SVRL.

Even if one were to accept that SVRLs are "self-generated" documents, the word "come" cannot create a carve-out for self-generated documents. *See* SA6; *United States v. Benson*, 819 F. Supp. 3d 753, 768 (W.D. Mich. 2026) (*Benson I*) (citation omitted) (contrasting "come into possession" with "in the possession of"). Congress used the phrase "*come into his possession*" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (emphasis added) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*.[3] Following this focus on the

---

[3] *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes

- 16 -

*how* and *when* an individual gains possession of a record or paper, 52 U.S.C. 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. There is thus no reason to add on an external-source limitation to avoid "superflu[ity]" (SA6); the phrase "come into his possession," "at a minimum . . . cabins an election officials' liability to documents she received during her tenure," *Benson II*, 2026 WL 1815425, at *11 n.8 (Nalbandian, J., dissenting).

The distinction between records "com[ing] into [one's] possession" and being "in [one's] possession," then, is a "temporal" one, *Benson II*, 2026 WL 1815425, at *11 n.7 (Nalbandian, J., dissenting)—not a distinction between obtaining records from an outside source and through self-generation—as is shown by one of the statutes cited in *Benson I* as "draw[ing] an explicit distinction between possessing

---

into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

something and having something come into one's possession," 819 F. Supp. 3d at 768 (citing 8 U.S.C. 1454); *see* SA6. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . may come into possession of it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a). Thus, the phrase "come into possession" implies a temporal change in circumstances. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C.1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.

The district court rejected the United States' temporal argument because "Title III has a temporal requirement: election officials are required to retain election records 'for a period of twenty-two months from the date of any general, special, or primary election'" and "the time

limit runs from the date of the election, not the date that the records came into election officers' possession." SA7 (quoting 52 U.S.C. 20701). But the district court confused the *expiration* of the duty to retain and preserve—22 months from the date of the relevant election—with the *commencement* of that duty—the moment that it comes into the election officer's possession. *See* 52 U.S.C. 20701. The phrase "come into . . . possession" imposes a temporal distinction on the latter (when the duty commences) by including only those documents that an officer comes to possess "during her tenure." *Benson II*, 2026 WL 1815425, at \*11 n.8 (Nalbandian, J., dissenting).

The district court also looked to the Section 301's "examples of records subject to the retention and preservation requirement" (SA6): "any application, registration, payment of poll tax, or other act requisite to vot[e] in such election." 52 U.S.C. 20701. According to the district court, "all" of these records "are records that election officials receive from prospective voters." SA6 (citing *Benson I*, 819 F. Supp. 3d at 768-769). But assuming that the examples of documents in the statute each "refers to something that the voter submits or does," *Benson I*, 819 F. Supp. 3d at 768-769, and that Congress may have "had reason to focus" on those

documents (SA7), Section 301 is not limited to those example documents. The provision requires an election official to "retain and preserve . . . *all* records and papers which come into his possession *relating to*" any such document. 52 U.S.C. 20701 (emphasis added). It is simply incorrect to say that every record or paper "*relating to*" those examples, 52 U.S.C. 20701 (emphasis added), comes from a voter or an outside source. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (identifying "voting registration records, poll lists," and "tally sheets" as among those documents encompassed by Section 301).

As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 2026 WL 1815425, at *11 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf); *see also id.* at *5 (majority opinion) (relying on the same report). "[C]ounty boards of

registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant." *Id.* at \*11 (Nalbandian, J., dissenting). These indices would be government-created records, but once an index was "passed . . . up the ladder," the receiving "state official came into possession of the index." *Ibid.* The indices were critical to the Commission because the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138. The Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. *Id.* at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). They reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. They gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88.

Now these county tally sheets and county voter registration lists have been replaced by the self-generated electronic state voter registration list as required by HAVA.

In any event, even if the district court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. "Title III focuses on individual 'officer[s] of election' and 'person[s] having custody, possession, or control of such record[s] or paper[s].'" *Benson II*, 2026 WL 1815425, at *11 (Nalbandian, J., dissenting) (quoting 52 U.S.C. 20701 and 20703). So even if someone in the WEC generated the requested record and, according to the district court, therefore did not "come into . . . possession" thereof herself, any *other* "officer of election" within the WEC that later acquired the record has indeed "come into . . . possession" of the record under the district court's view and was obligated to "retain and preserve" it. 52 U.S.C. 20701; *Benson II*, 2026 WL 1815425, at *11 (Nalbandian, J., dissenting). And WEC (and its Commissioners), now "having custody, possession, or control of such record or paper," must "ma[k]e [it] available for inspection, reproduction, and copying." 52

U.S.C. 20703; *Benson II*, 2026 WL 1815425, at \*11 (Nalbandian, J., dissenting).

### 2.     There is no conflict between Title III and HAVA.

The district court also held (SA9) that the CRA's bar on "willful 'alter[ing]'" of any records covered by 52 U.S.C. 20701, *see* 52 U.S.C. 20702, shows that Section 20701 cannot cover an SVRL because HAVA requires constant updates to an SVRL. Section 20702 states in full: "Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by [52 U.S.C. 20701] to be retained and preserved shall be" punished. 52 U.S.C. 20702. It does not prohibit any activity required or permitted by HAVA.

