No. 26-2217

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

WISCONSIN ELECTIONS COMMISSION, et al.,

Defendants-Appellees,

COMMON CAUSE, et al.,

Intervening Defendants-Appellees.

On appeal from the U.S. District Court for the Western District of Wisconsin, the Honorable James Peterson presiding

**BRIEF OF WISCONSIN ELECTIONS COMMISSION APPELLEES**

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

Attorneys for Wisconsin Elections Commission Appellees

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218
(608) 294-2907 (Fax)
charlie.gibson@wisdoj.gov

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........ 1

ISSUES PRESENTED ........ 1

INTRODUCTION ........ 2

STATEMENT OF THE CASE ........ 4

I. Congressional action affecting States' conduct of elections. ........ 4

A. The Elections Clause gives the States default authority over conducting elections, subject to congressional action. ........ 4

B. HAVA and the NVRA impose specific list maintenance obligations on covered States, leaving much to the States' discretion. ........ 5

C. Wisconsin is exempt from the NVRA and from HAVA's list maintenance provisions. ........ 7

D. The Civil Rights Act of 1960, including Title III, sought to strengthen enforcement of laws prohibiting discrimination against the right to vote. ........ 7

II. In 2025, US DOJ begins asserting authority to audit States' voter registration lists; it sues 30 States under HAVA, the NVRA, and Title III, but no court has so far granted it relief. ........ 10

III. US DOJ makes demands to Wisconsin, to which the Commission responds and offers to provide a redacted database; DOJ sues, but the suit is dismissed by the district court. ........ 11

A. US DOJ demands information, and Wisconsin provides detailed responses. ........ 11

B. US DOJ sues the Commission and moves for dispositive relief; the Commission and intervening defendants move to dismiss the case. .......... 14

C. The district court concludes that the voting database is not a "record" covered by Title III and dismisses the action. .......... 15

STANDARD OF REVIEW .......... 16

SUMMARY OF ARGUMENT .......... 16

ARGUMENT .......... 17

I. The Wisconsin voter database is not a "record" the Commission must retain and produce for inspection under Title III. .......... 17

A. Title III's retention and production requirement applies to records that come into officials' possession; officials may not alter such records. .......... 18

B. Wisconsin's voter database is not a record that the Commission must preserve, unaltered, and produce for inspection. .......... 18

1. Documents that "come into [an agency's] possession" do not include voter databases. .......... 19

2. The "relating to" words in Title III, discussing documents generated in the registration process, confirm that databases are not records subject to production. .......... 22

3. Title III's preservation requirements further support the district court's reading. .......... 24

C. US DOJ's contrary reading is unpersuasive. .......... 26

1. The NVRA's record production requirement features language different from Title III. .......... 27

2. The database's inclusion of data from voter registration documents does not make the database a covered record. .......... 28

3. US DOJ's temporal theory doesn't change the meaning of "comes into possession." .......... 29

4. The persons covered by the statute don't change the types of records it encompasses. .......... 30

5. US DOJ's reading of "alteration" is unsupported by the statutory language. .......... 31

II. The Civil Rights Act provides no authority for US DOJ to obtain documents for HAVA list maintenance inquiries. .......... 32

A. The specific enforcement choices Congress made in HAVA and the NVRA override the general language of Title III. .......... 33

B. DOJ ignores basic principles of statutory interpretation and the choices Congress made in enacting HAVA. .......... 35

III. US DOJ's demand to the Commission included no factual basis, as Title III requires. .......... 37

A. Title III requires a factual basis, and the December 2 demand included none. .......... 37

B. US DOJ's assertion of unreviewability and proposed definition of "basis" both lack merit. .......... 39

1. Demands under Title III are reviewable by courts. .......... 39

2. A comment in earlier correspondence was not a basis for the demand, and would not explain wanting Wisconsin's unredacted database. .... 42

IV. Wisconsin statutes prohibit giving US DOJ the personal information it seeks. .... 43

A. Wisconsin election law limits disclosure of voters' sensitive private information. .... 43

B. Title III does not preempt Wisconsin law's voter privacy safeguards. .... 45

CONCLUSION .... 47

## TABLE OF AUTHORITIES

### Cases

*Advoc. Health Care Network v. Stapleton*,
581 U.S. 468 (2017) .......... 21

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .......... 46

*Begay v. United States*,
553 U.S. 137 (2008) .......... 22

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) .......... 16

*Bryan v. United States*,
524 U.S. 184 (1998) .......... 31

*Chaidez v. Ford Motor Co.*,
937 F.3d 998 (7th Cir. 2019.) .......... 16

*Colon-Marrero v. Velez*,
813 F.3d 1 (1st Cir. 2016) .......... 34

*EEOC v. Quad/Graphics, Inc.*,
63 F.3d 642 (7th Cir. 1995) .......... 41

*Honeycutt v. United States*,
481 U.S. 443 (2017) .......... 20

*Judicial Watch, Inc. v. Lamone*,
399 F. Supp. 3d 425 (D. Md. 2019) .......... 27

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... 39, 41

*Liebert v. Millis*,
733 F. Supp. 3d 698 (W.D. Wis. 2024) .......... 23–24

*Loughrin v. United States*,
573 U.S. 351 (2014) .......... 21

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ........................................................................ 46

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) .................................................................................... 46

*Murphy v. NCAA*,
584 U.S. 453 (2018) .................................................................................... 46

*Pa. State Conf. of NAACP Branches v. Sec'y Commonw. of Pa.*,
97 F.4th 120 (3d Cir. 2024) .......................................................................... 23

*Polansky v. Executive Health Res., Inc.*,
599 U.S. 419 (2023) .................................................................................... 40

*Project Vote/Voting for Amer., Inc. v. Long*,
752 F. Supp. 2d 697 (E.D. Va. 2010) ............................................................ 28

*Pub. Int. Legal Found., Inc. v. Wolfe*,
2024 WL 4891940 (W.D. Wis. Nov. 26, 2024) ................................................. 7

*Public Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 ............................................................................................... 27

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ..................................................................... 27, 46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ............................................................................... 33, 36

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ................................................................................. 9, 10

*State of Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (N.D. Ala. 1960) ................................................................ 41

*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2014) ............................................................ 28

*United States v. Adams*,
2026 WL 2123871 (E.D. Ky. July 23, 2026) ..................................... 10, 21, 41

*United States v. Aguilar*,
2026 WL 2364502 (D. Nev. Aug. 14, 2026) .................................................. 10

*United States v. Amore*,
2026 WL 1040637 (D.R.I. Apr. 17, 2026) .......................................... 11, 35, 38

*United States v. Bd. of Elections of N.Y.*,
2026 WL 1999921 (N.D.N.Y. July 10, 2026) .................................... 11, 20, 26

*United States v. Bellows*,
2026 WL 1430481 (D. Me. May 21, 2026) .................................. 11, 21, 34, 35

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .................................... 10, 22, 25, 29, 30, 38, 42

*United States v. Bormes*,
568 U.S. 6 (2012) .............................................................................. 33, 36

*United States v. Caldwell*,
2026 WL 2186515 (D.N.J. July 29, 2026) ..................................................... 10

*United States v. DeMarinis*,
2026 WL 1780586 (D. Md. June 18, 2026) ............................ 11, 21, 22, 26, 41

*United States v. Evans*,
2026 WL 2267774 (D.D.C. Aug. 6, 2026) .................. 10, 20, 24, 25, 30, 35, 41

*United States v. Fontes*,
2026 WL 1177244 (D. Ariz. Apr. 28, 2026) ................................ 11, 21, 26, 41

*United States v. Galvin*,
2026 WL 972129 (D. Mass. Apr. 9, 2026).......................................... 11, 38, 39

*United States v. Griswold*,
2026 WL 2235374 (D. Colo. Aug. 3, 2026) ................................. 10, 20, 25, 38

*United States v. Koski*,
2026 WL 2032532 (E.D. Va. July 14, 2026) .......................... 11, 20, 25, 30, 31

*United States v. Matthews*,
2026 WL 2212877 (D.C. Ill. July 31, 2026) ............................................ 35, 38

*United States v. Oliver*,
2026 WL 2031479 (D.N.M. July 14, 2026) ....................................... 11, 38, 41

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ............................................ 10, 35, 38, 41

