No. 26-2217

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

v.

WISCONSIN ELECTIONS COMMISSION, et al.,

*Defendants-Appellees*

COMMON CAUSE, et al.,

*Intervenors-Defendants-Appellees*

On Appeal from the United States District Court for the Western District of Wisconsin
No. 3:25-cv-1036-jdp
Hon. James D. Peterson

# ANSWERING BRIEF OF INTERVENORS-DEFENDANTS-APPELLEES WISCONSIN ALLIANCE FOR RETIRED AMERICANS AND FORWARD LATINO

David R. Fox
Branden D. Lewiston
Kevin R. Kowalewski
Desiree M. Pelletier
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135
dfox@elias.law

*Attorneys for Intervenors-Defendants-Appellees Wisconsin Alliance for Retired Americans and Forward Latino*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2217

Short Caption: United States of America v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wisconsin Alliance for Retired Americans; Forward Latino

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Elias Law Group LLP; Pines Bach LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/ David R. Fox Date: 6/10/2026

Attorney's Printed Name: David R. Fox

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 250 Massachusetts Ave. NW, Suite 400

Washington, DC 20001

Phone Number: (202) 968-4546 Fax Number: (202) 312-5904

E-Mail Address: dfox@elias.law

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2217

Short Caption: United States of America v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** All information on this form is new.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wisconsin Alliance for Retired Americans; Forward Latino

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Elias Law Group LLP; Pines Bach LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/ Branden D. Lewiston Date: 6/16/2026

Attorney's Printed Name: Branden D. Lewiston

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 250 Massachusetts Ave. NW, Suite 400

Washington DC 20001

Phone Number: (202) 948-1135 Fax Number: (202) 312-5904

E-Mail Address: blewiston@elias.law

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2217

Short Caption: United States of America v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** All information on this form is new.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wisconsin Alliance for Retired Americans; Forward Latino

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Elias Law Group LLP; Pines Bach LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/ Kevin R. Kowalewski Date: 6/16/2026

Attorney's Printed Name: Kevin R. Kowalewski

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 250 Massachusetts Ave. NW, Suite 400
Washington DC 20001

Phone Number: (202) 948-1135 Fax Number: (202) 312-5904

E-Mail Address: kkowalewski@elias.law

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2217

Short Caption: United States of America v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** All information on this form is new.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wisconsin Alliance for Retired Americans; Forward Latino

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Elias Law Group LLP; Pines Bach LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/ Desiree Pelletier Date: 6/16/2026

Attorney's Printed Name: Desiree Pelletier

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 250 Massachusetts Ave. NW, Suite 400
Washington DC 20001

Phone Number: (202) 948-1135 Fax Number: (202) 312-5904

E-Mail Address: dpelletier@elias.law

rev. 12/19 AK

## TABLE OF CONTENTS

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

I. The Constitution and federal law commit voter registration practices to the States ........ 4

A. The Civil Rights Act of 1960 ........ 4

B. The National Voter Registration Act ........ 7

C. The Help America Vote Act ........ 9

II. DOJ embarks on a nationwide campaign to collect the private voter data of millions of Americans. ........ 11

III. DOJ sues Wisconsin to compel production of its protected voter data. ........ 14

IV. The district court dismisses DOJ's complaint. ........ 15

STANDARD OF REVIEW ........ 16

SUMMARY OF THE ARGUMENT ........ 17

ARGUMENT ........ 18

I. The CRA does not cover state-created, dynamic records like Wisconsin's SVRL. ........ 18

A. Wisconsin's SVRL was created by Wisconsin election officials and therefore did not "come into" their possession. ........ 19

B. Applying the CRA to Wisconsin's SVRL would require it to be preserved without alteration, but federal and Wisconsin law require constant updates. ........ 22

C. DOJ's interpretation of the CRA should be rejected. ........ 23

II. The Court should also affirm because of other flaws in DOJ's claim. ............ 32

A. DOJ's CRA demand is subject to meaningful judicial review. ............. 32

B. DOJ's stated purposes is unlawful because Wisconsin has no federal-law list maintenance duty. ....................................................... 35

C. DOJ's purported purpose of investigating list maintenance is not a proper purpose under the CRA. .................................................... 39

D. DOJ did not comply with the CRA's requirement that it issue a demand that states its basis. ................................................................ 43

E. The CRA does not preempt Wisconsin's voter privacy laws. ................ 46

F. DOJ has not complied with the Privacy Act. ........................................ 47

III. If the Court reverses, the next step would be to remand for discovery. ......... 49

CONCLUSION ................................................................................................ 51

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Advoc. Health Care Network v. Stapleton*,
581 U.S. 468 (2017) ........ 20

*Alabama ex rel. Gallion v. Rogers*,
187 F.Supp. 848, 853 (M.D. Ala. 1960) ........ 40

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) ........ 13

*Anniston Mfg. Co. v. Davis*,
301 U.S. 337 (1937) ........ 22

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ........ 4

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ........ 29

*Beeler v. Saul*,
977 F.3d 577 (7th Cir. 2020) ........ 30

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ........ 10, 13

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........ 2, 40

*Bissessur v. Ind. Univ. Bd. of Trs.*,
581 F.3d 599 (7th Cir. 2009) ........ 16

*Bond v. United States*,
572 U.S. 844 (2014) ........ 41

*Britkovyy v. Mayorkas*,
60 F.4th 1024 (7th Cir. 2023) ........ 31

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) ........ 16

*CFPB v. Source for Pub. Data, L.P.*,
903 F.3d 456, 458 (5th Cir. 2018) ........ 45

*CFTC v. Monex Deposit Co.*,
824 F.3d 690 (7th Cir. 2016) .......... 38

*Count US IN v. Morales*,
172 F.4th 974 (7th Cir. 2026) .......... 41

*Craig v. City of Richmond*,
179 F.4th 535 (7th Cir. 2026) .......... 19

*EEOC v. Quad/Graphics, Inc.*,
63 F.3d 642 (7th Cir. 1995) .......... 33

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 23

*Evans v. City of Chicago*,
10 F.3d 474 (7th Cir. 1993) .......... 36

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 43

*Fischer v. United States*,
603 U.S. 480, 487 (2024) .......... 25

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .......... 8

*Foster v. Love*,
522 U.S. 67 (1997) .......... 4, 41

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 19

*Huddleston v. United States*,
415 U.S. 814 (1974) .......... 20

*Hulce v. Zipongo Inc.*,
132 F.4th 493 (7th Cir. 2025) .......... 20

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... 6, 32, 34, 41

*League of Women Voters v. DHS*,
No. 25-CV-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .......... 47

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. CV 25-3501 (SLS), 2026 WL 1784297 (D.D.C. June 22, 2026) .......... 14

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) .................... 40, 41

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) .................... 20

*LULAC v. Exec. Off. of the President*,
No. 1:25-CV-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026) .................... 47

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) .................... 21

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .................... 44

*Patel v. Garland*,
596 U.S. 328 (2022) .................... 31

*Penn. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) .................... 6

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) .................... 36

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .................... *passim*

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026) .................... 8, 24

*Pub. Int. Legal. Found., Inc. v. Wolfe*,
No. 24-CV-285-JDP, 2024 WL 4891940 (W.D. Wis. Nov. 26, 2024) .................... 7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .................... 42

*Republican Nat'l Comm. v. NC. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) .................... 9

*Schwier v. Cox*,
412 F.Supp.2d 1266 (N.D. Ga. 2005) .................... 47

*Servotronics, Inc. v. Rolls-Royce PLC*,
975 F.3d 689 (7th Cir. 2020) .................... 25

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) .................... 16

*United States v. Adams*,
No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026)........................... 11

*United States v. Aguilar*,
No. 25-CV-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026) ............. 11

*United States v. Amore*,
No. 1:25-CV-00639-MSM-PAS,
2026 WL 1040637 (D.R.I. Apr. 17, 2026)............................................. 11, 39, 43, 44

*United States v. Bd. of Elections of N.Y.*,
No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ... 11, 34, 39

*United States v. Bellows*,
No. 1:25-CV-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026)............ *passim*

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)........................................................................ *passim*

*United States v. Caldwell*,
No. 3:26-CV-2025, 2026 WL 2186515 (D.N.J. July 29, 2026)................................ 11

*United States v. Clarke*,
573 U.S. 248 (2014) .......................................................................................... 50

*United States v. DeMarinis*,
No. 1:25-CV-03934, 2026 WL 1780586 (D. Md. June 18, 2026) ...................... 11, 23

*United States v. Evans*,
No. 25-CV-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026)............................ *passim*

*United States v. Fontes*,
No. 2:26-CV-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026) .......... 11

*United States v. Galvin*,
830 F.Supp.3d 122 (D. Mass. 2026) ......................................................... 11, 13, 44

*United States v. Griswold*,
No. 25-CV-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026)................................ 11

*United States v. Koski*,
No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026).................. 11, 21

*United States v. Matthews*,
No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) .......................... 11, 39

*United States v. McCullough*,
348 F.3d 620 (7th Cir. 2003) .......... 26

*United States v. Oliver*,
No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026).......... 11

*United States v. Oregon*,
828 F.Supp.3d 1092 (D. Or. 2026).......... *passim*

*United States v. Powell*,
379 U.S. 48 (1964) .......... 18, 33, 34

*United States v. Scanlan*,
No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026) .......... *passim*

*United States v. Schmidt*,
No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026).......... 11

Order, *United States v. Simon*,
No. 25-cv-3761, ECF No. 210 (D. Minn. Aug. 17, 2026)),
ECF No. 210.......... 12

*United States v. Thomas*,
No. 3:26-CV-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026).......... 11, 22

*United States v. Warner*,
No. 2:26-CV-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026) .......... 11, 39, 40

*United States v. Weber*,
816 F.Supp.3d 1168 (C.D. Cal. 2026).......... *passim*

*United States v. Wis. Elections Comm'n*,
No. 3:25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026).......... 11

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302, 324 (2014).......... 41

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025).......... 8, 24, 42, 46