The surrounding verbs elucidate the meaning of "alter" in this provision. *Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe "actions that, by their nature, impair the integrity or availability of records, documents, or objects." *Id.* at 481 (describing a similar list of verbs); *see id.* at 489-490. Performing list maintenance under HAVA is therefore not "alter[ing]" the SVRL at all; the SVRL is, as required by HAVA, an inherently evolving and changing document.

That is why, as the Tenth Circuit has concluded in the NVRA context, an election official "maintain[s]" a "dynamic" document like an SVRL by "consistently and constantly updat[ing]" it "to 'ensure that accurate and current voter registration rolls are maintained.'" *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1085 (10th Cir. 2025) (quoting 52 U.S.C. 20501(b)); *see* 52 U.S.C. 20507(i)(1) (requiring states to "maintain" records). So too under the CRA, an election official "retain[s] and preserve[s]" an SVRL, 52 U.S.C. 20701, by continuously updating it as required by HAVA to ensure its accuracy, 52 U.S.C. 21083. List maintenance keeps the SVRL current; it does not "alter" it as that term is used in 52 U.S.C. 20702.[4]

Finally, Section 20702's *willful* mens rea erases any doubt that list maintenance under HAVA could run afoul of the CRA's ban on altering

---

[4] For that reason, there is no merit to the district court's related assertions that "it makes little sense to require a state to 'retain' or 'preserve' a voter registration list, which is a living document that state election officials regularly update." SA6 (citing *United States v. Fontes*, No 26-cv-66, 2026 WL 1177244, at *4 (D. Ariz. Apr. 28, 2026)). The Tenth Circuit heard and rejected an analogous argument in *Voter Reference Foundation. See* 160 F.4th at 1084-1085 (rejecting the "argument that 'dynamic documents' held electronically cannot be records" because "a constantly changing database does not need preservation").

- 24 -

records. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998) (citation omitted) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'").

***

Construing Title III to not include the SVRL itself would paralyze the United States' ability to enforce various federal voting laws. The SVRL is the only statewide federally mandated record of voters required to conduct every election. HAVA states "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii). It is not just *any* record "requisite to voting," 52 U.S.C. 20701, in an election. Without the SVRL, federal elections cannot occur. The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A)(i). The SVRL must contain "the name and registration information of every legally registered voter in the State." 52 U.S.C. 21083(a)(1)(A)(ii). The SVRL must be "coordinated with other agency databases within the State," 52 U.S.C. 21083(a)(1)(A)(iv), and "[a]ll voter registration information

obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." 52 U.S.C. 21083(a)(1)(A)(vi). Absent this record, conducting federal elections is simply not possible.

Consequently, to ascertain whether a jurisdiction engages in practices that violate the CRA or HAVA (as well as the NVRA), for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Lynd II*, 306 F.2d at 228. That is why, in two matters against Georgia and Texas back in 2006 and 2008, the United States obtained the SVRLs, including drivers' license numbers and the last four digits of the Social Security numbers, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[5] The district court's reading would

---

[5] *See* Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006). The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See* Consent Decree, *Georgia*, *supra* (Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at*

effectively carve out vast numbers of federal election records, including SVRLs, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

### B. The DOJ satisfied the CRA's requirements.

The DOJ satisfied the statutory criteria under the CRA by stating a proper "basis and purpose" for its demand. 52 U.S.C. 20703. In its letters to WEC, the DOJ explained that it had "received several complaints regarding [WEC's] compliance with" HAVA, including both problems with its list maintenance procedure and its refusal to provide any process to evaluate complaints against the WEC. Doc. 5-1; Doc. 5-5. That is sufficient under the CRA.[6]

---

https://www.justice.gov/media/1173461/dl?inline (last visited July 1, 2026).

[6] According to the EAVS 2024 report, cited to in the letter, in addition to the problems reported in the letter, Wisconsin provided only the number of registration confirmation notices sent out—1,265,435 notices—but reported only the voters who did not change addresses, 12,229 voters. *See* 2024 EAVS report, at 180, https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf. That is approximately 1 million voter confirmation notices that are potentially ineligible voters or at the very least unaccounted for. In fact, Wisconsin listed 81.1% of notices as resolved by "other" means. *Id.* at 182. The EAVS report also included Wisconsin removing only 7.1% of voters who were ineligible. *Id.* at 186.

1. As an initial matter, defendants' attempts to dispute the sufficiency of the DOJ's demand to WEC require overlooking the limited role that courts play in evaluating the sufficiency of a demand under 52 U.S.C. 20703. The Attorney General's authority under Title III is a "purely investigative" one, *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General of the United States*, 285 F.2d 430 (5th Cir. 1961), and the "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking records required to be maintained under Section 20701, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [52 U.S.C. 20703] written demand for inspection of

Wisconsin provided no information in 2024 on duplicate voter registrations and listed 16,179 voter removals as "other" reasons for removal. *Id.* at 190.

records and papers covered in [52 U.S.C. 20701], the person against whom an order for production is sought under [52 U.S.C. 20705] has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Title III's special statutory proceeding limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703).