*United States v. Powell*
379 U.S. 48 .......... 40

*United States v. Scanlan*,
2026 WL 1864054 (D.N.H. June 29, 2026) .......... 11, 20, 38

*United States v. Schmidt*,
2026 WL 1850016 (W.D. Pa. June 27, 2026) .......... 11

*United States v. Theodore*,
479 F.2d 749 (4th Cir. 1973) .......... 42

*United States v. Thomas*,
2026 WL 2070437 (D. Conn. July 17, 2026) .......... 11

*United States v. Warner*,
2026 WL 2018877 (S.D.W. Va. July 13, 2026) .......... 11, 35, 38

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 10, 35, 38, 41

*Voter Reference Foundation, LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) .......... 31

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 41

**Statutes**

5 U.S.C. § 552a .......... 13

7 U.S.C. § 12 .......... 22

8 U.S.C. § 1454(a) .......... 30

18 U.S.C. § 1709 .......... 22

26 U.S.C. § 7504(a) .......... 40

26 U.S.C. § 7504(b) .......... 40

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

50 U.S.C. § 217 .......... 21
52 U.S.C. § 10101 .......... 8
52 U.S.C. § 10101(a)(2)(B) .......... 23
52 U.S.C. § 20507(a)(4) .......... 5
52 U.S.C. § 20507(a)(3) .......... 5
52 U.S.C. § 20507(i) .......... 36
52 U.S.C. § 20507(i)(1) .......... 27, 46
52 U.S.C. § 20703 .......... 37
52 U.S.C. § 20705 .......... 37, 39
52 U.S.C. § 21083(a)(1)(A) .......... 6
52 U.S.C. § 21083(a)(2)(A)(iii) .......... 7, 34, 36
52 U.S.C. § 21083(a)(2)(B) .......... 6
52 U.S.C. § 21083(b)(5) .......... 34
52 U.S.C. § 21083(5)(A)(i) .......... 6
52 U.S.C. § 21083(5)(A)(ii) .......... 6
52 U.S.C. § 21083(5)(A)(iii) .......... 6
52 U.S.C. § 21085 .......... 6, 34
52 U.S.C. §§ 20503–05 .......... 5
52 U.S.C. § 20503(b) .......... 7
Wis. Stat. § 5.05(1e) .......... 45
Wis. Stat. § 6.36(1)(a) .......... 28
Wis. Stat. § 6.36(1)(b) .......... 13, 44
Wis. Stat. § 6.36(1)(b)1. .......... 43, 44

Wis. Stat. §§ 6.30(5), 6.35(3) .... 32

**Rules**

Fed. R. Civ. P. 1 .... 40

Fed. R. Civ. P. 12(b)(6) .... 16

Fed. R. Civ. P. 81(a)(5) .... 40

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 .... 4

U.S. Const. art. VI, cl. 2 .... 45

**Other Authorities**

H.R. Rep. No. 8-956 at 7 (1959), 1959 WL 3581 .... 33

Pub. L. No. 85–315, 71 Stat. 637 .... 8

Pub. L. No. 107–252, 116 Stat. 1666 .... 5–6

Pub. L. No. 103–31, 107 Stat. 77 .... 5

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is not complete and correct. A complete and correct jurisdictional statement follows.

Appellant's complaint asserts a right to obtain unredacted documents from the Wisconsin Elections Commission under Title III of the Civil Rights Act. (Dkt. 1.) The district court had jurisdiction over these claims under 28 U.S.C. § 1331.

Appellees and intervenor appellees filed motions to dismiss. (Dkt. 56; 58; 62; 63.) The district court granted the motion on May 21, 2026. (SA 1–10; Dkt. 89.) The district court issued a final judgment, which disposed of all claims, on May 27, 2026. (SA 11; Dkt. 90.)

Appellant timely appealed on June 5, 2026. (Dkt. 91.) This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court correctly concluded that Title III of the Civil Rights Act does not entitle US DOJ to Wisconsin's unredacted voting list because the database is not a record the Commission was required to preserve and present for inspection.

This Court should answer yes and affirm.

2. Alternatively, whether US DOJ's case was properly dismissed because it cannot rely on Title III to review the Commission's compliance with Help America Vote Act (HAVA) voter database maintenance requirements.

If the Court reaches the issue, it should answer yes and affirm.

3. Alternatively, whether US DOJ's case was properly dismissed because its demand to the Commission stated no factual basis.

If the Court reaches the issue, it should answer yes and affirm.

4. Alternatively, whether US DOJ's case was properly dismissed because Wisconsin law prevented disclosure of the private voter information sought in the demand.

If the Court reaches the issue, it should answer yes and affirm.

## INTRODUCTION

As it has done in dozens of States around the country, the U.S. Department of Justice demanded that Wisconsin turn over its complete, unredacted voter registration list. The list includes sensitive information about the State's more than 3.6 million active registered voters[1]—including partial social security numbers, driver's license numbers, and address information for confidential voters. US DOJ said it needed this information to audit Wisconsin's compliance with list maintenance obligations under HAVA.

[1] The database also includes such information for inactive voters, since voters are deactivated, not removed.

The Wisconsin Elections Commission[2] provided US DOJ with detailed information about Wisconsin's list maintenance efforts—efforts beyond what HAVA requires—and offered to provide US DOJ with a redacted version of Wisconsin's voter list. Not good enough, said US DOJ, and sued the Commission to obtain the unredacted database. But US DOJ did not sue under HAVA, which imposes no database disclosure obligations on Wisconsin and confers no investigatory powers on US DOJ, but rather the Civil Rights Act of 1960, a civil rights law aimed at fighting discrimination in voting.

As have district courts in more than 20 cases against other States and the District of Columbia, the district court dismissed US DOJ's suit. This Court should affirm. As the district court observed, the Wisconsin database is not a record States must retain, unaltered, under Title III. And the court did not even reach other flaws independently requiring dismissal: HAVA spells out the State's and US DOJ's roles for list maintenance, and US DOJ cannot use Title III to expand its role; US DOJ's demand to the Commission failed to state a valid basis, as Title III requires; and Wisconsin law protects the privacy of the voter information the Commission redacts.

[2] This brief uses "Commission" to refer collectively to the Commission as a body and all individual Commission defendants-appellees.

## STATEMENT OF THE CASE

This is one of thirty cases brought by US DOJ against States around the country, seeking unredacted voter databases.

### I. Congressional action affecting States' conduct of elections.

This case involves US DOJ's effort to regulate States in how they administer federal elections. Where Congress has not chosen to regulate, the Constitution leaves that task to the States. US DOJ here looks to three statutes: HAVA, the NVRA, and Title III of the Civil Rights Act.

#### A. The Elections Clause gives the States default authority over conducting elections, subject to congressional action.

The Elections Clause gives the States default authority over federal election administration, subject to Congress's superintending authority. It provides that "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1.

US DOJ's effort here implicates multiple statutes. While US DOJ sued the Commission under Title III, its cited reason was to monitor the Commission's compliance with HAVA's voter list maintenance provisions.

### B. HAVA and the NVRA impose specific list maintenance obligations on covered States, leaving much to the States' discretion.

Congress has exercised its Elections Clause authority by enacting two laws regulating the States' voter registration practices. Neither imposes a comprehensive registration list maintenance regime on the States the way US DOJ describes; instead, it affords covered States discretion about how to implement Congress's mandates.

Congress enacted the National Voter Registration Act (NVRA) in 1993 to standardize registration requirements for federal elections. *See* Pub. L. No. 103–31, 107 Stat. 77 (now codified at 52 U.S.C. §§ 20501 *et seq*.). The NVRA's requirements for covered States include accepting a standard federal registration form, providing an opportunity to register when a person applies for or renews a driver's license, and permitting mail registrations for several categories of voters. *See* 52 U.S.C. §§ 20503–05.

Section 8 of the NVRA addresses voter registration lists. *See id.* § 20507. It gives States discretion to manage their lists, requiring only that States make "a reasonable effort to remove the names of ineligible voters," *id.* § 20507(a)(4), and imposing a few specific, pro-voter mandates, including that States follow a set of steps before deregistering a voter. *Id.* § 20507(a)(3).