*Watson v. Republican Nat'l Comm.*,
146 S.Ct. 2615 (2026) .......... 23

*Wis. Cent. Ltd v. United States*,
585 U.S. 274 (2018) .......... 24

*Wyeth v. Levine*,
555 U.S. 555 (2009) .... 46

*Yates v. United States*,
574 U.S. 528 (2015) .... 21

**STATUTES**

5 U.S.C. § 552a .... 4, 48, 49

6 U.S.C. § 1502 .... 21

7 U.S.C. § 12 .... 21

8 U.S.C. § 1454 .... 27

10 U.S.C. § 130c .... 28

18 U.S.C. § 1512 .... 25

18 U.S.C. § 3500 .... 21

18 U.S.C. § 1968 .... 21

28 U.S.C. § 1291 .... 3

28 U.S.C. § 1331 .... 3

28 U.S.C. § 1345 .... 3

30 U.S.C. § 1732 .... 21, 28

44 U.S.C. § 3572 .... 28

49 U.S.C. § 47124a .... 21

52 U.S.C. § 10101 .... 6

52 U.S.C. § 20501 .... 7

52 U.S.C. § 20503 .... 7

52 U.S.C. § 20507 .... 8, 13, 24

52 U.S.C. § 20510 .... 9

52 U.S.C. § 20701 .... *passim*

52 U.S.C. § 20702 .... 22, 40

52 U.S.C. § 20703 .... *passim*

52 U.S.C. § 20705 .... 3, 32

52 U.S.C. § 21083 .... *passim*

52 U.S.C. § 21085 .... 37

52 U.S.C. § 21111 .... 42

Pub. L. No. 85-315, 71 Stat. 634 (1957) .... 4

Wis. Stat. § 6.36 .... 4, 46

Wis. Stat. § 6.50 .... 36

Wis. Stat. § 7.15 .... 36


**RULES**


Fed. R. Civ. P. 1 .... 32

Fed. R. Civ. P. 81 .... 32


**OTHER AUTHORITIES**


7 *Oxford English Dictionary* (1933) .... 19

68 Fed. Reg. 47610 (Aug. 11, 2003) .... 48

*An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86 Cong. 6 (1960) .... 5

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) .... 14

*Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 212 (1959) .... *passim*

H.R. Rep. No. 107-329 (2001) .... 10

H.R. Rep. No. 86-956 (1959) .... 5, 40

Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. (1929) .... 31

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information ... 11

Nicholas Kerr & Elise Spenner, S*ystem That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://abcnews.go.com/Politics/system-dhs-urging-states-assess-voter-rolls-return/story?id=134863557 ... 14

*Oxford English Dictionary* (2d ed. 1989) ... 24

*Random House Dictionary of the English Language* (1966) ... 19

Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States Over Elections*, NBC News (July 17, 2026), https://www.nbcnews.com/politics/elections/homeland-security-secretary-markwayne-mullin-threatens-states-election-rcna588002 ... 14

Rep. of the U.S. Comm'n on C.R. (1959) ... *passim*

U.S. Dep't of Just., *MOU Between the United States and Texas* (May 13, 2008), https://www.justice.gov/media/1173461/dl?inline ... 31

*Webster's Third New International Dictionary* (1961) ... 19

*Webster's Third New International Dictionary* (1966) ... 19

Video posted by AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 ... 13

## INTRODUCTION

Last year, the Department of Justice embarked on an unprecedented campaign to collect the voter-registration data of nearly every American. DOJ sent letters to election officials across the nation demanding their State's full, unredacted statewide voter registration list ("SVRL"). When many officials refused, DOJ sued 30 States and the District of Columbia to force them to surrender these lists. DOJ has lost every case: 24 courts—including the Sixth Circuit, the district court below, and 22 other district courts—have rebuffed DOJ's demand to seize States' SVRLs. Not one has ruled for DOJ.

In suing for Wisconsin's its unredacted SVRL, DOJ relied exclusively on Title III of the Civil Rights Act of 1960 (the "CRA"), a 66-year-old statute providing for the preservation and inspection of "records and papers which come into [election officers'] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in recent elections. 52 U.S.C. § 20701; *see also id.* § 20703. DOJ resorts to the CRA because in the more recent statutes that mandate and regulate SVRLs, Congress did not give DOJ any inspection right that could cover Wisconsin's SVRL. But the CRA has never been held to cover SVRLs.

The district court was correct to dismiss DOJ's complaint. SVRLs are state-created databases that election officials continuously possess and revise, not discrete records that "come into [election officials'] possession" like the application, registration, and poll-tax-payment records that the CRA requires election officials to preserve unchanged and make available for inspection. DOJ's chief response is that

some courts have held that a different act—the National Voter Registration Act ("NVRA")—permits inspection of redacted SVRLs. But that does nothing for DOJ's CRA argument because the text of the NVRA's inspection provision (which does not apply in Wisconsin) differs markedly from the CRA's. Regardless, DOJ made no lawful demand under the CRA. Unlike in many other States, DOJ never even *invoked* the CRA in its pre-suit letters demanding Wisconsin's SVRL. No surprise, then, that DOJ also failed to comply with the CRA's basic requirement that any such demand "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. Its emailed demand asserted no factual basis and said only that the purpose was to "ensur[e] compliance with minimum standards and routine voter registration list maintenance," Ex. 3, Doc. 3-1, which is not a proper purpose for a CRA investigation in any State, but especially not in NVRA-exempt States like Wisconsin, where list maintenance is exclusively a matter of state law. And in its hurried quest to sweep up voter data across the country, DOJ flouted its obligations under the Privacy Act.

Courts have a long-recognized duty to review the lawfulness of intrusive federal investigations and demands. And they should greet a federal agency's newfound claim to "extravagant statutory power" with a healthy "measure of skepticism." *Biden v. Nebraska*, 600 U.S. 477, 516 (2023) (Barrett, J., concurring) (citation omitted). The court below properly fulfilled that duty by dismissing for failure to state a claim. This Court should affirm.

## JURISDICTIONAL STATEMENT

DOJ's jurisdictional statement is not complete and correct. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331, 1345, and 52 U.S.C. § 20705, because DOJ alleges a violation of the Civil Rights Act of 1960, 52 U.S.C. § 20703. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on May 27, 2026, Doc. 90; SA11-12, based on an Opinion and Order dismissing the complaint with prejudice issued on May 21, 2026. Doc. 89; SA1-10.[1] The United States filed a timely Notice of Appeal on June 5, 2026. Doc. 91.

## STATEMENT OF THE ISSUES

1. Whether Title III of the Civil Rights Act of 1960 requires Defendants to give DOJ a complete, unredacted copy of Wisconsin's SVRL, even though that list is a state-created, constantly changing database that does not "come into [election officials'] possession" and that by law must be constantly updated, rather than preserved unaltered? *See* 52 U.S.C. §§ 20701-20703.

2. Whether DOJ made a valid demand for production of Wisconsin's complete, unredacted SVRL under Title III of the Civil Rights Act of 1960, even though DOJ's demand never invoked the Civil Rights Act, provided no "statement of the basis" for the demand, and sought the records for a legally invalid "purpose." *See* 52 U.S.C. § 20703.

[1] The district court record is cited as "Doc. __," and the short appendix as "SA___."

3. Whether DOJ's demand for Wisconsin's complete, unredacted SVRL as part of a national campaign to assemble voter lists violates the federal Privacy Act or Wisconsin's voter privacy laws. *See* 5 U.S.C. § 552a; Wis. Stat. § 6.36(1)(b)1.a.

## STATEMENT OF THE CASE

### I. The Constitution and federal law commit voter registration practices to the States.

The Constitution "invests the States with responsibility for the mechanics" of elections, including federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). Although Congress may preempt state regulations of federal elections, such preemption extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Three federal election laws are implicated by this case.

#### A. The Civil Rights Act of 1960

Congress enacted Title III of the Civil Rights Act of 1960 to address problems of proof that emerged from Southern resistance to the Civil Rights Act of 1957. In particular, the U.S. Commission on Civil Rights created by the Civil Rights Act of 1957 was charged with "investigat[ing] allegations … that certain citizens of the United States are being deprived of their right to vote." Pub. L. No. 85-315, § 104(a)-(b), 71 Stat. 634, 635 (1957). As part of its work, the Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing voter registration forms submitted by Black and White applicants, the Commission revealed that election officials in Southern States often imposed tests on Black applicants from which White applicants were exempt, *see Rep.*

*of the U.S. Comm'n on C.R.*, at 87-88 (1959) ("*Comm'n Rep.*"), and denied registration to Black applicants "because of inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register," *id.* at 91.[2] The Commission thus concluded that reviewing voter "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137.

Yet the Commission found its investigatory work thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, in response to the 1957 Act, Alabama enacted legislation requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 212 (1959) ("*Hearings*") (statement of Att'y Gen. Rogers).[3] Compounding the problem, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7 (1959). The Commission therefore recommended that Congress enact legislation requiring that election officials retain applications to vote and allow DOJ to inspect them. *Comm'n Rep.* at 137-38. In testimony before Congress, DOJ agreed that comparing the voter applications of Black and White voters was essential to its civil rights work, explaining that, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *An Act to Enforce Constitutional Rights, and for Other Purposes:*

---

[2] The Commission Report is available at: https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

[3] Available at: https://perma.cc/ET26-FKD9.

*Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86 Cong. 6 (1960) (statement of U.S. Att'y Gen. Rogers).[4] "Congress responded by passing the Civil Rights Act of 1960." *Penn. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Shwartz, J., dissenting).

Congress tailored the CRA to the problem before it: the need to ensure the preservation and availability of the key evidence necessary to investigate voting rights violations. As explained by a principal drafter of the CRA, "[t]he purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector." *Hearings* at 700 (statement of Rep. William M. McCulloch).[5] The CRA thus "enable[s] the Attorney General to determine whether § 1971 suits or similar actions should be instituted." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[6] To that end, the CRA contains several interlocking provisions that collectively permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.*

The core provision of the CRA requires officials to "retain and preserve" the records most critical to a voting rights investigation:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] … all records and

[4] Available at: https://perma.cc/46G6-GQZB.

[5] Available at: https://perma.cc/ET26-FKD9.

[6] Section 1971, now codified at § 10101, guarantees the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. § 10101(a)(1).

> papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20701. The CRA criminalizes "willfully fail[ing]" to comply with the statute's command, *id.*, threatening "imprison[ment]" for "[a]ny person … who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved," *id.* § 20702. The CRA allows DOJ to inspect covered records after it makes a compliant pre-suit demand:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id.* § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

### B. The National Voter Registration Act

Three decades after the enactment of the CRA, Congress passed the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote" and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b). Congress, however, exempted States that had and maintained same-day voter registration from the NVRA's requirements. *Id.* § 20503(b). Wisconsin is one of six exempt States. *See Pub. Int. Legal. Found., Inc. v. Wolfe*, No. 24-CV-285-JDP, 2024 WL 4891940 at *2 (W.D. Wis. Nov. 26, 2024); *see also* Br. for United States as Appellee at 5, *Pub. Int. Legal Found., Inc. v. Wolfe*, No. 24-3258 (7th Cir. Apr. 23, 2025) ("Wisconsin is covered by [NVRA] Section 4(b)(2)'s exemption.").

For the 44 States covered by the NVRA, the statute's requirements are aimed at ensuring "simple means are available to register for federal elections and [that] these means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). The NVRA also requires covered States to take steps to ensure their voter rolls are reasonably up to date. *See* 52 U.S.C. § 20507(a)(4). But in doing so, the NVRA reaffirms the principal role of States in managing registration lists, requiring only that States "conduct a general program" that "makes a reasonable effort" to remove names from the list that are ineligible because of either (1) "the death of the registrant" or (2) "a change in the residence of the registrant." *Id.* § 20507(a)(4). The NVRA also tempers this modest list-maintenance obligation with a series of safeguards designed to prevent erroneous or rushed cancellations of voters' registrations. *Id.* § 20507(a)(3), (b)-(e).

The NVRA expressly addresses disclosure of records related to state compliance. It requires covered States to "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i). Courts hold either that this inspection provision does not reach States' SVRLs, *e.g.*, *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 678-83 (9th Cir. 2026), or that it permits States to redact sensitive personal information on voters before disclosing SVRLs, *e.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56

(1st Cir. 2024). The NVRA also authorizes DOJ and private enforcement actions to address any alleged violations. *See* 52 U.S.C. § 20510.

### C. The Help America Vote Act

A decade after the NVRA, and more than four decades after the CRA, Congress enacted HAVA to "improve voting systems and voter access." *Republican Nat'l Comm. v. NC. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Among other things, HAVA requires States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1).

The list is dynamic by design. For instance, HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* § 21083(a)(1)(A)(vi). The State's chief election official must ensure "local election officials are able to enter [that] information." *Id.* § 21083(a)(1)(A)(vii). Likewise, HAVA requires that the list "shall be coordinated with other agency databases within the State." *Id.* § 21083(a)(1)(A)(iv). HAVA also requires States take steps to ensure that "voter registration records" are "accurate and are updated regularly." *Id.* § 21083(a)(4). In other words, HAVA charges States with regularly changing their single, centralized SVRLs, so that it reflects the current snapshot of a State's registered voters.

Though HAVA gives DOJ authority to sue to address violations of the statute, *see id.* § 21111, it does not grant DOJ a right to demand or inspect SVRLs or otherwise empower DOJ to superintend or audit States' voter list maintenance practices. To the contrary, HAVA reaffirms the preeminent role of States in managing voter lists,

instructing that each State's list be "defined, maintained, and administered at the State level," *id.* § 21083(a)(1)(A), and committing "[t]he specific choices on the methods of complying with the requirements of [HAVA] to the discretion of the State," *id.* § 21085. The absence of any inspection provision in HAVA is a feature, not a bug—Congress viewed state authority over voter registration as central to preserving our democratic system:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. *The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate now elections will be run, and thereby be able to control the outcome.* This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (emphasis added).

HAVA also discusses list maintenance, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Rather, HAVA ports over the NVRA's list maintenance requirements to the computerized SVRL, charging most States with "perform[ing] list maintenance" of their computerized voter lists "on a regular basis" consistent with the requirements of the NVRA. 52 U.S.C. § 21083(a)(2)(A). But States exempt from the NVRA, such as Wisconsin, are also exempt from HAVA's list maintenance requirement—such States need only conduct list maintenance in accordance with "State law." *Id.* § 21083(a)(2)(A)(iii). HAVA also requires that state law "include provisions" geared toward ensuring SVRLs are "accurate and are updated regularly." *Id.* § 21083(a)(4).

## II. DOJ embarks on a nationwide campaign to collect the private voter data of millions of Americans.

Last year, DOJ launched an unprecedented campaign to collect States' unredacted SVRLs, which include sensitive information about each registered voter. DOJ sent demands to at least 48 States, but most refused to turn over their unredacted lists.[7] DOJ sued 30 States and the District of Columbia to compel disclosure.

DOJ's legal theories have shifted over the course of these lawsuits. DOJ initially framed the matter largely in terms of the NVRA and HAVA. *See United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 1. But in its more recent suits, including this one, DOJ rested exclusively on the CRA. *See* Compl., Doc. 1. Each district court that has addressed DOJ's CRA claims to date has dismissed them,[8] and the Sixth Circuit affirmed the Michigan district court's decision

---

[7] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[8] *See United States v. Oregon*, 828 F.Supp.3d 1092 (D. Or. 2026), *appeal docketed*, No. 26-1231 (9th Cir. argued May 19, 2026); *United States v. Weber*, 816 F.Supp.3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. argued May 19, 2026); *United States v. Fontes*, No. 2:26-CV-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026), *appeal docketed*, No. 26-3609 (9th Cir. June 4, 2026); *United States v. Galvin*, 830 F.Supp.3d 122 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 10, 2026); *United States v. Amore*, No. 1:25-CV-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 10, 2026); *United States v. Bellows*, No. 1:25-CV-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026), *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026); *United States v. Wis. Elections Comm'n*, No. 3:25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026), *appeal docketed*, No. 26-2217 (7th Cir. June 5, 2026); *United States v. DeMarinis*, No. 1:25-CV-03934, 2026 WL 1780586 (D. Md. June 18, 2026), *appeal docketed*, No. 26-01878 (D. Md. July 13, 2026); *United States v. Schmidt*, No. 2:25-CV-01481-CB, 2026 WL

dismissing DOJ's claims. *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026), *petition for rehearing en banc denied* (Aug. 14, 2026).

DOJ has also recast its factual allegations. In its early complaints, DOJ alleged that its demands were prompted by state-specific anomalies in voter list maintenance statistics. *See United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 5-4. Here, DOJ alleges that it received unspecified "complaints" regarding Wisconsin's "compliance with" HAVA—although it did not mention those "complaints" in the operative demand for Wisconsin's SVRL. Br. 27, ECF No. 22. In other recent suits, DOJ has abandoned the pretext that its demands were prompted

1850016 (W.D. Pa. June 27, 2026), *appeal docketed*, No. 26-2684 (3d Cir. July 7, 2026); *United States v. Scanlan*, No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026); *United States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026), *appeal docketed*, No. 26-2060 (2d Cir. July 28, 2026); *United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026), *appeal docketed*, No. 26-2126 (10th Cir. July 27, 2026); *United States v. Koski*, No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026), *appeal docketed*, No. 26-2002 (4th Cir. July 29, 2026); *United States v. Thomas*, 3:26-CV-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026), *appeal docketed*, No. 26-2064 (2d Cir. July 28, 2026); *United States v. Adams*, No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026), *appeal docketed*, No. 26-5657 (6th Cir. July 24, 2026); *United States v. Caldwell*, No. 3:26-CV-2025, 2026 WL 2186515 (D.N.J. July 29, 2026), *appeal filed*, No. 3:26-CV-2025 (D.N.J. Aug. 17, 2026); *United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026), *appeal filed,* No. 25-CV-3398 (C.D. Ill. Aug. 17, 2026); *United States v. Griswold*, No. 25-CV-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026), *appeal filed*, No. 25-CV-03967 (D. Colo. Aug 17, 2026); *United States v. Evans*, No. 25-CV-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026), *appeal filed*, No. 25-CV-4403 (D.D.C. Aug. 17, 2026); *United States v. Aguilar*, No. 25-CV-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Aug. 17, 2026), ECF No. 210.

by individualized concerns and has argued that CRA demands require no factual basis at all. *See, e.g.*, *Galvin*, 2026 WL 972129, at *4.

DOJ has also struggled to keep its story straight on the purpose of its demands, including its demand to Wisconsin. DOJ's told Wisconsin in its demand that the purpose was "ensuring compliance with minimum standards and routine voter registration list maintenance." Ex. 3, Doc 3-1. But when moving to expedite this appeal, DOJ scare-mongered about the "specter" of noncitizens on voter rolls, an issue it did not raise in its demand, pleadings, or briefing below. *See, e.g.*, Mot. to Expedite at 3, 13-14. DOJ now entirely omits the supposed noncitizen concern from its merits brief. Perhaps that is because, even in States subject to the NVRA, federal law requires only a "program" that takes "reasonable" steps to remove voters *who have moved or died*. *See* 52 U.S.C. § 20507(a)(4); *see also Bellitto*, 935 F.3d at 1195 (explaining the NVRA "requires a reasonable effort to remove only those voters who become ineligible because of death or change of address."); *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017) (similar).

DOJ's actions betray its true purpose: to empower the federal government to oversee each State's SVRL, despite no congressional authorization to do so. The head of DOJ's Civil Rights Division has confirmed that DOJ's goal is to purge "hundreds of thousands of people" from voter rolls.[9] To that end, DOJ intends to run the SVRLs it seizes from States through the Department of Homeland Security's notoriously

---

[9] Video posted by AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.

unreliable Systematic Alien Verification for Entitlements ("SAVE") database to identify suspected noncitizens and then attempt to cajole States into removing them from voter rolls.[10] DHS Secretary Mullin has threatened election officials with withheld grants, fines, and even criminal prosecution if they do not meet the administration's voter-removal demands.[11] Those threats come even though a federal court recently blocked the federal government's efforts to use SAVE for voter removals, finding that agencies "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and that using SAVE for voter verification would risk removing "United States citizens from voter rolls based on inaccurate information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *1 (D.D.C. June 22, 2026), *appeal docketed*, No. 26-5243 (D.C. Cir. June 29, 2026).