As part of this limited substantive review, "the factual foundation for, or the sufficiency of" the statement of basis and purpose "is not open to judicial review or ascertainment." *Lynd II*, 306 F.2d at 226; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*). There is "no justification" for requiring detailed descriptions of the facts giving rise to the Attorney General's demand. *Lynd I*, 301 F.2d at 822.

Nothing in the statute provides a meaningful standard against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose. *Cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that he may demand, 52 U.S.C. 20701, and a requirement that he communicate in writing "the basis and the purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

Instead, the Attorney General need only "identify in a general way the reasons for his demand" for federal election records. *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible* violations of a Federal statute." *Ibid.* (emphasis added); *see, e.g.*, *Bruce*, 298 F.2d at 861 ("'The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.'"); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962) (verbatim), *aff'd sub. nom. Coleman v. Kennedy*, *supra*; *cf. United States*

*v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950) (concluding that an administrative body to which a statute delegates investigative and accusatory duties may take steps to inform itself as to whether there is probable violation of the law). Accordingly, the only "matters open for determination" by the court when a recipient of the Attorney General's demand challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226.

Even under more generally applicable standards for enforcing administrative subpoenas, *see Benson I*, 819 F. Supp. 3d at 765 ("constru[ing] a request for records under the CRA as a form of administrative subpoena"), judicial review is limited. "An administrative agency is entitled to gather information that is 'reasonably relevant' to an inquiry within its purview." *CFTC v. Monex Deposit Co.*, 824 F.3d 690, 693 (7th Cir. 2016) (quoting *Morton Salt Co.*, 338 U.S. at 652). And a dispute as to whether the records sought by the agency will ultimately prove a legal violation is not a basis for resisting the subpoena. *See*

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *EEOC v. A.E. Staley Mfg. Co.*, 711 F.2d 780, 788 (7th Cir. 1983).

Under that standard, defendants cannot mount any successful challenge to the DOJ's demand in this case. Both the June 4 and 17 letters provided ample "basis" for the demand. The June 17, 2025, letter advised WEC that the DOJ had "received several complaints regarding [WEC's] compliance with" HAVA, including by "failing to comply with the list maintenance procedure requirements of Section 303 of HAVA." Doc. 5-1, at 2. And the June 4 letter noted that the DOJ "ha[d] learned that the [WEC] has refused to provide any administrative complaint process or hearing regarding HAVA complaints against the Commission." Doc. 5-5, at 3. And both the June 17 letter and a December 2 email to WEC explained that the DOJ sought "to determine if WEC is complying with" HAVA's list-maintenance requirements. Doc. 5-1, at 2; Doc. 5-3, at 2. *See Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997) (holding that a notice of suit under the Clean Water Act must only be "sufficiently specific to inform the alleged violat[ion] about what it is doing wrong" so that corrective actions can be made to avoid a lawsuit); *WaterKeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d

913, 916-917 (9th Cir. 2004) (citation omitted) (holding that, even if construing notice requirements strictly, "plaintiffs are not required to list every aspect or detail of every alleged violation"); *see also Benson II*, 2026 WL 1815425, at \*13 (Nalbandian, J., dissenting) (explaining that "two communications c[an] compose one demand" under Title III).

2. a. According to WEC, a demand under Title III can only be made when the federal government "reasonably believes that a State has violated voters' civil rights in a federal election." Doc. 58, at 27. WEC relies on the history leading up to the CRA, its legislative history, and the reasons why the statute was necessary. Doc. 58, at 23-27. As already explained, the statute does not require that the Attorney General have evidence (or a "reasonabl[e] belie[f]") of wrongdoing before he can initiate an investigation. *See Coleman*, 313 F.2d at 868; *see also Morton Salt Co.*, 338 U.S. at 642-643. Moreover, limiting Title III's coverage to investigations into violations of "voters' civil rights" (Doc. 58, at 27) is not supported by the statute itself.

Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language

accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). That includes looking to the "structure, history, and purpose" of the statutory scheme as a whole. *Abramski, Jr. v. United States*, 573 U.S. 169, 179 (2014) (citation omitted). And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (brackets in original; citation omitted).

Here, no language limiting Title III to voting-rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. 20701-20706. By contrast, Congress made clear elsewhere in the CRA where it intended to limit a remedy to particular harms— namely, racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. It is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868.

In any event, the HAVA is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[7] Accurate voter lists are crucial to protect against improper removal of voters, see 52 U.S.C. 21083, and to ensure that properly registered voters do not suffer from vote dilution, which is a harm in and of itself, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021).

b. WEC also argued that applying the CRA in a HAVA investigation would conflict with the NVRA and HAVA and that Wisconsin has no relevant obligations under HAVA that the DOJ could be investigating. Doc. 58, at 15-22.

---

[7] U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA _1-Pager_10-27-22_508.pdf.