Congress enacted the Help America Vote Act in 2002 to improve election infrastructure and further standardize administration. *See* Pub. L. No. 107–

252, 116 Stat. 1666 (now codified at 52 U.S.C. §§ 20901 *et seq.*). HAVA mandates that States requiring registration establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). HAVA supplements the list maintenance regulations established by the NVRA by requiring that the names of all registered voters appear on the computerized list, that only voters who are not registered or eligible are removed, and that duplicates are removed. *Id.* § 21083(a)(2)(B). HAVA does not specify how States are to comply with these mandates; rather, "[t]he specific choices on the methods of complying with" HAVA are "left to the discretion of the State[s]." 52 U.S.C. § 21085.

A separate subsection of HAVA requires state officials who process new registrations not to accept a federal registration unless it includes, where available, either a driver's license number or a partial social security number. *Id.* § 21083(5)(A)(i). Applicants who have not been issued driver's license or social security numbers may instead be assigned "unique identifying numbers." *Id.* § 21083(5)(A)(ii). States are entitled to "determine whether the information provided by an individual is sufficient . . . in accordance with State law." *Id.* § 21083(5)(A)(iii).

Neither the NVRA nor HAVA authorizes US DOJ to conduct an audit of a state's practices. US DOJ's enforcement tool is instead "a civil action" for "declaratory and injunctive relief." *Id.* § 20510 (NVRA); *id.* § 21111 (HAVA).

### C. Wisconsin is exempt from the NVRA and from HAVA's list maintenance provisions.

States are exempt from the NVRA if they have maintained pro-voter registration rules continuously since August 1, 1994, including allowing same-day registration at polling places. *See id.* § 20503(b). States exempt from the NVRA are also exempt from HAVA's list maintenance provisions; they are instead entitled to "remove the names of ineligible voters from the computerized list in accordance with State law." *Id.* § 21083(a)(2)(A)(iii).

Wisconsin, which has allowed same-day registration since August 1994, is exempt from the entirety of the NVRA. *Pub. Int. Legal Found., Inc. v. Wolfe*, 2024 WL 4891940, at *2 (W.D. Wis. Nov. 26, 2024). Wisconsin is thus also exempt from HAVA's list maintenance provisions; it has discretion to conduct its list maintenance in "accordance with State law." *Id.* § 21083(a)(2)(A)(iii). So long as Wisconsin (i) establishes a statewide, computerized list and (ii) maintains that list in accordance with Wisconsin law, it complies with HAVA.

### D. The Civil Rights Act of 1960, including Title III, sought to strengthen enforcement of laws prohibiting discrimination against the right to vote.

US DOJ says it needs Wisconsin's database to regulate the State's compliance with HAVA, but its Complaint relies on Title III of the 1960 Civil Rights Act as its source of authority.

Congress passed the first in a series of civil rights laws in 1957, exercising its Fifteenth Amendment enforcement power. *See* Civil Rights Act of 1957, Pub. L. No. 85–315, 71 Stat. 637. The 1957 Act expanded the federal government's capacity to enforce substantive rights previously conferred by Reconstruction-era statutes and the Fourteenth and Fifteenth Amendments. *See, e.g.*, *id.* (creating subsections (b) through (d) of the statute now codified at 52 U.S.C. § 10101). The 1957 Act created the bipartisan Commission on Civil Rights and empowered it to "investigate allegations . . . that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin." 71 Stat. at 635. It also created US DOJ's civil rights division and authorized the attorney general to seek injunctive relief in voting rights cases. *Id.* at 637.

The 1957 Act's enforcement scheme proved inadequate. The Civil Rights Commission's 1959 report to the President and Congress complained that southern States were hindering its investigations and US DOJ's enforcement efforts by destroying or blocking access to voting records—particularly voting applications of Black voters. *See* Comm'n on Civil Rights, 1959 Report of the United States Commission on Civil Rights 137.

The Commission concluded that "[s]uch practices" were "beyond the effective reach of the present remedial provisions of the Civil Rights Act of 1957." *Id.* at 137. It recommended that Congress enact a new law requiring the

States to preserve registration and voting records for inspection. *Id.* at 138. President Eisenhower concurred, urging passage of such a law on the grounds that "[a]ccess to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination." Dwight D. Eisenhower, Special Message to Congress on Civil Rights - Feb. 5, 1959.

Congress then enacted the Civil Rights Act of 1960. Title III of the Act requires preservation of certain records, imposes criminal liability on persons who violate the preservation requirement, and creates a process for DOJ to inspect certain records. *See* 74 Stat. at 88–89 (now codified at 52 U.S.C. §§ 20701–06). President Eisenhower's signing statement predicted that Title III would be "of invaluable aid in the successful enforcement of existing voting rights statutes." Dwight D. Eisenhower, Statement by the President Upon Signing the Civil Rights Act of 1960 - May 6, 1960. The other Titles of the 1960 Act sought to redress other defects in the 1957 Act's civil rights enforcement scheme. *See South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (describing the 1960 Act as making "[p]erfecting amendments" to the 1957 Act).

## II. In 2025, US DOJ begins asserting authority to audit States' voter registration lists; it sues 30 States under HAVA, the NVRA, and Title III, but no court has so far granted it relief.

In 2025, US DOJ began demanding voter registration data from state election officials, citing concerns about adequate voter list management under the NVRA or HAVA. US DOJ indicated that it wanted "the last four digits of every voter's Social Security number."[3]

Most States refused US DOJ's demands for unredacted voter data. In response, US DOJ sued 29 States and the District of Columbia.[4] As of this filing, over 20 district courts besides the Western District of Wisconsin have granted States' motions to dismiss, and the Sixth Circuit affirmed the Western District of Michigan's dismissal. *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) (affirming 819 F. Supp. 3d 753 (W.D. Mich. 2026)); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Aguilar*, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *United States v. Evans*, 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Caldwell*, 2026 WL 2186515 (D.N.J. July 29, 2026); *United*

---

[3] Kaylie Martinez-Ochoa *et al.*, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (last updated Aug. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[4] *Id.* Eleven states have complied with US DOJ's demands.

*States v. Adams*, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Oliver*, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Koski*, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Warner*, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections of N.Y.*, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Schmidt*, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. DeMarinis*, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Bellows*, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, 2026 WL 972129 (D. Mass. Apr. 9, 2026).

## III. US DOJ makes demands to Wisconsin, to which the Commission responds and offers to provide a redacted database; DOJ sues, but the suit is dismissed by the district court.

### A. US DOJ demands information, and Wisconsin provides detailed responses.

US DOJ's demands to Wisconsin generally followed the pattern in other States. On June 17, 2025, US DOJ sent Commission Administrator Meagan Wolfe a letter asserting that it had received unspecified complaints that the Commission was "failing to comply with the list maintenance procedure requirements of Section 3030 of HAVA." (Dkt. 3-1:2.) The June 17 letter asked

a series of questions about Wisconsin's voter registration list. These questions related to coordination with other States, removal of voters deemed "ineligible," removal of "inactive" voters, removal of "duplicate voter registrations," removal of "voters who have moved out of state," and removal of "registrants who are ineligible due to non-citizenship. (Dkt. 3-1:2–3.) The June 17 letter also requested Wisconsin's "current voter registration list," including "both active and inactive voters." (Dkt. 3-1:3.) The June 17 letter did not request an unredacted list or cite Title III.

On July 2, 2025, the Commission responded with a five-page letter that answered each of US DOJ's questions in detail. (Dkt. 3-1:5–10.) The Commission explained that it coordinates list management efforts with the State's Departments of Transportation, Corrections, and Health Services on a regular schedule. (Dkt. 3-1:6.) With respect to the request for Wisconsin's voter registration list, the letter explained that Wisconsin voter data is available through the online Badger Voters portal for a fee. (Dkt. 3-1:9.)

Five months later, the Commission heard from US DOJ again. On December 2, 2025, US DOJ attorney Eric Neff emailed the Commission a demand for records with the subject line "Demand for Full Voter Roll from DOJ CRT":

> To the Wisconsin Elections Commission:
>
> Please consider this email a demand to provide within 7 days:

> An electronic copy of the full Wisconsin statewide voter registration list
>
> This list is to include, pursuant to the Help America Vote Act, either the last four digits of the social security number, the driver's license number, or both.
>
> This request is for the purpose of ensuring compliance with minimum standards and routine voter list maintenance.
>
> If you have any questions, do not hesitate to contact me.