## III. DOJ sues Wisconsin to compel production of its protected voter data.

On June 17, 2025, DOJ sent a letter to Wisconsin Elections Commission Administrator Meagan Wolfe asserting that DOJ "ha[d] received several complaints" regarding Wisconsin's HAVA compliance, "many" of which "allege that WEC is failing to comply with the list maintenance procedure requirements of Section 303 of HAVA."

---

[10] *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1, 5-7); Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://abcnews.go.com/Politics/system-dhs-urging-states-assess-voter-rolls-return/story?id=134863557.

[11] Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States Over Elections*, NBC News (July 17, 2026), https://www.nbcnews.com/politics/elections/homeland-security-secretary-markwayne-mullin-threatens-states-election-rcna588002.

Ex. 1, Doc. 3-1. The June 17 letter requested WEC respond to a series of detailed questions about list maintenance and provide the State's "current voter registration list," including "both active and inactive voters." *Id.* It said nothing about the CRA. On July 2, 2025, WEC responded in a detailed, five-page letter thoroughly answering DOJ's questions, providing a link where DOJ could purchase Wisconsin's publicly available SVRL, and explaining that Wisconsin law provided no exception to the associated fee. *Id.* at Ex. 2.

DOJ did not respond for five months. Then, on December 2, 2025, DOJ abruptly emailed WEC with a barebones demand to provide "electronic copy of the full Wisconsin statewide voter registration list[,] … to include, pursuant to the Help America Vote Act, either the last four digits of the social security number, the driver's license number, or both." *Id.* at Ex. 3. The December 2 email said nothing about the June 17 letter or WEC's detailed July 2 response. And it did not invoke the CRA. WEC responded on December 11, 2025, explaining that, although Wisconsin was "willing to provide any non-confidential voter registration data or records," state privacy law "explicitly prohibits" WEC from providing the unredacted SVRL. *Id.* at Ex. 4. DOJ sued WEC on December 18, 2025.

## IV. The district court dismisses DOJ's complaint.

DOJ's sole claim is that WEC violated the CRA by not acquiescing to DOJ's December 2 demand. The district court rejected that claim after a thorough analysis of the statutory text. The court explained that the CRA "does not encompass records created by state election officials, including voter registration lists," because it covers only records that "come into [the] possession" of election officials, "not words [that

are] generally used to describe documents one creates." SA6-7. To hold otherwise, the court further explained, would create a conflict between HAVA's requirement that States constantly update and change SVRLs and the CRA's prohibition on "alter[ing]" covered records. SA9. The court is in good company: over a dozen other courts, including the Sixth Circuit, have held the CRA does not reach SVRLs.

Because the court dismissed based on the CRA's scope, the court had no need to address the numerous other independent grounds for dismissal the parties argued below, including that Wisconsin is not subject to the statutory list maintenance requirements DOJ cites, investigating list maintenance is not a proper purpose under the CRA, DOJ did not properly make a demand under the CRA, the CRA does not preempt Wisconsin voter privacy laws, and DOJ did not comply with the Privacy Act. *See* Doc. 58, 65, 78.

## STANDARD OF REVIEW

The Court "reviews a dismissal under Rule 12(b)(6) for failure to state a claim de novo." *Brooks v. Ross*, 578 F.3d 574, 578 (7th Cir. 2009) (citation omitted). A claim must be dismissed where a "complaint fails to contain enough information to state a legally cognizable claim." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009). "[A]n appellate court may affirm the district court's dismissal on any ground supported by the record, even if different from the grounds relied upon by the district court." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).

## SUMMARY OF THE ARGUMENT

1. The district court correctly dismissed DOJ's CRA claim on the grounds that the CRA does not extend to SVRLs. The statute covers only static records—like voter applications—that "come into" the possession of election officials from voters. 52 U.S.C. § 20701. But an SVRL is not a record that "comes into" the possession of election officials—it is a dynamic database that is created, maintained, and continuously revised by those election officials. Dictionary definitions, common usage, and statutory context confirm that "come into" possession refers to receiving something from an outside source. Further, the CRA requires covered records to be retained, preserved, and not altered. That makes sense when applied to discrete documents submitted to election officials by voters, but if extended to SVRLs, it would place the CRA in irreconcilable conflict with HAVA, which commands election officials to continuously update and alter SVRLs. DOJ's numerous counterarguments all fail and have been rejected by every court that has considered them.

2. The Court should also affirm on other grounds that the district court did not reach. DOJ failed many times over to comply with the CRA's requirement that it issue a pre-suit demand stating "the basis and the purpose" for its inspection. 52 U.S.C. § 20703. *First*, DOJ's stated purpose of assessing Wisconsin's compliance with federal list maintenance requirements is incoherent because Wisconsin is exempt from the list maintenance obligations DOJ invokes. *Second*, assessing list maintenance compliance is not a valid purpose for a CRA demand; the NVRA and HAVA govern list maintenance, and the CRA cannot be repurposed to grant DOJ the power to audit States' SVRLs when Congress chose *not* to grant DOJ any such

authority in the NVRA or HAVA. *Third*, DOJ never invoked the CRA in its pre-suit demand or stated any "basis" for that demand, as the statute requires. Each of these failures requires affirmance. And, contrary to DOJ's suggestion, nothing in the Federal Rules of Civil Procedure or the CRA insulates its demand from judicial review; to the contrary, the Supreme Court has made clear that judicial review of government document demands is necessary. *See United States v. Powell*, 379 U.S. 48 (1964). *Finally*, the Court should also affirm because nothing in the CRA suggests Congress intended to preempt state privacy laws like Wisconsin's that forbid disclosure of sensitive personal information on SVRLs, and because DOJ failed to comply with the notice requirements of the federal Privacy Act, which are triggered whenever a federal agency seeks to maintain or collect a system of records, as DOJ undoubtedly seeks to do here.

3. Should the Court reverse, the proper next step is to remand and allow discovery on, among other things, whether DOJ's stated purpose is pretextual.

## ARGUMENT

### I. The CRA does not cover state-created, dynamic records like Wisconsin's SVRL.

The district court correctly held that state-created, dynamic "voter registration lists are not documents subject to production under Title III." SA9. They are records that election officials create, not ones they "come into possession" of. And HAVA provides for constant changes, which would conflict with the CRA's demands for unaltered preservation. DOJ's unpersuasive counterarguments have been rejected by

every court to consider them to date. *See Evans*, 2026 WL 2267774, at *5 (collecting cases).

### A. Wisconsin's SVRL was created by Wisconsin election officials and therefore did not "come into" their possession.

"As with all questions of statutory interpretation, [the Court should] start with the text." *Craig v. City of Richmond*, 179 F.4th 535, 540 (7th Cir. 2026). The CRA requires election officers to "retain and preserve … all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Only "records" or "papers" that "come into" election officials' possession within the meaning of § 20701 are subject to production upon a proper demand by the Attorney General. *Id.* § 20703.

The CRA does not define what it means for a record to "come into" possession of an election officer. But dictionaries from around the time Congress enacted the CRA equated "coming into" possession of something with acquiring, obtaining, or receiving something from an outside source. *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire"). This same understanding endures 66 years later. *See, e.g.*, *Receive, Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"). Federal courts have also adopted

these definitions. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed., 1966, unabridged)).

Common usage confirms what the dictionaries already make clear. Consider, as the Sixth Circuit did, a cake. "A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes." *Benson*, 179 F.4th at 479. The baker might have "come into" possession of the purchased ingredients, but it would be "rather strange to say" she has "come into" possession of a cake she baked with those ingredients. *Id.* Such a phrase is unnatural because it would falsely imply that the baker merely acquired a finished cake from someone else instead of expending time and labor to produce it. By the same principle, "an ordinary English speaker would not say" that Wisconsin came into possession of the SVRL that it "created[.]" *See id.*

Accordingly, the district court's definition of "come into possession" is the "natural" and "ordinary" meaning of the phrase. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Because Wisconsin election officials internally generate and continuously update the SVRL, it does not "come into" their possession and thus is not a record subject inspection under the CRA. *See* SA7.

If Congress had intended for the CRA to cover dynamic documents created by election officials, it had "obvious alternative" language at its disposal. *Hulce v. Zipongo Inc.*, 132 F.4th 493, 499 (7th Cir. 2025) (quoting *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017)). It could have written the CRA to simply encompass "all records" that met the subsequent statutory criteria, without any qualifier regarding possession, as it did in the NVRA. *Koski*, 2026 WL 2032532, at *5 (quoting 52 U.S.C. § 20507(i)(1)). Or "Congress could have required the retention and production of all election-related records and papers '*in* the possession of' the state election official." *Bellows*, 2026 WL 1430481, at *6 n.10 (emphasis added). Indeed, Congress *frequently* employs the phrase "in the possession of" to convey its desire that a statute sweeps broadly. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a); 18 U.S.C. §§ 3500(a)-(b), 1968(f)(3)-(4); 7 U.S.C. § 12(e); 49 U.S.C. § 47124a(b)(1). But for the CRA, Congress "chose not to use this broader formulation in Section 20701 and, having done so, the court must give meaning to the words 'come into.'" *Scanlan*, 2026 WL 1864054, at *6. After all, "[c]ourts are required to give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018).

Additional textual indicators confirm that Congress used the ordinary meaning of "come into possession." The surrounding text of Section 20701 explains that the relevant "records" are those "relating to any application, registration, payment of poll tax, or other act requisite, to voting in such election." *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("Accompanying words" are key context

because "a word is known by the company it keeps."). Those are the sort of records that officials "obtain [] from … third parties," such as a prospective voter, rather than create themselves. *Benson*, 179 F.4th at 479. As the Sixth Circuit recounted, even the reference to records related to "payment of poll tax" reveals the narrow category of documents captured in this language. *Id.* When the CRA was enacted, voters would pay poll taxes to their sheriff, who would provide a receipt for the voter to present to election officials. *Id.* (quoting *Comm'n Rep*. at 32, 36-37). The CRA thus required that officers "would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

### B. Applying the CRA to Wisconsin's SVRL would require it to be preserved without alteration, but federal and Wisconsin law require constant updates.

The CRA's preservation requirements confirm that it does not apply to Wisconsin's SVRL. Any record covered by the CRA must be "retain[ed] and preserv[ed]," and may not be "alter[ed]." 52 U.S.C. §§ 20701, 20702. If Section 20701 is read to cover Wisconsin's SVRL, it would "effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, per the state, would be 'impractical to the point of impossible.'" *Scanlan*, 2026 WL 1864054, at *5 (quoting representations from the State of New Hampshire). It is implausible that "Congress was attempting to require the impossible." *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 355 (1937).