According to WEC, "[n]either the NVRA nor HAVA authorizes" the federal government "to conduct an audit of a State's practices; under each, US DOJ's only enforcement tool is 'a civil action' for declaratory and injunctive relief." Doc. 58, at 17-18 (citing 52 U.S.C. 20510 and 21111). While HAVA has no explicit inspection provision for the Attorney General (and the NVRA has only a public-inspection provision, 52 U.S.C. 20507(i)), it is implausible that Congress intended for the Attorney General to lack the ability to inspect complete records so pertinent to his enforcement authority under HAVA. Because it is well-settled that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), a better inference is that Congress saw no need to provide an inspection provision for the Attorney General in these later-enacted statutes, because the CRA provided a pre-existing investigative tool.

WEC further argues that there is a mismatch between Title III and HAVA because, it contends, "Title III exercises Congress's enforcement powers under section 2 of the Fifteenth Amendment" (Doc. 58, at 19 (citing *Mississippi*, 380 U.S. at 138)) but "HAVA, by contrast, exercises Congress's powers under the Elections Clause" (Doc. 58, at 19). For one

thing, *Mississippi* held that an entirely different section of the CRA (outside of Title III) "was passed by Congress under the authority of the Fifteenth Amendment." 380 U.S. at 138 (discussing 52 U.S.C. 10101). In any event, WEC provided no argument that Title III would not be justifiable Elections Clause legislation nor any authority for the proposition that an investigative statute must derive from the same source of congressional power as the substantive statute that the United States seeks to enforce. Doc. 58, at 20-21.

Finally, WEC contended that the DOJ could not legitimately investigate Wisconsin's HAVA compliance because "Wisconsin has no relevant HAVA obligations that [the federal government] could audit." Doc. 58, at 21. WEC relied on two provisions: first, the NVRA's exemption for States who have allowed registration at the polling place on election day since the statute's enactment, 52 U.S.C. 20503(b)(2); and second, the HAVA's statement that states falling under Section 20503(b)(2) "shall remove the names of ineligible voters from the [SVRL] in accordance with State law" as opposed to various procedures imported into the HAVA from the NVRA, 52 U.S.C. 21083(a)(2)(A)(iii).

WEC misunderstands HAVA. Section 303 of HAVA requires States to, among other things, "perform list maintenance . . . on a regular basis." 52 U.S.C. 21083(a)(2)(A). For most States, that regular list maintenance incorporates certain voter protections embedded in the NVRA: for example, "[a] State shall not remove the name of a registrant" because that registrant "has changed residence" without taking certain processes or waiting a certain amount of time "to confirm the change [in] address." 52 U.S.C. 20507(d), 21083(a)(2)(A)(i). There is a 90-day quiet period before a federal election before which the State must complete "any program the purpose of which is to systematically remove the names of ineligible voters." 52 U.S.C. 20507(c)(2)(A), 21083(a)(2)(A)(i). And those States must also "coordinate" their SVRLs with "State agency records on felony status" and "on death" "[f]or purposes of removing names of ineligible voters" under NVRA provisions relevant to removal for either of those reasons. 52 U.S.C. 21083(a)(2)(A)(ii); *see* 52 U.S.C. 20507(a)(3)(B) and (a)(4)(A).

From these NVRA-based requirements, Wisconsin is exempt and instead "shall remove the names of ineligible voters . . . in accordance with State law." 52 U.S.C. 21083(a)(2)(A)(iii). But 52 U.S.C.

21083(a)(2)(A)(iii) only exempts Wisconsin from the requirements laid out in 52 U.S.C. 21083(a)(2)(A)(i) and (ii)—not other requirements, such as the mandate that a "State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," 52 U.S.C. 21083(a)(4). As for "State law," 52 U.S.C. 21083(a)(2)(A)(iii), instead of following the NVRA protections provided to properly registered voters, the WEC must follow Wisconsin law which provides the methods and restrictions placed upon the WEC for removing registrants from the state registration list. Wis. Stat. Ann. § 6.50 (2026).[8]

3. Defendants also argued that the DOJ's demand was improper because it was "pretext[ual]." Doc. 58, at 46-47; Doc. 63, at 9-13. As already explained (pp. 27-35, *supra*), this Court's review of the DOJ's

---

[8] In their Opposition to the United States' Motion to Expedite Appeal (C.A. Doc. 18, at 9 n.3), intervenors WARA-FL pointed to the United States' recent brief in *Public Interest Legal Foundation, Inc. (PILF) v. Wolfe*, No. 24-3258 (7th Cir.) (argued Sept. 25, 2025), where the United States acknowledged that "Congress exempted" states like Wisconsin "from *certain* of HAVA's mandates that drew on the NVRA's existing requirements." U.S. Br. at 7, *PILF v. Wolfe*, *supra* (emphasis added). Exactly so: Wisconsin is exempt from *some*, but not all, of HAVA's list-maintenance requirements.

demand is limited to assessing whether the Attorney General in fact stated a "basis and purpose." 52 U.S.C. 20703.

Even if the statement were judicially reviewable, this Court should reject speculative allegations as to the "true purpose" of the DOJ's request. Under precedents involving administrative subpoenas, this Court has acknowledged that a party resisting a subpoena based on claims of "bad faith" "faces a 'heavy burden.'" *United States v. Insurance Consultants of Knox, Inc.*, 187 F.3d 755, 759 (7th Cir. 1999) (citation omitted). The party must "alleg[e] 'specific facts' in rebuttal." *Ibid.* (citation omitted).