(Dkt. 3-1:11). Neff's email did not cite Title III, offer any factual basis for the demand, or cite any specific provision of HAVA.

The email attached a proposed memorandum of understanding intended to cover any agreement to share data; it cited the NVRA, HAVA, Title III, and the Privacy Act of 1974 (5 U.S.C. § 552a) as authorities. (*See* Dkt. 1 ¶ 24.)

On December 11, 2025, the Commission responded to Neff's email with a six-page letter. (Dkt. 3-1:13–18.) The Commission reiterated that it was "willing to provide any non-confidential voter registration data or records sought by US DOJ." (Dkt. 3-1:13.) The Commission explained that Wis. Stat. § 6.36(1)(b)1.a. prohibits it from disclosing certain personally identifiable information (PII), including driver's license numbers, social security numbers, addresses of confidential electors, and voting accommodations. (Dkt. 3-1:13.)

The Commission also indicated that it had reviewed the federal authorities cited in US DOJ's proposed agreement and concluded that none preempted Wisconsin's voter privacy protections. The Commission explained that

Wisconsin is exempt from the NVRA, so the NVRA cannot impose any obligation to disclose PII; no provision of HAVA obligates Wisconsin to disclose PII; Neff's email did not "constitute the type of demand, including a statement of the basis and purpose" authorized by Title III; and the Privacy Act applies to federal agencies, not state agencies. (Dkt. 3-1:14–15.)

The Commission described in detail Wisconsin's "11 major voter list maintenance processes." (Dkt. 3-1:15–17.) The letter concluded by reiterating the Commission's willingness to help US DOJ "obtain Wisconsin voter records through the process permitted by law," and offered to answer any further questions about those processes or list maintenance. (Dkt. 3-1:17–18.)

### B. US DOJ sues the Commission and moves for dispositive relief; the Commission and intervening defendants move to dismiss the case.

On December 18, 2025, US DOJ sued the Commission, its individual Commissioners, and Administrator Wolfe. (Dkt. 1.) The same day, US DOJ filed a Motion for Order to Compel Production of Records Pursuant to 52 U.S.C. § 20701 *et seq*. (Dkt. 2; 3.) The district court granted motions by the Wisconsin Alliance for Retired Americans, Forward Latino, and Common Cause, to intervene. (Dkt. 7; 33; 53.)

The Commission and intervenors filed motions to dismiss and, in the alternative, a motion to quash. (Dkt. 56; 58; 62; 63.) The Commission explained that "ensuring compliance with minimum standards and routine voter list

maintenance" under HAVA was not a valid purpose of a demand under Title III; the demand included no factual basis; the State's database was not the type of "record" officials must retain and offer for inspection under Title III; and Wisconsin privacy laws, not preempted by federal law, prohibited providing the personal information US DOJ demanded. (Dkt. 89:5 (district court describing the motions).)

### C. The district court concludes that the voting database is not a "record" covered by Title III and dismisses the action.

On May 21, 2026, the district court granted the defendants' motions to dismiss and denied US DOJ's motion to compel. It concluded that the database was not a record subject to retention and production under Title III, looking at the phrase "comes into possession," the types of records the statute described, and the preservation and non-alteration requirements of Title III, which are an ill fit for an ever-changing database. (SA 6–7; Dkt. 89:7–9.) The court rejected US DOJ's view that the database is simply a compilation of voter registration records. (SA 8; Dkt. 89:8.) It did not reach the Commission's and intervenor appellees' other arguments. (SA 5; Dkt. 89:5.)

US DOJ appealed.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss for failure to state a claim de novo. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019.) In analyzing the case, the Court may affirm on any ground contained in the record. *Brooks v. Ross*, 578 F.3d 574, 578 (7th Cir. 2009).

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, the complaint does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court need not accept legal conclusions or threadbare allegations that merely recite the elements of a claim. *Brooks*, 578 F.3d at 581.

## SUMMARY OF ARGUMENT

The district court correctly dismissed US DOJ's claim, for four reasons—both the reason the court relied on, and three additional grounds.

First, as the district court concluded, the Wisconsin voter database is not a record that the Commission must retain, unaltered, and produce under Title III: it is not a record that comes into its possession, and Title III's requirements of preservation and non-alteration conflicts with Wisconsin's list maintenance obligations under HAVA.

Second, Title III doesn't empower US DOJ to obtain Wisconsin's unredacted voter database to police the Commission's HAVA compliance. A statute that provides a specific set of duties and remedies controls over a more general one,

and here, HAVA specifically sets out both Wisconsin's obligations and US DOJ's limited powers.

Third, even if Title III could be utilized for HAVA auditing, US DOJ's demand to the Commission failed to comply with Title III by stating a factual basis.

Fourth, Wisconsin law prohibits the Commission from sharing the personally identifiable information (PII) that US seeks. US DOJ offers no persuasive argument that Title III preempts that state law.

## ARGUMENT

As the district court and courts around the nation have agreed, US DOJ is not entitled to a State's unredacted voter database under Title III of the Civil Rights Act. It is not a "record" that state officials must retain, unaltered, and produce within the meaning of Title III; Title III does not offer US DOJ an additional investigation tool to police HAVA compliance; US DOJ's demand to the Commission provided no factual basis; and, under Wisconsin law, the PII that US DOJ seeks cannot be produced.

### I. The Wisconsin voter database is not a "record" the Commission must retain and produce for inspection under Title III.

Even assuming the Civil Rights Act empowered US DOJ to seek documents from States for purposes of monitoring HAVA compliance, Wisconsin's unredacted voter database falls outside the type of documents that Title III

requires States to preserve, unaltered, and produce for inspection. The district court's decision enjoys broad consensus: the Sixth Circuit and numerous district courts have reached that conclusion.

Wisconsin's database is maintained daily by the Commission, with extensive assistance from local and county election officials and input from other state agencies. (*See* Dkt. 3-1:15–18.) By its plain terms, Title III does not authorize a demand for such a record.

### A. Title III's retention and production requirement applies to records that come into officials' possession; officials may not alter such records.

Title III requires officials to retain and produce certain types of records for inspection. For twenty-two months following any federal election, elections officials must "retain and preserve" "all records and papers which come into [an official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. Criminal liability attaches to officials who willfully violate the preservation requirement, as well as to any person who "willfully steals, destroys, conceals, mutilates, or alters" those covered records. *Id.* §§ 20701–02.

### B. Wisconsin's voter database is not a record that the Commission must preserve, unaltered, and produce for inspection.

Wisconsin's unredacted voter list is not a record the Commission needs to preserve and produce for inspection in the 22 months following an election. The

database did not come into the Commission's possession but rather was created by it. It is unlike the types of documents described in Title III applications and registrations, documents presented in order to vote. And covered records under Title III must be preserved, unaltered, which if applied to the database, would conflict with the Commission's maintenance obligations under HAVA.

### 1. Documents that "come into [an agency's] possession" do not include voter databases.

The plain language of Title III does not include a voter database in describing the types of record the State must retain, unaltered, and make available to US DOJ. Such databases do not "come into [] the possession" of elections officials; they create and modify them internally.

Dictionaries do not define the phrase "come into possession" (a phrase, not a word), but it often appears within definitions. Merriam-Webster uses the phrase "come into possession" in its definitions of "receive," "acquire," "attain," and "inherit."[5] Black's Law Dictionary employs the phrase in its definition of "receive." *Receive*, Black's Law Dictionary (12th ed. 2024). As a matter of

---

[5] *Receive*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/receive (last visited Aug. 17, 2026); *Acquire*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/acquire (last visited Aug. 17, 2026); *Attain*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/attain (last visited Aug. 17, 2026); *Inherit*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/inherit (last visited Aug. 17, 2026).

ordinary usage, the Commission does not "receive," "acquire," or "attain" a database that it maintains internally.

In *Benson*, in concluding that Michigan's voter list was not a record that "comes into 'the election official's] possession," the Sixth Circuit looked at the definition of "comes into possession" as used by the Supreme Court in *Honeycutt v. United States*, 481 U.S. 443, 449 (2017), as well as the definitions of "acquire," "obtain," and "receive" from Webster's Third New International Dictionary and the Oxford English Dictionary, which each used the phrase "come into possession" to explain what those words meant. *Benson*, 179 F.4that 478–79.