The command to preserve and retain covered records is paired with Section 20702's criminal penalties for those who willfully "alter" them. 52 U.S.C. § 20702. HAVA, however, *requires* States to establish a dynamic SVRL "that is constantly

being 'altered' as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the [list] otherwise require modification." *Thomas*, 2026 WL 2070437, at *6; 52 U.S.C. § 21083(a)(1). Adopting DOJ's interpretation of the CRA would create an unavoidable clash with HAVA, and by extension, place election officials in the impossible bind of choosing which statute to honor—at risk of criminal penalty. *See, e.g.*, *DeMarinis*, 2026 WL 1780586, at *4-6 ("This Court will not read § 20701 to produce such an absurd result."). Courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). In particular, earlier-adopted statutes should be read "to contain that permissible meaning which fits most logically and comfortably into the body of both previously *and subsequently* enacted law." *Watson v. Republican Nat'l Comm.*, 146 S.Ct. 2615, 2177 n.8 (2026) (emphasis added). This Court should join the Sixth Circuit and numerous district courts in declining to "adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Benson*, 179 F.4th at 480.

### C. DOJ's interpretation of the CRA should be rejected.

Nothing in DOJ's brief should convince this Court to depart from the consensus that the CRA's plain text does not extend to internally generated, dynamic SVRLs.

*First*, DOJ points to cases in which courts have ordered production of (redacted) SVRLs under the NVRA, such as the First Circuit in *Public Interest Legal Foundation v. Bellows*, 92 F.4th 36 (1st Cir. 2024). Br. 13-15. But *Bellows* undercuts DOJ's reading of the CRA. The court held that the *NVRA's* inspection provision

extends to (redacted) SVRLs because an SVRL "concern[s] the implementation of programs and activities" relating to voter list maintenance. *Bellows*, 92 F.4th at 47-48 (quoting 52 U.S.C. § 20507(i)). But that language in the NVRA is targeted at internal, state-generated records about the "implementation" of state programs concerning voter lists—quite unlike the CRA, which is focused on discrete and static records received from voters. Indeed, the phrase on which the district court primarily relied, "come into … possession," does not appear in the NVRA, 52 U.S.C. § 20507(i), and so cases about the scope of the NVRA shed little light on the CRA's different text. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'"). The NVRA's inspection provision shows that Congress knows how to draft disclosure obligations that can extend to internal documents created by election officials—and when it does so, the language it employs differs markedly from that in the CRA.[12]

Another vital distinction: rather than the CRA's instruction to "preserve," "retain," and not "alter" records, the NVRA directs States to "*maintain*" "records" subject to disclosure. 52 U.S.C. § 20507(i) (emphasis added). Thus, while DOJ bizarrely cites the Tenth Circuit's decision in *Voter Reference Foundation* as support for its position, Br. 24, that opinion undermines DOJ's reading of the CRA, 160 F.4th

[12] The Ninth Circuit has held that SVRLs are not subject to disclosure under the NVRA. *Nago*, 174 F.4th at 679. That decision only further emphasizes that the NVRA cannot help DOJ here: if the NVRA's inspection provision, which is keyed to internal, State-created documents, as part of a statute that explicitly deals with voter list maintenance, does not permit inspection of SVRLs, then Title III of the CRA certainly does not.

at 1085. The Tenth Circuit's holding that a dynamic SVRL is a record under the NVRA hinged on the definition of "maintain": "to 'carry on' or 'keep up.'" *Id.* (quoting *Maintain*, Oxford English Dictionary (2d ed. 1989)). To "carry on" or "keep up" something is quite unlike the CRA's command to "preserve," "retain," and not "alter" records.

*Second*, DOJ attempts to paper over any conflict between its reading of the CRA and HAVA by asking the Court to ignore the plain meaning of the term "alter" in the CRA. Br. 23. "Alter" simply means "to cause to become different in some particular characteristic." *Alter*, *Webster's Third New International Dictionary* 63 (1966). The very point of list maintenance is that the list will "become different" every time a voter registers, updates their registration, or is removed from the list. DOJ responds that *Fischer v. United States* shows that alter has a narrower meaning, such that updating the SVRL would not count as "altering" it because it would not impair its evidentiary value—but *Fischer* reached that conclusion because the obstruction-of-justice statute it construed contains an additional mens rea requirement absent from the CRA. 603 U.S. 480, 487 (2024); *see also* 18 U.S.C. § 1512 ("Whoever corruptly … alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, *with the intent to impair the object's integrity or availability for use in an official proceeding*." (emphasis added)). Regardless, depending on the issue being investigated, updating the SVRL might well impair its evidentiary value—such as if an ineligible voter previously listed were removed. "Alter" "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *Servotronics,*

*Inc. v. Rolls-Royce PLC*, 975 F.3d 689, 694 (7th Cir. 2020) (citation omitted). Read together, the CRA's requirements that covered records be retained and preserved, *and* not altered, are all consistent with an obligation to keep records in a static, identical form; it simply does not make sense to extend that obligation to a dynamic, constantly evolving SVRL.

As a backup, DOJ urges the Court to ignore this statutory collision because an election official is not liable for altering a record covered by the CRA unless they do so "willfull[y]," Br. 24-25, meaning that they "acted with knowledge that his conduct was unlawful," *United States v. McCullough*, 348 F.3d 620, 626-27 (7th Cir. 2003) (citation omitted). DOJ fails to explain how this knowledge requirement can change what it means to "alter" a record, and regardless, if this Court held that Wisconsin's SVRL is a record covered by the CRA, election officials would thereafter be unable to engage in the list maintenance that HAVA demands.

*Third*, DOJ conflates an individual voter's application or registration record with the information contained therein. Br. 15-16. Although the SVRL draws from *information* contained in records that came from voters, the SVRL is definitionally not the same thing as the voter-provided records. Nor is it a mere compilation of those records. Instead, the SVRL is a new thing entirely, repurposing and combining information from voter-provided records while also mixing in information from election officials, such as a voter's "ward and aldermanic district," "unique registration identification number assigned by the commission," "[t]he date of any election in which the elector votes," "the method by which the elector's registration

form was received," and more. Wis. Stat § 6.36 (2025); *see also Benson*, 179 F.4th at 481 n.1 (noting that Michigan's list contained a voter's "[p]recinct number" and "voting history").

*Fourth*, DOJ proposes a "temporal" reading under which "come" into possession clarifies that the CRA covers "only those documents that an officer comes to possess 'during her tenure.'" Br. 19 (quoting *Benson*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting)). This interpretation is untethered from the CRA's text, which does not contain the additional phrases that DOJ relies upon: "during her tenure" and "in the course of administering" an election. Br. 17. As a result, the phrase "come into" does nothing, in the context of the CRA's text, to support a restriction to documents received during an official's service. Rather, the only temporal language in the statute is the reference to the twenty-two months after a federal election. To the extent that "comes into" imposes any temporal restriction, it would therefore limit the CRA to records first acquired during that 22-month period, which would bizarrely exclude records received during the two months immediately before election day, when the relevant records are most likely to be received. DOJ does not defend such an argument.

DOJ points to other statutes that use the phrase "come into possession," but those statutes only undercut its "temporal" construction: Each confirms that Congress deliberately uses the phrase "come into possession" when referring to things *received* by someone. For example, 8 U.S.C. § 1454(a) says that someone who "comes into" possession of a "lost" certificate of naturalization must

return it to the Attorney General; in other words, "it presupposes receipt from an external source." *Scanlan*, 2026 WL 1864054, at *5. DOJ's other handpicked statutes also illustrate that "come into" most naturally refers to receiving something from an outside source. *See, e.g.*, 44 U.S.C. § 3572 (using phrase "comes into possession" in reference to "information supplied by individuals or organizations to an agency"); 10 U.S.C. § 130c(d) (using phrase "came into possession or under the control of the United States" in reference to information "received by an agency" from a foreign government); 30 U.S.C. § 1732(b) (explaining States and Indian tribes are entitled royalty information "as soon as practicable after it comes into the possession of the Secretary").

*Fifth*, DOJ argues the district court's construction of the statute would still cover self-generated records in "all but the most marginal cases," because even if one employee "generated the requested record," other employees who acquire the record from the first employee would "come into [the] possession" of the record and thereby make it subject to the CRA. Br. 22. This argument misunderstands the district court's order. The district court—and others around the country—did not hold that coverage under the CRA turns on an employee-by-employee assessment, such that whether records are covered "turn[s] on the staffing practices of state election bodies." *Evans*, 2026 WL 2267774 at *10 n.8 (characterizing DOJ's argument as "pedantry"). Rather, the district court held that the relevant provisions as a whole draw a line between voter-created created documents on the one hand and internally generated documents on the other, requiring preservation only of the former and not of the

latter. Such an approach makes far more sense than DOJ's employee-by-employee straw man, as it is a "doubtful proposition that Congress sought to accomplish" coverage of internal records in such a "surpassingly strange manner" when it could have done so "in a much more straightforward way." *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (internal quotation marks omitted). And DOJ's reading would *still* fail to capture Wisconsin's SVRL, which does not transfer from one election officer to another as a static, discrete record would but is instead a "continuously maintained, state-generated compilation of data" that Wisconsin "has built, updated, and controlled since its creation." *Scanlan*, 2026 WL 1864054, at *6 (describing New Hampshire's list).

In a similar vein, DOJ asserts that a passing reference to voucher indices in the Civil Rights Commission Report should control whether Wisconsin's SVRL falls under the CRA, Br. 20, but DOJ conspicuously fails to locate any evidence in the statutory text or legislative history to indicate that *those voucher indices* were within the CRA's reach. DOJ claims that voucher indices "were among the records that the Commission recommended that Congress make available for federal inspection," Br. 21, but the report says nothing of the sort. *See Comm'n Rep.* 137-38. Rather, the report briefly mentions the Commission reviewed an index showing which voters vouched for which other voters in Bullock County, Alabama; it does nothing to suggest that the CRA was meant to ensure DOJ access to that voucher index, which the federal government could *already obtain* without the need for further statutory authority. *Id.* at 93. As explained in the next paragraph, the purpose of the CRA was

to ensure the preservation of records that were *not* available to the Commission. And regardless, the Commission's report cannot alter the scope of the CRA's plain text.