In its Motion to Dismiss, WEC relied on the fact that the DOJ has investigated and sued many States under Title III and that the DOJ did not immediately ask for an unredacted copy of the SVRL in its communications with WEC. Doc. 58, at 8-10, 46-47. Common Cause alleged that the terms of the MOU attached to an email to WEC showed pretext because it would give the DOJ an oversight role that is consistent with the DOJ's asserted desire (in its communications to WEC and in its court filings) to ensure that WEC is complying with federal law. Doc. 63, at 10-11. It further pointed to "public reporting" (largely based on

inadmissible hearsay), irrelevant filings and documents dealing with *other* federal agencies, and a letter sent from the former Attorney General Pam Bondi to the Governor of Minnesota addressing a variety of issues, from immigration to voting to SNAP benefits. Doc. 63, at 4-11. None of this satisfies defendants' "heavy burden" to "alleg[e] 'specific facts,'" not just cast aspersions. *Insurance Consultants*, 187 F.3d at 759 (citations omitted).

## II. Defendants' privacy-related arguments lack merit.

Defendants argued that the DOJ's demand for an electronic, unredacted copy of Wisconsin's SVRL violated the federal Privacy Act as well as state law. Doc. 58, at 18, 33-34; Doc. 63, at 13-15. The district court did not reach these arguments, and they are meritless.

### A. The DOJ's demand complied with the Privacy Act.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896).

1. The Privacy Act prohibits a federal agency from "maintain[ing a] record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7). Enforcing the HAVA's list-maintenance requirements satisfies the law-enforcement exception. *See* 52 U.S.C. 21111 (giving the Attorney General enforcement authority). However, the United States agrees that certain information, like an individual's party affiliation and how that individual votes (including for which party), both "describ[es] how an[] individual exercises" his First Amendment rights and is not "pertinent to" the DOJ's investigation. 5 U.S.C. 552a(e)(7). Accordingly, the United States will not object to a redaction of that information in the State's SVRL. Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand.

2. The DOJ has complied with the Privacy Act's requirement that it publish a System of Records Notice (SORN) in the Federal Register before "establish[ing] or revis[ing]" a "system of records." 5 U.S.C. 552a(e)(4); *see* 5 U.S.C. 552a(a)(5) (defining "system of records").

The full list of routine uses for the DOJ's collection of voter information can be found in the SORN titled, JUSTICE/CRT-001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a).[9]

The SORN also covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject" is a "term[] of art in the context of DOJ investigations,"

---

[9] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited June 30, 2026).

*American Oversight v. Department of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which, for as long as the relevant SORN has existed, has included anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into voter fraud. Additionally, eligible voters' votes may be diluted by votes cast by non-eligible voters, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), and they are thus potential "victims" of HAVA non-compliance, 68 Fed. Reg. at 47,611.

And the SORN covers the SVRL given its broad coverage of "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47,611.

**B.     Federal law preempts any contrary Wisconsin law.**

Below, Wisconsin argued that Wisconsin's privacy laws prevent disclosure of the records that the DOJ sought and that the CRA did not

preclude redacting sensitive information. Doc. 58, at 34-35. This argument is unpersuasive.

While a state has broad constitutional authority over the conduct of federal elections, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1, *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (finding that "[e]very government ought to contain in itself the means of its own preservation," and the Constitution's Elections Clause vests in Congress "paramount" authority over federal elections, state laws to the contrary notwithstanding) (quoting The Federalist No. 59, at 362-363 (C. Rossiter ed. 1961) (A. Hamilton), then *Ex parte Siebold*, 100 U.S. 371, 392 (1879)). The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (internal citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex parte*

*Siebold*, 100 U.S. at 384 (brackets in original)); *see also Inter Tribal Council*, 570 U.S. at 7-9 (discussing the breadth of the Elections Clause).

A "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption applies both "where it is impossible for a private party to comply with both state and federal law" and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-373 (brackets in original; citation omitted). Whether a state law poses a sufficient obstacle to implicate preemption is determined "by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373; *see also Knox v. Brnovich*, 907 F.3d 1167, 1173-1174 (9th Cir. 2018) (brackets in original) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009))). A state law that "undermines the intended purpose and 'natural effect'" of federal law is preempted. *Crosby*, 530 U.S. at 373.

Congress enacted broad regulations over the conduct of federal elections in the statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). To the extent that state law prohibits Wisconsin from complying with the DOJ's demands— as Wisconsin insists state law does—that state law must yield. *See* U.S. Const. Art. VI, Cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order dismissing the DOJ's Title III claim and denying the Motion to Compel, and remand with instructions to order WEC to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to demand from a State an electronic, unredacted copy of its SVRL to determine the State's

compliance with HAVA, as set forth above.

Finally, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). Contrary to arguments raised against the United States' Motion to Expedite, a decision in August or September would still allow the United States to work with Wisconsin to take real steps to clean up its SVRL, if necessary, prior to the upcoming federal election. The United States is confident that States will not ignore out-of-hand alerts from the United States that their SVRLs contain ineligible voters.

In the alternative, and for the same reasons, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. P. 2, 40(a)(1).