District courts considering this issue have agreed that records coming into an official's possession do not include voter databases. *See Evans*, 2026 WL 2267774, at *6 ("'comes into his possession' refers to a record . . . that reached or arrived in the possession of the Board, and not a record or paper that originated there."); *Griswold*, 2026 WL 2235374, at *5; *Koski*, 2026 WL 2032532, at *5 ("Virginia's SVRL did not 'come into [Defendant's] possession' as that phrase is ordinarily understood."); *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *9 ("[A] voter registration list is not a [Section] 20701 document because it is created by state officials and, therefore, does not come into their possession."); *Scanlan*, 2026 WL 1864054, at *4 (Title III refers "only to records that election officials obtain from outside sources—*i.e.*, prospective voters—

and not to records that they themselves have created and thus have always possessed"); *Demarinis*, 2026 WL 1780586, at *4 ("[T]he [state voter list], which is created by state officials, does not 'come into [their] possession.' "); *Bellows*, 2026 WL 1430481, at *7 ("[T]he United States cannot utilize Title III to compel production of Maine's SVRL because it is not a record that comes into the possession of state officials, but is instead the product of the labors of state officials."); *Fontes*, 2026 WL 1177244, at *2 (an SVRL is not a Title III document "because it is created by state officials and is not a document that people submit to the State as part of the voter registration process"); *Adams*, 2026 WL 2123871, at *4 (following *Benson* and concluding that the database did not come into Kentucky's possession).

The "cardinal principle" of statutory interpretation is "that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted). That principle is even stronger where Congress "did not adopt 'obvious alternative' language." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (citation omitted). Here, Congress chose "come into possession" rather than the obvious alternative

"in the possession of," a phrase it employs in some other laws. For example, 50 U.S.C. § 217 requires a servicemember to give notice of and relinquish any "captured or abandoned property" that "comes into his possession." That

prohibition makes perfect sense as applied to property received or obtained from an external source; it makes no sense for property a servicemember personally creates or generates. *See also, e.g.*, 18 U.S.C. § 1709 (applying a similar rule to postal workers). And Congress knows how to use the broader alternative "in the possession of" when that is what it means. *See*, *e.g.*, 7 U.S.C. § 12 (authorizing the Commodity Futures Trading Commission to publicly disclose certain "information in the possession of the Commission").

#### 2. The "relating to" words in Title III, discussing documents generated in the registration process, confirm that databases are not records subject to production.

The surrounding words in Title III support the district court's reading. Where a statute lists specific examples of a general type, courts "should read the examples as limiting" the general category. *Begay v. United States*, 553 U.S. 137, 143 (2008). Here, each of the listed things in § 20701 to which a covered record relates——"any application, registration, payment of poll tax, or other act requisite to voting in such election," is something a voter submitted in order to vote, not a database of information collected and maintained based on multiple sources.

*Benson* also relied on that surrounding language, reasoning that the activities to which the "records" must relate further bolstered its conclusion. *Benson*, 179 F.4th at 479; *see also DeMarinis*, 2026 WL 1780586, at *4 ("Each

of these terms ["relating to any application, registration, payment of poll tax, or other act requisite to voting in such election"] refers to something that the voter submits or does as part of the registration process.") (quoting *Benson*, 819 F. Supp. 3d at 768–69).

That conclusion is also consistent with how courts have construed the very similar phrase in voting rights provisions enacted in 1964. The Materiality Clause of that law, 52 U.S.C. § 10101(a)(2)(B), forbids denying an individual the right to vote based on non-material errors or omissions in any record "relating to any application, registration, or other act requisite to voting." Courts have read "requisite to voting" to mean documents a voter completes in becoming qualified to vote. *See Pa. State Conf. of NAACP Branches v. Sec'y Commonw. of Pa.*, 97 F.4th 120, 131–32 (3d Cir. 2024); *Liebert v. Millis*, 733 F. Supp. 3d 698, 713–15 (W.D. Wis. 2024).[6]

US DOJ points to the *Benson* dissent's concern that treating Title III as including only documents voters submit would not cover voting officials' own documents. (App. Br. 20–21.) But "[n]ot every statute is intended to cover every problem." *Liebert*, 733 F. Supp. 3d at 717. Title III was part of a series of

[6] Courts have varied in how they've defined exactly which voter documents are covered by the Materiality Clause—whether just registration forms, to anything voters provide in the registration process, to applications for mail ballots. *See Liebert v. Millis*, 733 F. Supp. 3d 698, 711–12 (W.D. Wis. 2024) (gathering cases). That disagreement is not relevant to the issue here.

congressional actions, which included further statutes enacted in 1964 and 1965. *Id.*

The problem at hand in 1960 was obtaining the documents voters had provided in an effort to vote, not state voting lists. In 1959, the Attorney General testified that the way to evaluate whether Black voters had satisfactorily demonstrated their qualifications to vote was to obtain "the records of registrations or other action required for exercise of the franchise." *Evans*, 2026 WL 2267774, at *9 (discussing 1959 Hearings, 86 Cong. 191). The federal government didn't need a new law to obtain lists of voters who had successfully registered; those had long been treated as public records. *Id.* at *10 (discussing 1959 Civil Rights Report at 75, 81–82, 148).)

**3. Title III's preservation requirements further support the district court's reading.**

The district court also reasoned that US DOJ's position was in tension with Title III's requirement that covered records be "retain[ed]" and "preserve[d]," and not "alter[ed]." (SA 9; Dkt. 89:9 (quoting 52 U.S.C. § 20701).) Wisconsin's voter database, which state and local officials update on a constant basis, is being altered, not preserved. As the district court said, "[t]he government has provided no explanation of what it means to "retain" or "preserve" a document like a voter registration list that is updated on a near-constant basis." (SA 9; Dkt. 89:9.) Multiple courts have agreed with that principle, as well.

States must maintain and update their voter databases to comply with the NVRA and HAVA, § 20507(a)(4), 21083(a)(4)(A). Other courts have agreed that treating voter databases as covered records would leave election officials unable to comply with both HAVA (and the NVRA) and Title III.

*Benson* observed that US DOJ's reading would put the states on collision course between their obligations under the three statutes: either they could comply with Title III, and make no changes to the database, or comply with the NVRA and HAVA, and continuously alter and update it. *Benson,* 179 F.4th at 479–80. The court reasoned, "we should not adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Id.* at 480.

The district court in *Thomas* contrasted a State's database, which "[u]navoidably and of necessity, . . . is constantly being 'altered' as information is updated; voters are added, voters are removed, addresses changed . . . ," with the type of records to be retained under Title III, which cannot "legally be altered, damaged or destroyed" after they "come into the possession" of state officials." *Thomas*, 2026 WL 2070437, at *6; *see also Evans*, 2026 WL 2267774, at *6 (alteration requirement makes US DOJ's reading "strange and unharmonious"); *Griswold*, 2026 WL 2235374, at *8 (US DOJ's reading would be in conflict with NVRA and HAVA); *Koski*, 2026 WL 2032532 at *5 ("[C]onstruing § 20701 in a manner that subjects Virginia's SVRL to Title III

'would place Title III on a collision course with the NVRA and HAVA.'"); *Bd. of Elections of N.Y.*, 2026 WL 1999921 at *9 ("[I]nterpreting [Section] 20701 to include the [SVRL] would not be harmonious with an adjacent provision, [Section] 20702, and would place Title III in conflict with the NVRA and HAVA."); *Demarinis*, 2026 WL 1780586 at *5 (US DOJ's interpretation would "criminalize the same conduct that the NVRA and HAVA require"); *Fontes*, 2026 WL 1177244 at *5 ("This conclusion would directly conflict with both the NVRA and the HAVA, which affirmatively requires states to modify its VRLs under certain conditions.").

**C. US DOJ's contrary reading is unpersuasive.**

US DOJ offers five responses: (1) some courts have held that database production is required under a different statute, the NVRA; (2) the database includes information from some documents that would be records under Title III; (3) "comes into possession" is not a feature of the covered records, but just a timing requirement; (4) the persons covered by the statute change the meaning of "comes into possession"; and (5) Title III does not prohibit all alteration of covered records, but only bad alteration.