*Sixth*, DOJ speculates the "intention of Congress" supports its view of the CRA. Br. 26-27. "Because the plain meaning of [the CRA] resolve[s] this question," this Court "need not look beyond the text to consult legislative history." *Beeler v. Saul*, 977 F.3d 577, 590 (7th Cir. 2020). A look, nevertheless, shows that DOJ is wrong about Congress's intent. The Commission Report that prompted enactment of the CRA explains why Congress was preoccupied with application materials: The Commission found its investigation thwarted by efforts to destroy "[r]ejected applications" submitted by Black applicants, *Comm'n Rep*. 93, and it determined that comparing such applications to accepted applications submitted by White applicants was "essential to any investigation of denials of the right to vote," *id.* at 137. That is why it recommended Congress enact legislation requiring voter applications to be preserved and subject to inspection. *Id.* at 138. DOJ needed those voter *applications* specifically because "[w]ithout access to accepted and rejected registration materials, the Attorney General could not independently evaluate whether black voters had satisfactorily established their qualifications or had done all that was asked of white voters, such that their omission from the voter rolls could be attributed to race." *Evans*, 2026 WL 2267774, at *9.

Unlike voter applications, voter lists would "not have enabled the Attorney General to conduct the sort of *comparative* analysis necessary to seek injunctive relief." *Id.* at *10 (emphasis added). Also, voter lists (although not SVRLs, with their

detailed personal identifying information) would have *already* been available to DOJ, without the need for a federal law mandating their disclosure, because "voter rolls have long been treated as public records, which are made available to political parties, advocacy organizations, and members of the public." *Id.* (citing Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. 44, 167, 179, 236, 259, 270, 272, 290 (1929)). That is why "[i]n the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain lists of qualified voters, even in jurisdictions hostile to its mission." *Id.* In light of this history, it is no surprise that the CRA's text is keyed to records submitted to election officials by voters, not voter lists.

*Finally*, DOJ turns to hyperbolic policy arguments, claiming that it would "paralyze" DOJ's ability to enforce voting laws if the CRA did not reach SVRLs. Br. 21. "These arguments are nonstarters because they are based in public policy, and 'policy concerns cannot trump the best interpretation of the statutory text.'" *Britkovyy v. Mayorkas*, 60 F.4th 1024, 1031 (7th Cir. 2023) (quoting *Patel v. Garland*, 596 U.S. 328, 346 (2022)). In any event, nothing would be "paralyzed." DOJ's present campaign for States' SVRLs is unprecedented; it has never before needed the sweeping and previously unasserted power it now claims is vital to enforcing federal law.[13] If

[13] DOJ cites instances in which Georgia in 2006 and Texas in 2008 voluntarily provided DOJ with their SVRLs, Br. 26, but neither were part of a national campaign to audit States' SVRLs, as DOJ seeks to do here. Both were also resolved without a court adjudicating the merits. *See* Consent Decree, *United States v. Georgia*, No. 1:06-CV-2442 (N.D. Ga. Oct. 27, 2006); U.S. Dep't of Just., *MOU Between the United States and Texas* (May 13, 2008), https://www.justice.gov/media/1173461/dl?inline.

Congress thought it necessary for DOJ to audit unredacted SVRLs to assess compliance with HAVA, it would have given DOJ the authority to do so *in HAVA*. *Bellows*, 2026 WL 1430481, at *8. Rather than grant DOJ such authority, however, HAVA in fact affirms that SVRLs are to be "maintained" and "administered" at "the State level." 52 U.S.C. § 21083(a)(1)(A).

## II. The Court should also affirm because of other flaws in DOJ's claim.

DOJ's demand also fails for a host of independent reasons, each of which provides an independent basis to affirm.

### A. DOJ's CRA demand is subject to meaningful judicial review.

DOJ argues that a 60-year-old Fifth Circuit decision, *Lynd*, largely exempts CRA claims from judicial review and, indeed, the Federal Rules of Civil Procedure. *See* Br. 28-33. According to DOJ, the CRA instead requires some unspecified "special statutory proceeding[s]," free of any pesky "procedural device[s] or maneuver[s]" questioning DOJ's compliance with the statute it invokes. *Id.* at 28-29 (citing *Lynd*, 306 F.2d at 226). This is baseless.

DOJ points to nothing in the Federal Rules or the CRA itself that grants its claim immunity from run-of-the-mill Rule 12(b)(6) analysis. Start with the Federal Rules, which "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. This case is just such an action. Although Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—none involve the CRA. *See* Fed. R. Civ. P. 81(a).

Nor does anything in the CRA support the exemption DOJ seeks. The statute merely provides that federal district courts "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. That unremarkable jurisdictional language cannot be read to insulate CRA claims from routine judicial review or displace the Federal Rules. Just two years after *Lynd*, the Supreme Court construed a statute with materially identical language ("appropriate process") and held that, since it "contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). DOJ appears to recognize this: Despite suggesting the CRA supplants the Federal Rules, DOJ explicitly invokes Rule 12(b)(6) as the standard of review for this appeal. *See* Br. 11.

*Powell* also held that judicial review of government document demands has teeth. *Powell* tasks courts with ensuring a demand is related to a "legitimate purpose, that the inquiry may be relevant to the purpose," and "that the administrative steps required" have been followed. 379 U.S. at 57-58; *see also EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995) (empowering courts to quash subpoena issued for an "illegitimate purpose" and to assess whether a subpoena seeks "reasonably relevant information … and relates to an investigation within the agency's authority" (citations omitted)). That charge more than authorizes all the judicial review Intervenors-Appellants seek here.

"The Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention[s] and reliance on *Lynd*." *Oregon*, 828 F.Supp.3d at 1102. Accordingly, courts evaluating

DOJ's recent requests for States' SVRLs have rebuffed DOJ's position that its CRA demand is exempt from the Federal Rules and meaningful judicial scrutiny. *E.g.*, *Benson*, 179 F.4th at 483 n.2 (rejecting *Lynd* as "60-year-old out-of-circuit caselaw" and holding that "subsequent binding precedent from the Supreme Court and this court carves out a role for the courts in reviewing civil investigative demands" (citing *Powell*, 379 U.S. at 58)); *Bd. of Elections*, 2026 WL 1999921, at *6 (joining "the many other district courts which have determined that a court's role in evaluating these Title III claims is not so limited" as DOJ suggests) (citing cases). Despite this chorus of courts relying on *Powell* to reject DOJ's claimed exemption from judicial review, DOJ's opening brief before this Court omits *any* discussion of *Powell* or the mountain of case law holding government document demands, including under the CRA, are subject to judicial scrutiny.

Further, DOJ overstates *Lynd*—the court simply never addressed the issues on appeal here. *Lynd* recognized that courts must be "open for [] determination" if there were a "genuine dispute" about whether a "particular paper or record" fell under the CRA. *Lynd*, 306 F.2d at 226. There is certainly such a dispute here. *See supra* Argument § I. And the *Lynd* court had no reason to doubt that DOJ invoked the CRA for a valid purpose and complied with the statute's demand requirements, unlike here. As the court explained, the CRA's "clearest purpose[]" is to permit investigations "concerning infringement or denial of … voting rights," *Lynd*, 306 F.2d at 228, and "[t]he record establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial

discrimination "with respect to registration and voting," *id.* at 229 & n.6. *Lynd* therefore never considered any of the issues currently before this Court and thus does not purport to foreclose judicial review of those issues.

DOJ also suggests judicial review is improper because the CRA contains no "meaningful standard against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose." Br. 30. But the CRA itself provides the standard—it requires that DOJ state "the basis and the purpose" for sending the demand, and it specifies what records fall within its scope.

### B. DOJ's stated purposes is unlawful because Wisconsin has no federal-law list maintenance duty.

The CRA requires that a records demand "shall" be accompanied by a "statement of the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ insists its CRA demand was "for one purpose only: to evaluate Wisconsin's compliance with the list maintenance provisions of HAVA." Opp. to Mot. to Dismiss at 6, Doc. 71; *see also* Br. 32. On appeal DOJ invokes two sections of HAVA to support its CRA demand—Section 303(a)(2) and 303(a)(4)—but DOJ fundamentally misunderstands Wisconsin's obligations under those provisions. Properly construed, neither can provide a coherent purpose for DOJ's demand for Wisconsin's SVRL.

DOJ admits that because Wisconsin is exempt from the NVRA, it is also exempt from HAVA's Section 303(a)(2)(A)(i)-(ii). Br. 38-39. That is because Section 303(a)(2), the only provision in HAVA that requires election officials to conduct "list maintenance," contains a crucial limitation: NVRA-exempt States like Wisconsin need only "remove the names of ineligible voters" from their lists "in accordance with

*State law*," rather than based on any *federal* list maintenance obligations. 52 U.S.C. § 21083(a)(2)(iii) (emphasis added). Accordingly, Wisconsin's *only* affirmative list maintenance obligations flow from state law. But DOJ never argues that it intends to use its CRA demand to assess Wisconsin's compliance with its own laws, much less identify any statutory authority for doing so. Nor could it: "The Constitution does not authorize federal judges to superintend state and local governments' compliance with their own laws." *Evans v. City of Chicago*, 10 F.3d 474, 481 (7th Cir. 1993); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (explaining federal courts cannot compel state officials to comply with state law). Section 303(a)(2) cannot, therefore, support DOJ's CRA demand.

DOJ relies instead on a separate portion of HAVA, Section 303(a)(4), which directs that a State's "election system shall include *provisions* to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4) (emphasis added). But the only duty this subsection imposes on Wisconsin is to "include" certain "provisions" in its statutory law—quite unlike Section 303(a)(2), which actually directs officials in covered States to "perform" and "conduct[]" "list maintenance." *Id.* § 21083(a)(2). DOJ can assess Wisconsin's compliance with Section 303(a)(4)'s requirements by consulting Wisconsin statutes. *E.g.*, Wis. Stat. § 6.50(1) (requiring WEC to identify voters who have not participated in an election for four or more consecutive years for potential suspension of status); *id.* § 6.50(3) (requiring municipal clerks to issue notices to voters they believe have moved of a pending change to their voter registration status); *id.* § 6.50(4) (requiring

municipal clerk to deactivate registration of voter who is deceased); *id.* § 7.15(1) (requiring the review of duplicate voter records). The SVRL itself would do nothing to facilitate that assessment. Section 303(a)(4) thus cannot support DOJ's CRA demand.