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

s/ Kelsey E. McGee
ANDREW G. BRANIFF
DAVID N. GOLDMAN
KELSEY E. McGEE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 251-0053

## STATEMENT REGARDING ORAL ARGUMENT

The United States is willing to waive oral argument, despite the great importance of the issues here, to allow faster resolution of this case. Of course, the United States will participate in oral argument, if the Court believes that the benefit of oral argument would outweigh the time concerns and would request that argument take place in September 2026 or at an earlier special hearing.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(1)(7)(B)(i) and 7th Cir. R. 32 because the brief contains 9708 words, excluding the parts exempted by Federal Rules of Appellate Procedure 32(f) and 7th Cir. R. 32. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Kelsey E. McGee
KELSEY E. MCGEE
 Attorney

Date: July 2, 2026

# CERTIFICATE OF SERVICE

I certify that on July 2, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Kelsey E. McGee
KELSEY E. MCGEE
Attorney

# SHORT APPENDIX

# SHORT APPENDIX TABLE OF CONTENTS

Seventh Circuit Rule 30(d) Statement

Opinion and Order,
    filed May 21, 2026 (Doc. 89)..................................................... SA1

Judgment in a Civil Case,
    filed May 27, 2026 (Doc. 90)...................................................SA11

**SEVENTH CIRCUIT RULE 30(d) STATEMENT**

This Short Appendix contains all the materials required by Seventh Circuit Rule 30(a) and (b).

s/ Kelsey E. McGee<br>
KELSEY E. McGEE<br>
Attorney

Date: July 2, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

WISCONSIN ELECTIONS COMMISSION, MEAGAN
WOLFE, ANN S. JACOBS, MARK L. THOMSEN,
CARRIE RIEPL, DON M. MILLIS, ROBERT F.
SPINDELL, JR., and MARGE BOSTELMANN,
Defendants,

and

COMMON CAUSE, MELISSA ADAMS,
AMANDA MAKULEC, JAIME RIEFER, WISCONSIN
ALLIANCE FOR RETIRED AMERICANS, and
FORWARD LATINO,

Intervenor-Defendants,

OPINION and ORDER

25-cv-1036-jdp

---

This case is one of more than two dozen lawsuits that the United States has filed in states across the country seeking production of a state voter registration list. The Attorney General demanded that Wisconsin election officials produce the state's unredacted voter registration list. When the election officials refused, citing state privacy laws, the government filed this lawsuit against the Wisconsin Elections Commission and each of its members to compel production of the voter list under Title III of the Civil Rights Act of 1960. Two groups of voters and voter advocacy organizations have intervened as defendants. *See* Dkt. 53.

Two competing sets of motions are before the court. The government moves to compel production of the voter registration list, Dkt. 2. Defendants and one set of intervenors move to dismiss the complaint, Dkt. 56 and Dkt. 62, joined by the other intervenors. Dkt. 65. The court has also received amicus briefs from advocacy groups in support of both sides. Dkt. 59; Dkt. 61; Dkt. 67; Dkt. 73.

SA1

The court will grant the motions to dismiss and deny the motion to compel. Like the courts in *United States v. Benson*, No. 1:25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) and *United States v. Fontes*, No. cv-26-00066, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026), the court concludes that a voter registration list is not a record that can be demanded under Title III. Accordingly, the government's demand for Wisconsin's voter list fails as a matter of law.[1]

BACKGROUND

States have authority under the United States Constitution to prescribe the "time, place, and manner" for federal elections, subject to any regulations imposed by Congress. U.S. Const. Art. I, § 4, cl. 1. Congress has exercised its authority to regulate elections on several occasions. As relevant here, the Help America Vote Act (HAVA) requires each state to implement a "single, uniform, official, centralized, interactive, computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1), and to maintain that list regularly by adding newly eligible voters and removing ineligible voters. *Id.* § 21083(a)(2)(A)(iii); (a)(2)(B). Consistent with principles of state control over elections, HAVA provides only a minimum set of requirements for voter registration lists; for instance, it requires that each voter's name and registration information be included in the list and that each voter be assigned a unique identifier. 52 U.S.C. § 21083(a)(1)(A)(ii)–(iii). State election officials retain discretion under

---

[1] Four other district courts have also rejected the government's request for voter lists under Title III, although they did so on different grounds. *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026)*; United States v. Galvin*, No. cv 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-cv-00639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026). No court has granted the government's request.

2

SA2

HAVA to determine the appropriate method for creating, storing, and maintaining their state's voter registration list. *Id.* §§ 21085 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.").

In June 2025, the United States Department of Justice sent a letter to the administrator of the Wisconsin Elections Commission, asserting that it had "received several complaints" regarding the commission's compliance with HAVA and requesting a copy of Wisconsin's current voter registration list as well as information about Wisconsin's list maintenance procedures. Dkt. 5-1. In response, the commission referred the government to an online portal where it could download a redacted copy of the voter list, and it answered the government's questions about its list maintenance procedures. Dkt. 5-2.