These arguments are unpersuasive. So far, no court has agreed with US DOJ's interpretation.

### 1. The NVRA's record production requirement features language different from Title III.

US DOJ points to cases construing state voter database production under the NVRA. (App. Br. 13–15.) Those cases relied on the different document production language in NVRA. They demonstrate the Commission's point: had Congress wanted to create a statute giving US DOJ the power it seeks, it would have chosen different words.

The NVRA requires States to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Based on that specific language, some courts have concluded that States must produce some version of their database to entities that requested it. In *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36, 46 (1st Cir. 2024), for example, the court held that the database was generated to implement a voting program. And in *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 439 (D. Md. 2019), the court held that the voter list is a "program" and "activity" conducted by state elections officials.

As US DOJ recognizes, not all courts have agreed that even the NVRA includes state voter databases. (App. Br. 13, citing *Public Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 679–80.) And States can redact such productions to protect voters' private data before producing them. *Project Vote/Voting for*

*Amer., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733 (S.D. Miss. 2014).

But the critical point is more basic: the NVRA language those courts relied on is not in Title III. The NVRA says nothing about "comes into possession," and refers explicitly to documents concerning a State's implementation of the NVRA and activities relating to list maintenance. And US DOJ's demand to Wisconsin was not made under the NVRA; as US DOJ concedes, Wisconsin is exempt from that statute's requirements. (App. Br. 5–6.)

#### 2. The database's inclusion of data from voter registration documents does not make the database a covered record.

US DOJ asserts that since some of the sources of information in Wisconsin's database, which includes data from registration records, would be covered records, so too is the voter database. But the database, made up of data from numerous sources, is distinct from documents from which the data is drawn.

Drawing heavily from the dissent in *Benson*, US DOJ says that the Commission acquired information from individual voters' voter registration documents or electronic records. (App. Br. 15.) But US DOJ does not explain why the database's inclusion of information from such records, among other sources, makes the database itself a covered record. The Commission and election officials decide which information to include or exclude from the database, some determined by state law, Wis. Stat. § 6.36(1)(a), altering the

information as new data is received. That self-maintained body of information is not a record that comes into the official's possession.

As the *Benson* majority explained, there is a difference between the component information in a database and the database itself. The court compared it to a baker's cakes: while a baker may have come into possession of flour, eggs, and other ingredients, it would be strange to say that she had "come into possession" of the cake she baked. *Benson*, 179 F.4th at 479. The court concluded that the dissent's mistaken assumption that Michigan's database was just a compilation of individual records tainted its "entire analysis." *Id.* at 482.

### 3. US DOJ's temporal theory doesn't change the meaning of "comes into possession."

US DOJ posits that "comes into possession" relates not to whether an agency acquired documents from an outside source, but rather to when the agency made the acquisition. (App. Br. 16–19.) But even under US DOJ's theory, the triggering moment for the 22-month obligation is when the official "comes into possession" of the record—when he "comes to possess" the relevant thing. (App. Br. 19.) US DOJ can't avoid the acquisition-based language in the

statute.[7] Other courts have also rejected US DOJ's "temporal" theory. *See Benson*, 179 F.4th at 481; *Evans*, 2026 WL 2267774, at *7 (the time when documents are acquired does "not define the phrase "comes into possession"); *Koski*, 2026 WL 2032532, at *6 (court not persuaded by reading).

The naturalization statute US DOJ points to, which imposes duties on people who may "may come into possession" of a lost certificate of naturalization, doesn't alter the analysis. (App. Br. 18 (discussing 8 U.S.C. § 1454(a).) That statute also uses "come into possession" to describe people who have obtained a document they did not create.

#### 4. The persons covered by the statute don't change the types of records it encompasses.

US DOJ posits that the list of persons covered by the statute, which includes a "person having custody, possession, or control of such record or paper," expands the scope of documents covered. (App. Br. 22 (quoting 52 U.S.C. § 20701).) The provision does no such work: it just cross-references the covered records, requiring persons who have "*such* record[] or paper[]," 52 U.S.C. § 20701, to maintain it. If the record is not encompassed by the statute to begin with, it does not become so when it changes hands.

---

[7] US DOJ points to two consent decrees in Texas and Georgia, where those States agreed to provide certain voting information. (App. Br. 26 n.5.) Such agreements are irrelevant to whether US DOJ states a claim here.

#### 5. US DOJ's reading of "alteration" is unsupported by the statutory language.

Finally, US DOJ suggests that Title III's ban on altering covered records is unproblematic on the theory that changing the database is not "altering" it. (App. Br. 23–25.) But the definition US DOJ offers—that "alter" is an action "impair[ing] the integrity or availability of records"—would apply if the Wisconsin database were a "record" under Title III and the Commission changed it, as it does on a constant basis.

The statute's use of "willful" (App. Br. 24–25) gets US DOJ no further: that requires only that the actor understand that he is violating the law. *Bryan v. United States*, 524 U.S. 184, 191–92 (1998). And US DOJ's cited NVRA case, *Voter Reference Foundation, LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025) (App. Br. 24 & n.4), has nothing to say about "alteration."

As the court reasoned in *Koski*, while "[o]ne could certainly imagine a world in which the NVRA and HAVA demand 'good' SVRL alterations, while the CRA punishes 'bad' SVRL alterations . . . a more natural understanding, especially considering that the existence of a computerized voter list would not have been foreseeable to Congress in the 1960s, is that the NVRA and HAVA promote SVRL maintenance, and the CRA simply does not contemplate that kind of record." 2026 WL 2032532, at *6.

Title III prohibits destruction and alteration as an evidence preservation tool, ensuring that officials who may have impeded an individual's right to vote do not destroy the documents supporting her registration and other efforts to vote. Unlike the original registration documents, which Wisconsin law requires be retained and preserved,[8] the "evolving and changing" state database, (App. Br. 23), is not a record under Title III—it preserves no original history of voters' effort to register to vote.

Wisconsin's voter database is not a record that the Commission must retain under Title III: it did not come into the Commission's possession, and treating it as such a record would conflict with the Commission's database maintenance obligations under HAVA and Wisconsin law.

## II. The Civil Rights Act provides no authority for US DOJ to obtain documents for HAVA list maintenance inquiries.

Having determined that Wisconsin's database was not a record subject to retention and inspection under Title III, the district court did not reach the question of whether US DOJ can employ Title III to conduct an audit under HAVA. But a second reason US DOJ's case was properly dismissed is that Title III does not afford US DOJ such power.

[8] Wis. Stat. §§ 6.30(5), 6.35(3). US DOJ has not requested any such documents.

### A. The specific enforcement choices Congress made in HAVA and the NVRA override the general language of Title III.

Congress made specific choices about US DOJ's and States' respective roles in maintaining voter databases under the NVRA's and HAVA. Title III cannot be construed contrary to those congressional choices.

As the Supreme Court has observed, "[i]t is a commonplace of statutory construction that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted); *see also United States v. Bormes*, 568 U.S. 6, 12–13 (2012) (a "'precisely drawn, detailed statute' pre-empts more general remedies") (citation omitted). When "a general authorization and a more limited, specific authorization exist side-by-side," the specific provision controls. *RadLAX*, 566 U.S. at 645.

The Civil Rights Act of 1960, passed under Congress's Fifteenth Amendment power, empowers the federal government to investigate alleged race discrimination in voting. The Congressional Record describes the 1960 Civil Rights Act's purpose as "to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956 at 7 (1959), 1959 WL 3581 at *1945. Title III, the chapter giving US DOJ the ability to obtain certain documents and investigate civil

rights violations, says nothing about electronic voting databases, how States should maintain them, or US DOJ's role in their administration or enforcement.

HAVA, in contrast, spells out the States' and US DOJ's roles in list maintenance. Passed under the Elections Clause,[9] HAVA affords the States leeway about how to manage voter registration lists, leaving the "specific choices on the methods of complying with [HAVA's] requirements" to the States' discretion. 52 U.S.C. § 21085. HAVA maintained the exemptions Congress had previously granted to certain States, including Wisconsin. *See id.* § 21083(a)(2)(A)(iii), (b)(5). And HAVA gives US DOJ only civil enforcement power, not any powers to investigate or audit the States. *See id.* § 21111.