DOJ also mentioned two other provisions of HAVA in its Complaint—Sections 303(a)(1)(A) and 303(a)(5)(A)—though on appeal DOJ does not claim its purpose is to assess Wisconsin's compliance with these provisions, which are even further afield from any list-maintenance investigation. *See* Compl. ¶ 12. Section 303(a)(1)(A) requires each State to compile and maintain "a single, uniform, official, centralized, interactive computerized statewide voter registration list." But Wisconsin undoubtedly *has* a computerized statewide voter registration list, the SVRL: indeed, as DOJ admits, WEC "offered the publicly available [SVRL] to the Attorney General[]." Compl. ¶ 22. And because HAVA leaves "to the discretion of the State" "[t]he specific choices on the methods of complying with [this section]," 52 U.S.C. § 21085, DOJ has no grounds to investigate Wisconsin's specific approach to complying with Section 303(a)(1)(A).

Next, DOJ notes that Section 303(a)(5)(A) requires States to verify information provided by applicants. *See* Compl. ¶ 13. But that has nothing to do with list maintenance and so falls outside DOJ's stated purpose in issuing its CRA demand. In any event, this provision of HAVA specifically notes that "[t]he State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, *in accordance with State law*." 52 U.S.C.

§ 21083(a)(5)(A)(iii) (emphasis added). For the same reasons that DOJ is not entitled to investigate whether Wisconsin conducts its own state list maintenance requirements in compliance with state law, DOJ is not entitled to determine whether Wisconsin complies with this provision in accordance with state law.

Finally, even if Wisconsin were subject to HAVA's list maintenance requirements, a glaring disconnect would persist between DOJ's stated purpose and its demand for Wisconsin's SVRL. An SVRL is a mere snapshot of who is *currently* registered; it reveals nothing about what programs or procedures a State has in place to verify eligibility or remove voters, and even less on whether those efforts are "reasonable." 52 U.S.C. § 21083(a)(4). As even DOJ admits, the record it demands must be "reasonably relevant" to its stated purpose. Br. 31 (quoting *CFTC v. Monex Deposit Co.*, 824 F.3d 690, 693 (7th Cir. 2016)). But DOJ fails to offer any coherent justification for the "deep level of intrusive digging" it is proposing into "line-by-line voter roll data," *Weber*, 816 F.Supp.3d at 1188, nor "any reasonable explanation" why sensitive and protected registration data on an SVRL furthers its purported purpose of assessing list maintenance programs, *Oregon*, 828 F.Supp.3d at 1105 n.4.

At bottom, Wisconsin's limited obligations under HAVA cannot justify a federal demand that Wisconsin turn over protected information on every registered voter in the State. DOJ therefore has no valid purpose for its CRA demand, requiring dismissal.

### C. DOJ's purported purpose of investigating list maintenance is not a proper purpose under the CRA.

Even if Wisconsin had some federal-law list maintenance obligation to investigate, it would not be the proper subject of a CRA records demand. The plain text and context of the CRA demonstrate that "[t]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." *Id.* at 1105. That common-sense conclusion is supported by bedrock constitutional principles of federalism, further enshrined by Congress in HAVA and the NVRA, that confirm the CRA does not grant DOJ power to usurp state authority over elections. Thus, irrespective of Wisconsin's status under HAVA, DOJ's only stated purpose of auditing Wisconsin's voter list maintenance under the statute is not a proper purpose under the CRA, as courts have held in repeatedly rejecting DOJ's parallel demands.[14]

DOJ's response effectively asks the Court to read the CRA's "purpose" requirement out of the statute entirely. According to DOJ, because the CRA does not explicitly list what kind of "purpose" it must "state," there are "no limitations on the permissible purpose of the Attorney General's demand." Br. 34. But "[i]f any purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no

[14] *See Matthews*, 2026 WL 2212877, at *5-6; *Warner*, 2026 WL 2018877, at *6-7; *Bellows*, 2026 WL 1430481, at *7-10; *Amore*, 2026 WL 1040637, at *6; *Oregon*, 828 F.Supp.3d at 1108-09; *Weber*, 816 F.Supp.3d at 1183-84; *see also Bd. of Elections of N.Y.*, 2026 WL 1999921, at *7 (DOJ's purported purpose "lacks any relation to the purposes for which Title III was enacted").

function." *Oregon*, 828 F.Supp.3d at 1104. In other words, DOJ once again has a surplusage problem, and this Court should not read "Title III so broadly as to render an express statutory obligation void of any authoritative meaning." *Warner*, 2026 WL 2018877, at *6.

DOJ's blinkered read of the CRA's purpose requirement is simply not how statutory interpretation works. "Textualists—like all those who use language to communicate—do not interpret words in a vacuum." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 672 (2026) (Barrett, J., concurring) (alteration in original) (quoting *Nebraska*, 600 U.S. at 509, 511-12, 515). And just as a parent's instruction to a babysitter to "[m]ake sure the kids have fun" does not mean the babysitter may take the kids on a multi-day jaunt to a rollercoaster park, *Nebraska*, 600 U.S. at 513 (Barrett, J., concurring), the CRA's instruction that DOJ state the "purpose" for its demand does not give DOJ carte blanche authority to invoke the CRA for whatever purpose it desires.

Rather, the proper purposes for a CRA demand can be discerned from "look[ing] to Title III's text together with the legislative backdrop against which Congress enacted the statute." *Warner*, 2026 WL 2018877, at *6. The CRA is about "act[s] requisite to voting," 52 U.S.C. § 20702, which immediately situates that its inspection provision is *also* rooted in an individual's right to vote. That unmistakable textual cue aligns with the CRA's history which, as contemporary courts observed, "leaves no doubt but that [CRA] [wa]s designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F.Supp. 848, 853 (M.D.

Ala. 1960). As DOJ acknowledges, the "CRA was passed by Congress to strengthen the Civil Rights Act of 1957…." Br. 3. Specifically, enforcement of the 1957 Act was stymied by "the refusal of some state and local authorit[ies] to permit" inspection of voter registration forms. H.R. Rep. No. 86-956, at 7. Thus, as DOJ's favored case put it, the 1960 CRA's "purpose is to enable the Attorney General to determine whether [§ 10101 voting rights] suits or similar actions should be instituted." *Lynd*, 306 F.2d at 228. Said differently, the "purpose of Title III" was to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Hearings* at 600. This Court should reject DOJ's attempt to convert the CRA, enacted to *protect* the right to vote, into a tool to further its broader efforts to *remove* voters from States' voter rolls. *See supra* Statement § I(A).

The "[b]ackground legal conventions and constitutional structure [that] inform the most natural reading of a statute," *Learning Res.*, 146 S. Ct. at 672 (Barrett, J., concurring), further confirm that "whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them." *Bellows*, 2026 WL 1430481, at *7. The Constitution, in the first instance, "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69. And although Congress may override State choices, when the federal government "claims to discover in a long-extant statute an unheralded power," courts "typically greet its announcement with a measure of skepticism. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). In asserting authority to superintend state list

maintenance, DOJ's "boundless reading" of the CRA defies the "basic principles of federalism." *Bond v. United States*, 572 U.S. 844, 858-59 (2014). As this Court recently observed, "federalism-related concerns" are often "dispositive" in the elections context. *Count US IN v. Morales*, 172 F.4th 974, 976 (7th Cir. 2026).

DOJ's attempt to shoehorn the CRA into a voter list inspection tool would also upset the "comprehensive scheme for the creation and upkeep of states' computerized" SVRLs Congress created in HAVA and the NVRA. *Bellows*, 2026 WL 1430481, at *8. Indeed, HAVA contains no inspection provision, and certainly does "not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list." *Id.* at *18. Instead, HAVA grants the Attorney General power to "bring a civil action against any State" for "declaratory and injunctive relief" under the statute—so long as DOJ can state a viable claim for relief that survives Rule 12(b)(6) review. 52 U.S.C. § 21111. And although the NVRA—from which Wisconsin is exempt—does include a pre-suit investigation tool, it too does not grant DOJ authority to audit *unredacted* SVRLs. *E.g.*, *Voter Reference Found.*, 160 F.4th at 1083 n.14; *Pub. Int. Legal Found. v. Bellows*, 92 F.4th at 56.

DOJ speculates—without evidence—that Congress saw "no need" to provide such provision in HAVA because the CRA already provided such a tool. Br. 36. But to *infer* that the federal government could audit a State's SVRL for violations of one federal statute (HAVA) by using authority from a provision in a *separate* federal

statute (the CRA)—enacted decades earlier for a distinct purpose—defies federalism, statutory interpretation, and logic itself. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal citations omitted) (holding where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," specific provisions control over general authorizations). In the end, the Court also "must be guided to a degree by common sense," which underscores that Congress did not haphazardly grant DOJ a power of such "political magnitude" in a six-decade old civil rights law that no court has ever applied outside of voting rights investigations. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

### D. DOJ did not comply with the CRA's requirement that it issue a demand that states its basis.

Finally, DOJ also failed to state "the basis" for its demand, as the CRA independently requires. 52 U.S.C. § 20703 (emphasis added). DOJ never invoked the CRA in its requests for Wisconsin's SVRL; the operative demand for Wisconsin's unredacted SVRL did not state any factual basis at all; and the basis DOJ raises in its briefing is vague and insufficient.

*First*, DOJ did not even invoke the CRA in any of its correspondence with WEC. In cases against other States DOJ has argued that it complied with the requirement to state "the basis" for its request by citing the CRA, *e.g.*, *Amore*, 2026 WL 1040637, at *5, but that construction would doom DOJ's demand here. Neither DOJ's June 17, 2025, letter nor the December 2, 2025, email requesting the unredacted SVRL said

anything about the CRA. Exs. 1, 3, Doc. 3-1.[15] Not until filing its December 2025 *complaint* did DOJ attempt to backtrack and connect its requests, which only cited HAVA, to the CRA. There was simply no CRA demand, which is fatal to DOJ's CRA claim. *See Benson*, 179 F.4th at 483 (finding DOJ's demand insufficient where earlier letters "reference the NVRA and HAVA" but "[t]hose letters did not mention Title III").