In December 2025, the government renewed its request for Wisconsin's voter registration list, this time specifying that it wanted the unredacted version containing either the voter's driver's license number or the last four digits of the voter's social security number. Dkt. 5-3 and Dkt. 72-1. The commission refused to share the unredacted list, citing state privacy laws. Dkt. 5-4. The government responded with this lawsuit, asserting that it was entitled to the unredacted list under Title III of the Civil Rights Act of 1960. Dkt. 1.

The government's request for Wisconsin's unredacted voter registration list is not unique. Thus far, the government has requested voter registration lists from 48 states and Washington, D.C., and it has initiated lawsuits to compel production against 30 states and Washington D.C.[2]

---

[2] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (May 11, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information (last visited May 13, 2026).

SA3

ANALYSIS

Title III of the Civil Rights Act of 1960 is one of a series of federal laws enacted in the mid-twentieth century to enforce the Fifteenth Amendment against state efforts to suppress black citizens' right to vote. *See Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). Title III provides a tool for the federal government to obtain records from state election officials to investigate alleged discriminatory practices. *Id.* at 853–54. Title III requires state election officials to "retain and preserve" for 22 months following any election "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. It also requires state election officials to produce those records for inspection and copying "upon demand in writing by the Attorney General." *Id.* § 20703. The Attorney General must provide "a statement of the basis and the purpose" for the demand. *Id.*

Here, the government asserts in its complaint that it is entitled to Wisconsin's unredacted voter registration list under Title III. Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), contending that the government's Title III claim fails as a matter of law. A Rule 12(b)(6) motion challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" in the complaint. *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022) (internal quotations omitted).

The government disputes whether Rule 12(b)(6) applies in this case, asserting instead that Title III actions are subject to a summary proceeding akin to an order to show cause.

4

SA4

Dkt. 71, at 12–17 (citing *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962)). But the court's analysis of the dispositive issue would be the same either way, so the court need not resolve this dispute. *See Lynd*, 306 F.2d at 226 (noting that even in a summary proceeding, the court must decide as a matter of law whether the records can be properly demanded under Title III).

Defendants and their amici contend that the government's position fails for multiple reasons, specifically: (1) a voter registration list is not a record subject to production under Title III; (2) the government has not provided an adequate statement of basis and purpose, as required by the statute; (3) the government has not explained why it needs an unredacted copy of the voter list, as opposed to the publicly available redacted version; and (4) the government's request is barred by state and federal privacy laws. The court agrees that a voter registration list is not a record subject to production under Title III, so it will dismiss the complaint on that ground without considering defendants' other arguments.

Title III requires state election officials to retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in a given election. 52 U.S.C. § 20701. The government can demand production of a document only if it is subject to retention and preservation under § 20701. *Id.* § 20703. Whether § 20701 applies to a voter registration list is a question of statutory interpretation. In interpreting a statute, the court begins with the statutory text, with "the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal quotations omitted). The words of the statute must be read in context, "with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Whenever possible, the statute should be construed "so that effect is given to all its provisions,

5

SA5

so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

Two district courts have recently adopted the view that a voter registration list is not a record subject to retention and preservation under § 20701. *Benson*, 2026 WL 362789; *Fontes*, 2026 WL 1177244. *Benson* construed § 20701 to mean that election officials must retain only records received from prospective voters or other outside sources, not records created by the state itself. *Id.* at *9. The *Benson* court gave three reasons why the statutory text supported that interpretation. First, the statute requires an election official to retain only records that "come into his possession." That phrase is most naturally read as a synonym of "receive" or "acquire," which are not words generally used to describe documents one creates. *Id.* Second, part of the phrase "come into his possession" would be superfluous if § 20701 included internally created documents, because then Congress could just as easily have said, "in his possession." *Id.* Third, § 20701 provides examples of records subject to the retention and preservation requirement, namely, voter applications, registrations, and records of poll tax payments, all of which are records that election officials receive from prospective voters. *Id.*

The *Benson* court also found the government's interpretation of § 20701 inconsistent with the broader statutory context of Title III. It observed that § 20701 requires states to preserve all documents subject to disclosure under the statute, reasoning that "nothing in the CRA's text implies an intent to require states to preserve every election-related record that they *create.*" *Id.* at *10. The court in *Fontes* expanded on this analysis, observing that it makes little sense to require a state to "retain" or "preserve" a voter registration list, which is a living document that state election officials regularly update by adding newly eligible voters and removing ineligible ones. 2026 WL 1177244, at *4.

6

SA6

The *Fontes* court also concluded that the government's interpretation would introduce conflict between Title III and other federal election statutes, including HAVA and the National Voter Registration Act (NVRA). 2026 WL 1177244, at *4–*5. Section 20702 of Title III provides that any election official who "steals, destroys, conceals, mutilates, or alters" a record subject to preservation under § 20701 may be fined or imprisoned for up to one year. But HAVA and the NVRA require election officials to "alter" the state voter registration list by regularly updating it. *Id.* In the *Fontes* court's view, the government's reading of Title III creates a nonsensical scenario in which state election officials could be fined or imprisoned for doing something that federal law requires them to do. *Id.*

This court agrees with *Benson* and *Fontes* that § 20701 does not encompass records created by state election officials, including voter registration lists. The government's arguments to the contrary are not persuasive. First, the government says that Congress used the phrase "come into his possession" to focus on the time that an election official gains possession of the records, not to exclude records created by the state. Dkt. 71, at 27. But that argument doesn't square with the plain language of the statute. Title III has a temporal requirement: election officials are required to retain election records "for a period of twenty-two months from the date of any general, special, or primary election." 52 U.S.C. § 20701. But the time limit runs from the date of the election, not the date that the records came into election officers' possession. *See Gallion*, 187 F. Supp. at 855 ("Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months"). It's not clear what time restriction "come into his possession" might impose under the government's interpretation of Title III, and the government doesn't explain.