In light of the contrast between the authority granted under each statute, several district courts have held Title III cannot be utilized to exceed HAVA's limits, and that US DOJ's desire to evaluate a State's HAVA or NVRA list maintenance is not within the scope of a Title III demand.

In *Bellows*, the court compared Title III with the text and structure of HAVA and the NVRA, remarking that "whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them." 2026 WL 1430481. at *7. To conclude otherwise, the court observed, "would take a

[9] *Colon-Marrero v. Velez*, 813 F.3d 1, 19 (1st Cir. 2016).

sledgehammer to the balance Congress struck when it required states to create and maintain computerized lists of registered voters in the first place." *Id.* at *9; *see also Oregon*, 828 F. Supp. 3d at 1105 (a demand for records under Title III "must relate to a purpose of investigating violations of individuals' voting rights."); *Weber*, 816 F. Supp. 3d at 1183 ("Title III was not passed as a tool for NVRA compliance."); *Evans*, 2026 WL 2267774, at *8 ("nothing supports the Department's supposition that Congress intended Title III to be a freewheeling source of authority for the Attorney General to investigate any violation of federal election law"); *Warner*, 2026 WL 2018877, at 6–7 (compliance with list maintenance requirements does not relate to "potential violations of an individual's right to vote"); *United States v. Matthews*, 2026 WL 2212877, at 5–6 (D. Ill. July 31, 2026) (in Title III, "Congress did not confer a general auditing power to the DOJ over state election officials."); *Amore*, 2026 WL 1040637, at 6.

### B. DOJ ignores basic principles of statutory interpretation and the choices Congress made in enacting HAVA.

To justify utilizing a Civil Rights Act provision to give itself power under HAVA, US DOJ offers two novel interpretations: that its ability to demand documents under Title III includes investigating a violation of any federal statute, (App. Br. 34), and that in enacting HAVA, Congress must have assumed US DOJ already had the power to investigate and audit voting

databases under the Civil Rights Act (App. Br. 36). Neither of these readings enjoys statutory or case law support.

The idea that Title III empowers US DOJ to obtain documents relating to any federal violation ignores basic statutory interpretation—that laws must be read together and harmonized, and that where a statute has addressed specific problems with specific solutions, those trump more general laws. *RadLAX*, 566 U.S. at 645; *Bormes*, 568 U.S. at 12–13. In enacting HAVA, Congress chose not to give US DOJ the power to audit States or to demand their voter databases, giving it only the power to bring a civil action. And it left list maintenance practices to the States—especially States like Wisconsin, exempt from the NVRA, which follows *Wisconsin* law in removing registrants from its database. 52 U.S.C. § 21083(a)(2)(A)(iii). HAVA did not even include a public inspection provision like that in the NVRA. *Id.* § 20507(i). Interpreting Title III to give US DOJ those very powers would conflict with the choices Congress made under HAVA.

US DOJ theorizes that Congress must have assumed that it had already empowered US DOJ to be the database police force under the Civil Rights Act, back in 1960. All US DOJ offers for this theory is belief in its own power: it says it is "implausible" that Congress would not have conferred on it the power to obtain records "so pertinent to [the Attorney General's] enforcement

authority under HAVA." (App. Br. 36.) US DOJ's assumptions don't match the choices Congress made.

HAVA's own provisions, not Title III, reflect Congress's choices about how to administer and enforce HAVA. US DOJ makes no persuasive case that, more than three decades earlier, Congress implicitly made different choices through Title III about how to administer state voter databases.

## III. US DOJ's demand to the Commission included no factual basis, as Title III requires.

The dismissal should also be upheld because US DOJ's December 2 demand stated no factual basis. *Benson* and other courts have recognized that US DOJ must articulate a specific factual reason it is investigating the State—not merely invoke a statute, whether Title III, HAVA, or something else.

### A. Title III requires a factual basis, and the December 2 demand included none.

US DOJ's December 2 demand to the Commission did not meet the requirements of a valid demand under Title III. Under § 20703, the federal government must provide both the purpose and basis for its demand. And the basis must be a factual ground for investigating, not just a recitation of the statute.

US DOJ may inspect covered records by making a "demand in writing" that states "the basis and the purpose therefore," with judicial process available to procure compliance where appropriate. *Id.* §§ 20703, 20705. The term "and" is

"conjunctive," and when used in a list means that all items "are required." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012). Courts have concluded that US DOJ thus must "offer a written statement of *both* the purpose and basis for its demands." *Weber*, 816 F. Supp. 3d at 1184; *see also Benson*, 179 F.4th at 483 (US DOJ needed to provide both a purpose and basis for its demand); *Griswold*, 2026 WL 2235374, at *4 (demand must include both a statement of purpose and basis). In *Weber*, the court observed that the basis-and-purpose requirement precludes US DOJ from "embark[ing] on a fishing expedition of voter records in any state . . . without identifying a single issue with the state's policies beforehand." *Weber*, 816 F. Supp. 3d at 1184.

Further, the basis is more than a recitation of the law invoked. A "basis" is "an underlying fact or condition." *Basis,* Black's Law Dictionary (12th ed. 2024). Courts have agreed that providing a "basis" is not just citing a statute, but rather articulating the factual reason why US DOJ is investigating the State. *See Galvin*, 830 F. Supp. 3d at 130 (distinguishing legal authority from factual basis); *Matthews*, 2026 WL 2212877, at *5 (same); *Oliver*, 2026 WL 2031479, at *9 (same); *Scanlan*, 2026 WL 1864054, at *7 (same); *Warner*, 2026 WL 2018877, at *4 (same); *Amore*, 2026 WL 1040637, at *5; *Oregon*, 828 F. Supp. 3d at 1103–04.

Indeed, in the first years of Civil Rights Act enforcement, that is precisely what US DOJ did. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962) (quoting demand, which included both factual basis and legal purpose); *Galvin*, 830 F. Supp. 3d at 128 (collecting early cases with such examples).

Here, US DOJ did not attempt to articulate a valid basis with its demand. The demand said it wanted to ascertain whether WEC is complying with "HAVA's list maintenance requirements." (App. Br. 32.) That would address, at most, the *purpose* requirement of a Title III demand. It provided no factual basis for why US DOJ wanted to investigate.

### B. US DOJ's assertion of unreviewability and proposed definition of "basis" both lack merit.

US DOJ argues that no court can review the sufficiency of the basis stated in its demand and that the basis can simply be a citation to a statute, or a concern expressed in earlier correspondence. Those theories are incorrect.

#### 1. Demands under Title III are reviewable by courts.

US DOJ argues that courts cannot review whether it has articulated a basis for its demand. It asserts that the rules of civil procedure do not apply and courts cannot review its demand on the theory that the sufficiency of the basis is "not open to judicial review." (App. Br. 28–29.)

Title III provides that a court may compel compliance with a valid demand "by appropriate process." 52 U.S.C. § 20705. The Federal Rules "govern the

procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. And Rule 81 provides no exception; it indicates that the Federal Rules "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5).

In *United States v. Powell*, the Supreme Court held that the Federal Rules govern the procedures to be followed when a federal statute provides that a court may grant certain relief "by appropriate process." 379 U.S. 48, 52, 58 n.18 (quoting 26 U.S.C. § 7504(a) & (b)) (1964). The Court held that, where a statute provides no alternative procedure to the Federal Rules, "the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination [of records]." 379 U.S. at 58 & n.18. While that statement was not the main holding of the case, the central question was about appropriate investigative process. *Id.* at 52–53.[10]

In *Oregon*, the district court looked to *Powell* in concluding that the court could evaluate the sufficiency of US DOJ's demands against Oregon there.

---

[10] More generally, the Court held in *Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 436 (2023), that the Federal Rules are the default rules in civil litigation, and though Congress may exempt a statutory proceeding, court may "not lightly infer that Congress has done so; and silence on the subject is seldom enough."