*Second*, DOJ alleges that its December 2 email is its demand, Compl. ¶ 26, but that email fails to state any factual "basis,", as the CRA requires. 52 U.S.C. § 20703. To satisfy that requirement, DOJ's demand must have included at least some "factual allegations suggesting" the possibility of a legal violation. *Amore*, 2026 WL 1040637, at *5. The bare-bones email states DOJ's purported purpose—"ensuring compliance with minimum standards and routine voter registration list maintenance"—but never alleges anything that could be construed as DOJ's factual basis. Ex. 3, Doc. 3-1. That is fatal to DOJ's claim: "the statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct." *Galvin*, 2026 WL 972129, at *4. And DOJ cannot rely on the June letters for a statement of basis; its Complaint is quite clear that the December 2 email alone is its purported CRA demand. Compl. ¶ 26. Nothing in the December 2 letter suggests it was following up on or referring back to prior correspondence. Besides, the Supreme Court has interpreted similar statutory

[15] Without comment or explanation, the December 2 email attached a proposed memorandum of understanding; it contains a scattershot citation to six different authorities including the NVRA, HAVA, the CRA, and the Privacy Act. Doc. 1 ¶ 24. This appears to be the only time the CRA was referenced in any communications with WEC.

instructions to require the government to provide "'a' *single* document containing the required information, not a mishmash of pieces with some assembly required." *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (emphasis added); *id.* at 163 ("Congress's decision to use the indefinite article 'a' … suggests that the government must issue a single statutorily compliant document[.]"). Accordingly, because DOJ "cannot pinpoint" a single CRA demand "with a statement of the basis *and* purpose," it failed to satisfy the statutory requirements. *Benson*, 179 F.4th at 482-83.

*Third*, even reading DOJ's scattered communications together, DOJ still failed to state any adequate basis. DOJ's June 17 letter merely asserted that DOJ had received unspecified "complaints" that WEC was "failing to comply with the list maintenance procedure requirements of Section 303 of HAVA," Ex. 1, Doc. 3-1, while the June 4 letter complained about the separate concern that Wisconsin lacked a process for resolving unspecified "HAVA complaints" without a word about those complaints' subject matter, Doc. 5-5. The assertion that DOJ received "complaints" without more provides no color about the "specific, articulable facts pointing to" a possible violation of HAVA. *Weber*, 2026 WL 118807, at *9; *see also Oregon*, 828 F.Supp.3d at 1104 (finding that DOJ's demand "contain[ed] no statement of a factual basis for believing Oregon violated the NVRA or HAVA"). From these letters, it is impossible to glean *what* kind of Section 303 violation DOJ is investigating. Did DOJ receive credible complaints that Wisconsin improperly removed *eligible* voters from its registration list? Or that it failed to remove *ineligible* voters? Or something else entirely? "Simply put, [DOJ's demand] does not identify what conduct, it believes,

constitute[d] an alleged violation." *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018) (quashing civil investigative demand that failed to provide basis for investigation).

**E. The CRA does not preempt Wisconsin's voter privacy laws.**

Even if the CRA permits DOJ to inspect Wisconsin's SVRL, Wisconsin law protects sensitive voter information from disclosure. *See* Wis. Stat. § 6.36(1)(b)1.a. That includes a voter's "operator's license number" and partial "social security account number," *id.*, the very information DOJ demands, *see* Doc. 5-3. In light of this, for DOJ to obtain the protected information, it must show the CRA preempts Wisconsin's voter privacy laws. It does not.

As DOJ admits, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Br. 46 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). Nothing in the CRA's text evinces a purpose to preempt common-sense voter privacy laws like Wisconsin's. A comparison to the NVRA confirms the point. The courts that have held the NVRA's inspection provision requires disclosure of SVRLs have emphasized that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" on such lists. *Pub. Int. Legal Found. v. Bellows*, 92 F.4th at 53-56; *see, e.g.*, *Voter Reference Found.*, 160 F.4th at 1083 n.14. Nor does anything in the CRA's text prohibit such redactions.

Indeed, the Congress that enacted the CRA could not have intended to preempt state laws exempting driver's license numbers and social security numbers from inspection because federal law did not even require registrants to provide that information until 2002. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Even *Lynd* recognizes that

the CRA was intended only to reach "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231. Because there is no reason to conclude Congress's purpose in enacting the CRA was to preempt state voter privacy laws, the CRA cannot require WEC "to disclose specific types of information they are prohibited from disclosing under" state law. *Oregon*, 828 F.Supp.3d at 1108.

### F. DOJ has not complied with the Privacy Act.

The Court should also affirm because the mass data collection DOJ seeks would violate the Privacy Act. *See Weber*, 816 F.Supp.3d at 1192-93 (dismissing DOJ's demand for California's unredacted SVRL on this ground).

The Privacy Act "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 25-CV-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). One such requirement is that before an agency may "establish or revise any 'system of records,' it must 'publish in the Federal Register … a notice of the existence and character of the system of records.'" *Id.* at *2 (quoting 5 U.S.C. § 552a(e)(4)). The System of Records Notice or "SORN" must specify the "purposes for which the information is intended to be used," whose records are at issue, and the types of records covered. 5 U.S.C. § 552a(e). DOJ does not appear to contest that Wisconsin's SVRL, which contains the names and other identifying information of all registered voters, qualifies as a "system of records" under the Act. *See Schwier v. Cox*, 412 F.Supp.2d 1266, 1271-72 (N.D. Ga. 2005) (holding a voter list is a system of records), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). DOJ must, therefore, issue a compliant SORN "before" it

engages in activity covered by the Act. *LULAC v. Exec. Off. of the President*, No. 1:25-CV-0946, 2026 WL 252420, at *54-55 (D.D.C. Jan. 30, 2026).

DOJ points to a SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records." Br. 42-44. But this SORN fails to support DOJ's attempt to collect voter data here several times over. *First*, it does not disclose what DOJ intends to do with the voter data it collects—indeed, it does not even *mention* HAVA or the CRA. DOJ seeks to excuse this omission because the SORN refers to the Civil Rights Division's website, which in turns mentions the statutes, Br. 43 n.9, but the Privacy Act requires information in the SORN to be "published in the Federal Register"—not on an agency's webpage. 5 U.S.C. § 552a(e)(4). And the Division's website merely lists the statutes enforced by the Voting Section—it does not disclose the intended "routine uses" of the mass data collection DOJ seeks here, and so does not satisfy the Privacy Act. *Id.* § 552a(e)(4)(D).

*Second*, the SORN says DOJ may maintain information about the "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). DOJ insists that this language covers its demand here because every registered voter in Wisconsin is simultaneously a "subject" and "victim" in its "investigation into voter fraud." Br. 43-44. Wisconsin's voters would be aghast to learn that DOJ views each and every one of them as a "subject"—a term that, as DOJ recognizes, means that the individual's "conduct" is "under investigation," *id.*, a designation serious enough that it would normally trigger a well-advised recipient to seek criminal defense counsel. And it is similarly implausible to call every registered

voter in Wisconsin a "victim" in an investigation purportedly about the sufficiency of Wisconsin's processes and programs to maintain its voter roll. Reading these terms as capaciously as DOJ urges would make a mockery of the Privacy Act's notice requirements.

*Third*, the SORN describes the categories of covered records as "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47611. Although this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude—as DOJ insists—that these terms extend to permit proactively seizing each State's full, unredacted SVRL.

For all these reasons, this SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." *Weber*, 816 F.Supp.3d at 1193-94. "Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of" Wisconsinites. *Id.*[16]

## III. If the Court reverses, the next step would be to remand for discovery.

Even if the Court were to reverse, it should reject DOJ's audacious request to "remand with instructions to order WEC to immediately produce the requested

[16] The "law enforcement" exception DOJ references only means that DOJ is not *categorically* barred from collecting First Amendment information. *See* 5 U.S.C. § 552a(e)(7). There is no law enforcement exception to the Act's SORN requirement. *Id.* § 552a(e)(4).

unredacted SVRL" and to immediately issue its mandate. Br. 47. The appropriate next step would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking Wisconsin's SVRL was pretextual. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). The CRA required DOJ to state "the purpose" for its demand, so it matters whether the asserted purpose is the true one.

As multiple federal courts have noted, there is reason to doubt DOJ's true purpose in seeking States' SVRLs. *See, e.g.*, *Weber*, 816 F.Supp.3d at 1182-86 (concluding DOJ's stated purpose in demanding California's SVRL was "pretextual" and "contrived"); *Oregon*, 828 F.Supp.3d at 1107 (expressing "serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data"). DOJ's true purpose appears to be to run Wisconsin's SVRL through DHS's SAVE database, to try to identify noncitizens, and then attempt to force the State to remove from its rolls registered voters whose citizenship was not confirmed by that notoriously unreliable database. *See supra* Background § II. But, as noted, that project has nothing to do with DOJ's stated purpose here—and DHS is currently blocked from using SAVE to facilitate voter removals in any event. *Id.*

DOJ also invites remand proceedings on its compliance with the Privacy Act: "Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand." Br. 42. But DOJ fails to recognize

that the need for remand proceedings on the Privacy Act is incompatible with its request for an order directing WEC to "immediately" produce Wisconsin's SVRL. Br. 47. This is yet another reason why the Court should decline DOJ's request to skip remand proceedings.

## CONCLUSION

The decision below should be affirmed.

Dated: August 17, 2026

*<u>/s/ David R. Fox</u>*
David R. Fox
Branden D. Lewiston
Kevin R. Kowalewski
Desiree M. Pelletier
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135
dfox@elias.law
blewiston@elias.law
kkowalewski@elias.law
dpelletier@elias.law

*Attorneys for Intervenors-Defendants-Appellees*
*Wisconsin Alliance for Retired Americans and Forward Latino*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Seventh Circuit R. 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,928 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Seventh Circuit R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2605) in 12-point Century Schoolbook Font.

Dated: August 17, 2026

*/s/ David R. Fox*
David R. Fox

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 17, 2026

*/s/ David R. Fox*
David R. Fox