7

SA7

Second, the government argues that *Benson* and *Fontes* relied on a meaningless distinction that would "effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress" in passing Title III. The government says that most voter registration applications today are completed electronically and only preserved in voter registration lists, so excluding those lists would hollow out Title III for no discernible reason.

As an initial matter, the government provides no factual support for its assertion that electronic voter registration applications are not preserved outside the state voter registration list. As defendants point out, that assertion is not supported by Wisconsin law, which requires Wisconsin election officials to retain original copies of both paper and electronic voter registration forms. Wis. Stat §§ 6.30(5), 6.35(3). Nor does the court agree that the distinction drawn in *Benson* and *Fontes* is meaningless. As the *Benson* court observed, Congress had reason to focus the scope of Title III on records submitted by voters, because it was attempting to prevent states from engaging in the then-routine practice of destroying rejected voter registration applications to conceal discriminatory practices. 2026 WL 362789, at *9 (citing *Report of the United States Commission on Civil Rights* 93 (1959), https://perma.cc/2PDF-GZHB). Further, voter registration lists are not necessarily simple compilations of voter registration applications. Some contain additional information that Congress may very well have wanted to exempt from production: for example, the court in *Benson* noted that Michigan's voting list contains information about individuals' voting histories.[3] *Id.* at *10.

---

[3] Neither side explains whether Wisconsin's voter registration list contains information other than what voters submit on their voter registration applications. But even if it does not, the fact that some state voter lists contain that type of information helps explain why Congress may have exempted these records.

8

SA8

Third, the government challenges the *Fontes* court's conclusion that § 20702's prohibition on "alter[ing]" records is inconsistent with the list maintenance requirements in HAVA and the NVRA. The government argues that when read in context of the other words in § 20702 (steal, destroy, conceal, mutilate), the statute plainly prohibits only alterations intended to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes, not regular document maintenance. The government's reading of § 20702 is a fair one, but it doesn't call into question the holding of *Fontes*. Even if § 20702 could conceivably be reconciled with the government's interpretation of Title III, there is still tension in a statutory construction that applies Title III's requirements to non-permanent records like voter registration lists. In addition to the prohibition on "alter[ing]," state election officials must "retain" and "preserve" documents subject to production under Title III. 52 U.S.C. § 20701. The government has provided no explanation of what it means to "retain" or "preserve" a document like a voter registration list that is updated on a near-constant basis.

In sum, this court joins *Benson* and *Fontes* in concluding that voter registration lists are not documents subject to production under Title III. That makes it unnecessary to decide whether the government has complied with the other statutory requirements to demand records. The government's motion to compel, Dkt. 2, will be denied, and the motions to dismiss filed by defendants and intervenor-defendant Common Cause, Dkt. 52 and Dkt. 56, will be granted.

The Seventh Circuit has cautioned against dismissing a complaint without leave to amend, but the court may do so if any amendment would be futile. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012). The court has concluded that Title III does not even apply to the government's request for Wisconsin's voter registration list, so there

9

SA9

is no way that it could amend its complaint to state a claim for relief. The government's complaint will be dismissed with prejudice and without leave to amend.

ORDER

IT IS ORDERED that:

1. Plaintiff the United States of America's motion to compel, Dkt. 2, is DENIED.

2. Defendants and intervenor-defendant Common Cause's motions to dismiss, Dkt. 56 and Dkt. 62, are GRANTED.

3. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered May 21, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

SA10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

   v.

WISCONSIN ELECTIONS COMMISSION,
MEAGAN WOLFE, ANN S. JACOBS,          Case No. 25-cv-1036-jdp
MARK L. THOMSEN, CARRIE RIEPL,
DON M. MILLIS, ROBERT F. SPINDELL, JR.,
and MARGE BOSTELMANN,

      Defendants,

   and

COMMON CAUSE, MELISSA ADAMS,
AMANDA MAKULEC, JAIME RIEFER,
WISCONSIN ALLIANCE FOR RETIRED
AMERICANS, and FORWARD LATINO,

      Intervenor-Defendants.

JUDGMENT IN A CIVIL CASE

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of

defendants Wisconsin Elections Commission, Meagan Wolfe, Ann S. Jacobs, Mark L.

Thomsen, Carrie Riepl, Don M. Millis, Robert F. Spindell, Jr., Marge Bostelmann, and

SA11

intervenor-defendant Common Cause against plaintiff United States of America dismissing this case.

| | |
|---|---|
| s/ Deputy Clerk | 5/27/2026 |
| Joel Turner, Clerk of Court | Date |

SA12