*Oregon*, 828 F. Supp. 3d at 1102–03. Other district courts have also rejected claims by US DOJ that its Title III demands are unreviewable. *See Fontes*, 2026 WL 1177244, at *1 n.1 (collecting cases); *Evans*, 2026 WL 2267774, at *4 (citing *Powell*); *Adams*, 2026 WL 2123871, at *4; *Oliver*, 2026 WL 2031479, at *7 n.17; *DeMarinis*, 2026 WL 1780586, at *4; *Weber*, 816 F. Supp. 3d at 1182.

US DOJ looks to cases decided pre-*Powell*, (App. Br. 28–31), but the holdings of those cases don't help it. *State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (N.D. Ala. 1960), considered a constitutional challenge to the statute on the merits. *Lynd* also involved no dispute about the scope of documents sought. The court noted that disputes about whether records fell within Title III's definition of records "would, of course, be open for . . . determination." *Lynd*, 306 F.2d at 226.

US DOJ also claims the Civil Rights Act falls within the rare area of statutes subject to no judicial review because the statute was "drawn in such broad terms that in a given case there is no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988) (cited at App. Br. 30). But it offers no reasoning for why the Civil Rights Act would be one of those rare exceptions.

Analogizing Title III to an "administrative subpoena," (App. Br. 31), gets US DOJ no further. When the government demands documents, it must show a legitimate purpose, a colorable basis, and a reasonable scope. *See EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995) (agency must establish

that the subpoena (i) "seeks reasonably relevant information," (ii) "is not too indefinite," (iii) "relates to an investigation within the agency's authority," (iv) "has not been made for an illegitimate purpose," and (iv) is not "excessively burdensome."); *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) (holding a tax summons unenforceable because it was "overbroad and disproportionate to the end sought").

#### 2. A comment in earlier correspondence was not a basis for the demand, and would not explain wanting Wisconsin's unredacted database.

With nothing in the demand itself, US DOJ looks to a comment in earlier correspondence with the Commission. That doesn't work, for two reasons.

US DOJ points to correspondence from June 4, when it mentioned that it had received complaints that the Commission had "refused to provide any administrative complaint process" under HAVA. (App. Br. 32.) No such concern appeared in the December 2 demand. (Dkt. 3-1:11). Title III requires a demand with a statement of both basis *and* purpose, and so the cobble strategy doesn't work. *See Benson*, 179 F.4th at 483.

Even if US DOJ could borrow statements from prior correspondence to fashion a "demand," a concern about the Commission's administrative appeal processes would bear no relationship to demanding an unredacted version of Wisconsin's voter database. The "basis" would still be inadequate as unrelated and disproportionate to what US DOJ sought.

US DOJ's demand did not state a lawful basis. HAVA compliance, the statement in the December 2 demand, was not a factual basis for US DOJ's inquiry. And even if US DOJ could add on a concern mentioned in earlier correspondence about the Commission's administrative appeal process, it would not be a factual basis to seek Wisconsin's unredacted voter database.

## IV. Wisconsin statutes prohibit giving US DOJ the personal information it seeks.

A fourth reason to affirm the district court is that Wisconsin statutes prohibit the Commission from giving US DOJ the personal information it seeks. Outside a few exceptions that don't apply here, Wisconsin law requires redaction of driver's license, social security numbers, and other PII. Title III doesn't preempt that requirement.

### A. Wisconsin election law limits disclosure of voters' sensitive private information.

Wisconsin election statutes provide for broad availability of most voter data, while at the same time protecting sensitive voter information. Through a proper request, "any person" may obtain the state's official registration list. Wis. Stat. § 6.36(1)(b)1. The Commission routinely provides the entire nonconfidential parts of the list or portions thereof to candidates, parties, civic organizations, academic researchers, journalists, and interested members of the public. That list has important information redacted to protect voters' privacy.

Five categories of personally identifying information ("PII") must be redacted when the list is publicly disclosed. State law bars the Commission from disclosing an elector's "date of birth, operator's [*i.e.*, driver's] license number, or social security account number . . . the address of [a confidential elector], or any indication of [a voting] accommodation." Wis. Stat. § 6.36(1)(b)1.a.; *see also id.* § 6.47 (regulating confidential electors); *id.* § 7.15(14) (authorizing voting accommodations). In general, such PII may be disclosed only to certain designated Wisconsin elections officials who use it to carry out their duties. *Id.* § 6.36(1)(b)1.a.

The rule has three exceptions. First, the Commission must share unredacted PII as necessary to comply with the Electronic Registration Information Center (ERIC) membership agreement. *Id.* § 6.36(1)(ae). Second, the Commission "may" —but is not required to—provide unredacted PII "to a law enforcement agency . . . to be used for law enforcement purposes." *Id.* § 6.36(1)(bm). And third, the Commission may provide PII "to a subunit of the state government of another state to be used for official purposes." *Id.* § 6.36(1)(bn).

US DOJ has not argued that any of these exceptions applies to its demand. The ERIC and other-state-subunit exceptions do not apply. And although US DOJ is a law enforcement agency, the law enforcement exception does not apply, either.

The demand was not issued in furtherance of a "law enforcement purpose[]." The law US DOJ purports to be enforcing—HAVA—gives it no authority to audit Wisconsin's list management. Second, the Commission understands section 6.36(1)(bm) to authorize release of unredacted PII only where law enforcement makes a particularized showing of need. US DOJ's demand does not qualify. And third, the exception uses a discretionary "may," Wis. Stat. § 6.36(1)(bm), and so the Commission's decision could exercise its discretion and deny the request. *See* Wis. Stat. § 5.05(1e).

### B. Title III does not preempt Wisconsin law's voter privacy safeguards.

US DOJ doesn't contest that Wisconsin law prohibits release of the State's unredacted voter list, but it now asserts that Title III preempts Wisconsin law.[11] That is incorrect. The question is congressional intent, and Congress has chosen not to require disclosure of confidential voter database information in HAVA and the NVRA. Further, Title III does not even regulate private individuals, as preemption requires.

Under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The scope of a statute's preemptive effect is determined by congressional intent: "the

[11] Below, US DOJ did not argue preemption. (Dkt. 71:31.)

purpose of Congress is the ultimate touchstone" in every preemption case. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).

US DOJ claims conflict preemption, (App. Br. 46–47), but offers only general preemption principles and a statement that election officials have a "sweeping" obligation to preserve records. It does nothing to demonstrate that Congress intended to preempt state privacy laws about voter databases in enacting Title III.

Congress's choices in enacting HAVA and the NVRA show the opposite. HAVA contains no public inspection provision. The NVRA contains a public inspection provision, 52 U.S.C. § 20507(i)(1), but courts have held that Congress intended to allow redaction of PII under that law. *See, e.g. Bellows*, 92 F.4th at 56 (collecting cases). It makes no sense to conclude that Congress intended to preempt state laws protecting PII in voter databases in 1960, but subsequently ensured that States could protect such data from disclosure when it enacted later laws specifically addressing the electronic data.

Preemption also doesn't apply because Title III doesn't regulate private parties. A preemption provision "'must be best read as one that regulates private actors.'" *McHenry County v. Raoul*, 44 F.4th 581, 587 (7th Cir. 2022) (quoting *Murphy v. NCAA*, 584 U.S. 453, 477 (2018)); *see also id.* at 588 ("The Court said at least three times in *Murphy* that a valid preemption provision is

one that regulates private actors.") Here, Title III's demand provision, 52 U.S.C. § 20703, regulates public actors, not private ones.

Section 20703 entitles US DOJ to demand that "the person having custody, possession, or control of [a covered] record or paper" make that record or paper "available for inspection, reproduction, and copying at the principal office of such custodian." "[P]erson" refers either to the state "officer of election" or to the "custodian" charged by state law with preserving the record in question. *Id.* § 20701. The covered persons, public actors, are not the subject of preemption doctrines.

Wisconsin statutes prohibit US DOJ from obtaining the personal voter information it seeks. That is yet another reason to affirm the district court's dismissal.

## CONCLUSION

The Court should affirm the dismissal of US DOJ's case.

Dated this 17th day of August 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

Attorneys for Wisconsin Elections Commission Appellees

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218
(608) 294-2907 (Fax)
charlie.gibson@wisdoj.gov

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

> This brief contains 10,663 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 17th day of August 2026.

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on August 17, 2026, I electronically filed the foregoing Brief of Wisconsin Elections Commission Appellees with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 17th day of August 2026.

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General