**No. 26-2217**

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

WISCONSIN ELECTIONS COMMISSION, *et al.*

*Defendants-Appellees*

COMMON CAUSE, *et al.*,

*Intervenor-Defendants-Appellees*.

On Appeal from the United States District Court for the
Western District of Wisconsin
Case No. 3:25-cv-1036-JDP
The Honorable Judge James D. Peterson

**SUPPLEMENTAL APPENDIX OF INTERVENOR-DEFENDANTS-APPELLEES COMMON CAUSE, MELISSA ADAMS, AMANDA MAKULEC, AND JAIME RIEFER**

Douglas M. Poland
Scott B. Thompson
Law Forward, Inc.
222 W. Washington Ave., Ste. 680
Madison, WI 53703
dpoland@lawforward.org
sthompson@lawforward.org
608.283.9822

Jonathan Topaz
Theresa J. Lee
Sophia Lin Lakin
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
jtopaz@aclu.org

tlee@aclu.org
slakin@aclu.org

Ryan V. Cox
ACLU of Wisconsin Foundation, Inc.
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Tel.: (414) 272-4032
Fax: 414-272-0182
rcox@aclu-wi.org

*Attorneys for Intervenor-Defendants-Appellees Common Cause, Melissa Adams, Amanda Makulec, and Jaime Riefer*

**TABLE OF CONTENTS**

*United States v. Weber*,
No. 2:25-cv-9149, (C.D. Cal. Dec. 1, 2025),
Dkt. No. 87-3 ........................................ Supp. App. 1

*United States v. Schmidt*,
No. 2:25-cv-1481 (W.D. Pa. Jan. 12, 2026),
Dkt. No. 103-3 ........................................ Supp. App. 4

*United States v. Fontes*,
No. 2:26-cv-66 (D. Az. Jan. 7, 2026),
Dkt. No. 8-4 ........................................ Supp. App. 8

*United States v. Amore*,
No. 25-cv-639 (D.R.I.)
March 26, 2026 Hearing Transcript ........................ Supp. App. 13

*American Federation of State, County and Municipal Employees, AFL-CIO v. Social Security Administration*,
No. 1:25-cv-596 (D. Md. Jan. 16, 2026),
Dkt. No. 197 ........................................ Supp. App. 127

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 10, 2025

Via Mail and Email

The Honorable Shirley Weber
Secretary of State
1500 11th Street
Sacramento, CA 95814
secretary.weber@sos.ca.gov

Dear Secretary of State Weber:

We write to you as the chief election official for the State of California to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing California's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by California officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

> The current electronic copy of California's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the EAVS data for Question A3d, California had 2,178,551 voters (15.6 percent) with duplicate registrations. However, seven counties failed to provide data regarding duplicate registrations. Please provide a list of all duplicate registration records in Imperial, Los Angeles, Napa, Nevada, San Bernardino, Siskiyou, and Stanislaus counties.
2. No data was listed in the EAVS survey for Question A12h for California regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list including the date(s) of removal. If they were merged or linked with another record, please provide that information. Please explain California's process for determining duplicates and what happens to the duplicate registrations.
3. In the EAVS data for Question QA12c, California had 378,349 voters (11.9 percent) removed because of death, which was well below the national average. Please provide a list of all registrations that were cancelled because of death. Please explain California's process for determining who is deceased and removing them from the voter roll and when that occurs.
4. Confirmation Notice data was missing in the EAVS survey for Questions A10a through A10f for several counties in California. Please provide the data for each county in California for Questions A10a through A10f.
5. The 2022 EAVS report contained 4,984,314 inactive voters, while the 2024 report contained 2,883,995. Please explain the reason for the change in the number of inactive registrations for these years.
6. A list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were cancelled due to non-citizenship of the registrant.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Cc: Jana Lean
Chief of Elections
1500 11th Street, 5th Floor
Sacramento, CA 95814
jana.lean@sos.ca.gov

# Exhibit 3

EXHIBIT 3

U.S. Department of Justice

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

August 4, 2025

Via Mail and Email

The Honorable Al Schmidt
Secretary of the Commonwealth
401 North Street, Rm 302
Harrisburg, PA 17120
Email: al.schmidt@pa.gov | ra-voterreg@pa.gov

Dear Secretary Schmidt:

We write to you as the chief election official for the Commonwealth of Pennsylvania to request information regarding the Commonwealth's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 et seq.

Please provide a list of the election officials who are responsible for implementing Pennsylvania's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Commonwealth officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close

of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the EAVS data for Question A3d, Pennsylvania identified 378,187 voters (4.49 percent) with duplicate registrations, nearly three times below the nationwide average of 12.7 percent. Moreover, we understand the Public Interest Legal Foundation recently identified an additional 19,489 registrants holding matched voter registration files in second states as of Summer 2025, 3,170 instances of same-address duplications, 70 intra-county duplicates, and 321 placeholder/fictitious dates of birth. Please explain why duplicate registrations are such a low percentage of the total registration applications received.
2. Similarly, in the EAVS data for Question A12h, 47 of 66 counties in Pennsylvania recorded either 0 or 1 transactions to remove duplicate registrants. Please confirm how frequently county personnel perform manual duplicate queries and how frequently SURE performs automated searches.
3. In the EAVS data for Question A3g, Pennsylvania listed 40,209 transactions as "other," without further explanation. Please explain those registrations listed as "other."
4. In the EAVS data for Question A4h, Pennsylvania listed 1 transaction arising from an Armed Forces Recruitment Office, which is significantly below similarly sized states. Please explain why such few transactions can be sourced to Armed Forces Recruitment Offices and what actions Pennsylvania is taking to ensure Offices fulfill their voter registration responsibility.
5. In the EAVS data for Question A11, concerning the reason for sending confirmation notices, the largest category by far is A11n, "Other." Please explain the nature of these confirmation notices and why they do not fit in available categories.
6. In the EAVS data, Pennsylvania has failed to respond to Question A13a regarding merged voter records. Please provide the requested data or an explanation for why that information is not available.

Please provide a description of the steps that Pennsylvania has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures that Pennsylvania used to remove those ineligible voters from the registration list for categories two and three below. For all categories below, please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present:

1. Non-citizen
2. Adjudicated incompetent
3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc: Jessica Mathis, Director
Bureau of Election Services and Notaries
401 North Street, Room 210
Harrisburg, PA 17120
jesmathis@pa.gov

# EXHIBIT 4

ADRIAN FONTES
SECRETARY OF STATE

August 29, 2025

*Via Email*

Harmeet Dhillon
Assistant Attorney General
Michael E. Gates
Deputy Assistant Attorney General
Maureen Riordan
Acting Chief, Voting Section
United States Department of Justice
Voting Section
950 Pennsylvania Ave, NW – 4CON
Washington, DC 20530

*Re: Reply to July 28 and August 14 Letters*

Dear Ms. Dhillon, Mr. Gates, and Ms. Riordan,

This Office is in receipt of your correspondence dated August 14, 2025, that reiterated your requests of your correspondence dated July 28.

Your July 28 letter requested a "description of the steps that Arizona has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures it used to remove those ineligible voters from the registration list." In compliance with the National Voter Registration Act ("NVRA") requirement that states, "conduct a general program that makes reasonable effort to remove the names of ineligible voters from the official lists of eligible voters," Arizona statutes and rules provide a robust program of voter registration list maintenance. Arizona's fifteen elected county recorders are the officials primarily responsible for registering voters and removing ineligible voters from the state's voter registration rolls. *See* A.R.S. §§ 16-131, -163, -165. List maintenance is an activity that county recorders conduct on an ongoing basis.

In addition to state statute, the Secretary of State biennially issues an Elections Procedures Manual (the "EPM") containing "rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." A.R.S. § 16-452(A). Arizona's election officials, including county recorders, are required to follow the rules set forth

1700 West Washington, Seventh Floor
Phoenix, Arizona 85007
Telephone: (602) 542-8683
Toll-free in Arizona 1-877-THE VOTE

in the EPM, which include a detailed guide to county recorders to assist them in carrying out their list maintenance responsibilities. *See* 2023 EPM, at 36-48.[1]

With respect to your request for information concerning removal from the voter registration rolls of non-citizens, those adjudicated incompetent, and those with felony convictions, the EPM explains these processes on pages 36, 38, 40, and 42-44. It is important to note that since 2005, Arizona law has required that those registering to vote for the first time in Arizona or moving between Arizona counties and re-registering in a new county must provide satisfactory evidence of United States citizenship. *See* A.R.S. § 16-166(F). This requirement to provide documentary citizenship evidence at the point of registration is an additional protection against non-citizen registration. Additionally, Arizona is a member of the Electronic Registration Information Center ("ERIC"), taking full advantage of its state-of-the-art resources to ensure the accuracy of its registration lists. Arizona also participates in the Systematic Alien Verification for Entitlements ("SAVE"), ensuring, in cooperation with the Department of Homeland Security, that every full-ballot voter registering in Arizona is a United States citizen.

To answer your questions regarding Election Administration and Voting Survey ("EAVS"), consistent with federal law and guidelines, the Secretary relies on Arizona's fifteen county recorders to contribute accurate data based on their own records. However, despite the county data being complete and accurate, there are at times varying interpretations behind the data. For example, EAVS Question A10 requested information about confirmation notices sent to all registered voters. In particular, the 2024 EAVS instrument provided different instructions concerning confirmation notices from the instructions in the 2022 EAVS instrument. *Compare* 2024 EAVS Instructions for A10 (stating that "[t]his total shall include confirmation notices sent for any reason) *with* 2022 EAVS Instructions for A8 (indicating that confirmation notices may be sent when there is an indication that a voter no longer lives in the jurisdiction or has not voted or appeared to voter during the relevant period). Six of our fifteen counties understood that to include the notices sent to people on our Active Early Voting List ("AEVL") ninety days before an election.[2] Therefore, for six counties, there was a significant increase in confirmation notices reported in 2024. And the vast majority of that increase in notices related to 90-day notices that voters are not required to return to their county recorders, which explains the size of the "status unknown" responses to Question A10f.

You also asked about steps that Arizona takes to identify duplicate voter registrations. The EPM directs county recorders to conduct a duplicate record search before a new voter registration is entered into the statewide voter registration database. EPM, at 25. Once a voter registration record is entered into the statewide voter registration database, it is automatically verified against

---

[1] The 2023 EPM, which is currently in effect until the 2025 EPM is issued on or before December 31, 2025, is available in a fully searchable format on the Secretary's website: https://apps.azsos.gov/election/files/epm/2023/EPM_20231231_Final_Edits_to_Cal_1_11_2024.pdf. The draft 2025 EPM retains the detailed guidance concerning list maintenance, with revisions to reflect changes to Arizona law and court decisions. The draft 2025 EPM is currently in its public comment period, and may be viewed on the Secretary's website: https://azsos.gov/sites/default/files/docs/2025-Elections-Proceedures-Manual-Draft-0801.pdf.

[2] *See* A.R.S. § 16-544(D). The AEVL notice specifically tells the voter that no action is needed unless they no longer wish to receive their ballot by mail or need a ballot in an alternative format. This mailing is used as a first notice, and if any of these notices are received back to the Recorder as undeliverable, that triggers the NVRA process.

existing records in the statewide voter registration database for the purpose of identifying (and potentially canceling) any duplicate record. EPM, at 26.

Further, Arizona Recorders have an active ongoing list maintenance program, where they are constantly reviewing reports of individuals reported deceased, adjudicated incapacitated or convicted of a felony, people that have moved in-state or have moved and surrendered their Arizona driver's license to another state, as well as a number of other periodic reports utilized as part of Arizona's membership to the Electronic Registration Information Center (ERIC).

Second, this Office must reiterate that Arizona privacy law prohibits this or any other state office from releasing certain sensitive personal data. Your July 28 letter demands that we produce for inspection "[t]he current electronic copy of Arizona's computerized statewide voter registration database . . . includ[ing] all fields contained within the list." Your August 14 letter repeated this request.

Arizona takes seriously its obligation to protect sensitive personally identifiable information of Arizona voters. For that reason, A.R.S. § 16-168(F) restricts public access to information in the state's voter registration database including "month and day of birth date, the social security number or any portion thereof, the driver license number or nonoperating identification license number, the Indian census number, the father's name or mother's maiden name, the state or country of birth and the records containing a voter's signature and a voter's e-mail address." Arizona government officials who provide information from the voter registration database in violation of state law are at risk of felony prosecution. *Id.*

Your July 28 letter requested Arizona's voter registration information pursuant only to the NVRA, ostensibly to "ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA." It was not until your August 14 letter that you referenced the Department of Justice's authority under the Civil Rights Act of 1960 ("CRA"). But you do not explain how your authority under the CRA applies to your stated purpose for demanding a copy of the voter registration database "to ascertain Arizona's compliance with the list maintenance requirements of the NVRA and HAVA" or preempts state privacy laws.

Arizona citizens must be able to exercise their First and Fourteenth Amendment rights to register and vote without fear that the information they provide to do so could be disseminated in a way that fails to protect their privacy or is contrary to law. Courts have recognized that states may properly withhold sensitive personal information in response to a request under NVRA for voter registration information. *See Pub. Int. Legal Found., Inc. v. Bellows,* 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases). In addition, the Privacy Act of 1974 imposes specific limitations upon Federal agencies, including the Department of Justice ("DOJ"), when they collect, aggregate, or maintain information concerning individual citizens, even when the information might be otherwise publicly available. The Privacy Act also provides individuals the right to update, correct, or remove their personal information if needed and in specified circumstances.

While your August 14 letter refers to language in the Help America Vote Act that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act," it does not answer larger questions about the DOJ's compliance with the Privacy Act with respect to its request for Arizona's complete voter registration database.

Specifically, we understand the DOJ to be creating a system of records of Arizona voters that can be searched based on an individual's name or other identifier. *See* 5 U.S.C. § 552a(a)(5).

The Privacy Act requires publication in the Federal Register of a notice providing the DOJ's purpose in creating the system of records and how Arizona's voter registration database is necessary and relevant to that purpose. *See* 5 U.S.C. § 552a(e)(4). The Privacy Act also requires the DOJ to maintain a system of records with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness" to individuals. 5 U.S.C. § 552a(e)(5). In addition, the Privacy Act prohibits Federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Before we can provide to you even the public portions of Arizona's statewide voter registration database, please provide information demonstrating the DOJ's compliance with the Privacy Act with respect to the request for Arizona's voter registration database.

Furthermore, even if this Office were to release the entire unredacted voter registration list with driver's license numbers, social security numbers, and all other identifying information you have requested, that data alone does not provide evidence regarding Arizona's compliance with its NVRA obligation to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official list of eligible voters. The voter registration list merely captures a snapshot in time and provides little information about list maintenance activities. Instead, the above-mentioned EPM details how Arizona's counties and the Secretary of State's Office execute the list maintenance obligations created by the NVRA and state law.

The Arizona Secretary of State, as Arizona's Chief Election Officer, is committed to complying with both state and federal law to ensure that eligible voters' rights to register and vote are protected at all costs. Arizona voters also have important privacy rights that cannot be infringed because they choose to exercise their constitutionally protected voting rights.

Please let us know if we can be of further assistance.

Sincerely,

Adrian Fontes
Arizona Secretary of State

Contact: Luke Douglas, Acting General Counsel
Email: ldouglas@azsos.gov
Office: 480-244-166

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * *25-CV-639-MSM
*
UNITED STATES OF AMERICA, *
*
Plaintiff, *
*
vs. *MARCH 26, 2026
*
GREGG M. AMORE, in his official *
capacity as Secretary of State *
for the State of Rhode Island, *
*
Defendant. *Courtroom 2
*PROVIDENCE, RI
* * * * * * * * * * * * * * * * * *

BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE

(Motion to Compel)
(Motions to Dismiss)

**APPEARANCES:**

FOR THE PLAINTIFF: ERIC NEFF
DOJ-Crt
Civil Rights Division
150 M St. NE, Ste 8-1807
Washington, DC 20002

FOR THE DEFENDANT: JAMES J. ARGUIN
Gregg Amore RI Department of Attorney
General
150 South Main Street
Providence, RI 02903

FOR INTERVENOR DEFENDANTS:

Common Cause
Catherine Saunders
Stuart Waldman
Julia Sanches

ARI J. SAVITZKY
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004

FOR INTERVENOR DEFENDANTS:

SEIU District 1199NE
Rhode Island Alliance for Retired Americans
Carolyn Betensky
Michael Zack Mezera

ROBERT GOLAN-VILELLA, ESQ.
Elias Law Group LLP
250 Massachusetts Ave NW
Ste 400
Washington, DC 20001

Court Reporter:

Denise P. Veitch, RPR
One Exchange Terrace
Providence, RI 02903

26 MARCH 2026 -- 10:00 A.M.

THE COURT: We are on the record in Civil Action 25-639, and it is entitled United States of America v. Gregg Amore; it's a civil action. Can counsel who are going to argue identify themselves for the record and identify who else is at counsel table, please.

MR. ARGUIN: Good morning, your Honor. Special Assistant Agent Attorney on behalf of the Secretary of State for the State of Rhode Island Gregg M. Amore, and with me at counsel table is Special Assistant Attorney General Kyla Duffy.

THE COURT: Okay. You didn't give us your name.

MR. ARGUIN: James Arguin.

THE COURT: Thank you.

MR. ARGUIN: Sorry, your Honor.

THE COURT: That's okay. All right.

MR. SAVITZKY: Good morning, your Honor. Ari Savitzky on behalf of Intervenor Defendants Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches; and with me at counsel table is my colleague, Will Hughes.

THE COURT: Okay. Thank you.

MR. GOLAN-VILELLA: Robert Golan-Vilella on behalf of the SEIU Intervenors. With me at counsel

table is David Fox, and in the gallery is Miriam Weizenbaum.

THE COURT: Thank you.

For the Government.

MR. NEFF: Good morning, your Honor. My name is Eric Neff. I'm here on behalf of the United States, with my co-counsel, Christopher Gardner.

THE COURT: All right. I apologize if I get anybody's name wrong in this.

Let's just set some ground rules so we can make this a little easier for everyone. Our stenographer is valiantly trying to keep up with us so we have to make an effort not to speak quickly. I don't know if anybody here is naturally a quick talker; try to slow it down. Because it's a dialogue I will have to break in and ask questions that results in some necessary overtalk, but if we can just stop and try not to speak over each other more than necessary, I would appreciate that.

I had a request from my Clerk for an order of argument. I believe the Motions to Dismiss, that the Defendants wish to proceed first. Am I wrong about that?

MR. ARGUIN: Your Honor, we're happy with whatever order is convenient to the Court, but

certainly that would make the most sense to us, given the overlapping nature of the arguments.

THE COURT: Right. My original intent was to have the government argue its Motion to Compel, have you respond; then have you argue your Motion to Dismiss and have them respond. But rather than do a back and forth -- is that all right with you, Mr. Neff?

MR. NEFF: Yes, your Honor, and that's consistent with how most other courts have been proceeding, so I think that makes sense.

THE COURT: Okay. We don't like to do things the way -- no, I'm just kidding. That is fine.

So on behalf of the State of Rhode Island, Gregg Amore, I'll hear from you on your Motion to Dismiss, and can you also address the government's Motion to Compel which is at ECF 2 in this case.

MR. ARGUIN: Thank you, your Honor.

The Department of Justice seeks to use civil rights legislation that was enacted for an entirely different purpose to compel the production of Rhode Island's complete Voter Registration List without redaction of confidential data on nearly 750,000 active registered voters in the State. This effort goes far beyond what Congress intended when it passed the Civil Rights Act of 1960. It also is fundamentally at odds

with the very statutes DOJ claims it seeks to enforce, which are, specifically, the National Voter Rights Act, which I'll refer to as NVRA, and the Help America Vote Act, or HAVA. The object and purpose of those statutes is to make it easier, not harder, for eligible voters to register and exercise their right to vote. And you can find that in the statement of Findings and Purpose in Section 20501 of the NVRA. Those statutes also have their own enforcement provisions that can be found in 52 U.S.C. Section 21111 of the HAVA and Section 20510(a) of the NVRA. They also, pursuant to court interpretations including from the First Circuit, allow for the redaction of confidential information relating to voters, including individual voter's Social Security numbers and driver's license numbers.

Now, DOJ tries to bypass these records by plucking a records demand provision from the Civil Rights Act, a law enacted more than 30 years before the NVRA and HAVA, to obtain the very confidential information the First Circuit and other courts have held should be redacted.

It further contends, and this is at its reply brief, ECF 33, pages eight to nine, that its authority affording to demand records under the Civil Rights Act is nonreviewable.

THE COURT: Well, let's address that, because they're saying they're entitled to a special process here. Address the issue of the special process, if any, that they're entitled to and how the Court is supposed to look at the fact that they filed a civil complaint in determining whether there's a special process or I should follow the basic Rules of Civil Procedure with respect to their Complaint.

MR. ARGUIN: Certainly. Let me start with the very fundamentals. This action was filed as a civil action. The Federal Rules of Civil Procedure, (1) make expressly clear that the Federal Rules of Civil Procedure apply to all civil actions except as specified in Rule 81; and Rule 81, of course, makes no mention of an action for a records demand under the Civil Rights Act. It also, according to the Complaint, seeks relief under the Declaratory Judgment Act, Section 28 U.S.C. Section 2201, which Rule 57 of the Civil Rules makes expressly clear it's subject to the Rules of Federal Civil Procedure. And it served the summons in this action on Secretary Amore under Rule 4 of the Federal Rules of Civil Procedure; and the form under Rule 4 specifically advised the Secretary that he could answer or file a Motion to Dismiss pursuant to Rule 12 of the Rules of Civil Procedure.

All of that indicates that the -- this case is no different than any other civil action. And that's also confirmed when one looks at the language of the Civil Rights Act of 1960. The provision of the statute, it makes clear that this court is not a rubber stamp to simply follow a ministerial process to approve any records demand DOJ may submit under the Civil Rights Act. In fact, Section 20703 of the Civil Rights Act imposes specific obligations on DOJ to provide a written statement of the basis and purpose for any records demand.

THE COURT: And so doesn't that get into what do you mean by basis and purpose. Are we talking factual or legal basis and factual or legal purpose; correct?

MR. ARGUIN: Both. The basis is the factual basis why, what is the reasonable suspicion, what is the factual allegation that gives rise to what they claim is a civil rights violation; and I'll come back to that in greater detail later. But the purpose is also what are you looking to achieve? And that's also a problem here, which I'll explain shortly.

But getting back to the court's jurisdiction in the summary process, Section 20705 specifically says an action for enforcement of a demand that is served under the Civil Rights Act must be -- is within this

court's jurisdiction and must be exercised pursuant to appropriate process.

So in terms of the summary proceedings that they're talking about, the appropriate process is what's the determinant factor. And your Honor has guidance from the United States Supreme Court in its *Powell* decision on exactly what that phrase means. And, in fact, the Supreme Court in *Powell* interpreted an IRS statute that had substantively similar language to the CRA record demand provision, including the use of the phrase "by appropriate process". And like the Civil Rights Act, it also did not say anything about it was limited to a subpoena or anything else. It was an action by the federal agency to enforce a records demand or demand for inspection to get access to records that the person who was served with those records opposed.

And the Supreme Court of the United States interpreted the phrase "appropriate process" to refer to the Rules of Federal Civil Procedure. And that, of course, is consistent with the Rules I was just reviewing. But, more importantly, it also said that that appropriate process is used to ensure that the court's process is not being invoked or abused by the person seeking to compel, by the agency seeking to

compel the production of records. And it also made clear that part of that appropriate process inquiry is to inquire into the underlying reasons of the demand.

And that brings us full circle back to the statutory language of the CRA which highlights, you know, which raises several different points of why that framework simply does not apply in this context. And let me quickly point out some reasons by that.

What DOJ is trying to do is pluck one provision from the Civil Rights Act enacted 30 years ago and read it to the exclusion of all other statutes that are applicable to the very issues in this case, including, specifically, the NVRA and the HAVA, which are the very statutes it claims it wants to enforce.

The NVRA and HAVA have specific protections for confidential information. And I already mentioned the Supreme Court's decision in *Bellows* that, that are applicable to any demand for records or any requests for production of the states' registered voter list. And what's more, in the years since the Civil Rights Act of 1960 was enacted, Congress has also recognized the need for additional protections for the privacy of data revealing personally identifiable information of citizens and Americans; and that's both in the E-Government Act and the Privacy Act.

THE COURT: So how do I read -- the government is going to argue that the Fifth Circuit case from 1960, *Lynd,* is controlling. Obviously it's not precedent, binding precedent on this circuit or this district; but how do I read *Lynd* and *Powell* together? Are you saying *Powell*, for the purposes of the inquiry that the Court can make, kind of overrules or tacitly overrules *Lynd*?

MR. ARGUIN: To the extent that *Lynd* stands for the proposition that there is no testing of the basis or the purpose of a demand under the Civil Rights Act, *Lynd* is overruled. But *Lynd* also recognizes, and its discussion is consistent with all of the Fifth Circuit 1960-era cases the DOJ relies upon invoking the Civil Rights Act. All of those cases dealt with a situation that was within the scope of the Civil Rights Act. It was specifically dealing with instances where there were efforts to intimidate or interfere with the right to vote, most commonly through racial profiling or exclusionary practices to preclude people from voting because of their race.

THE COURT: So my background is in criminal law, so I look at this as if we look at it like a search warrant, so to speak, which it's not and I understand it's completely not a good analogy. But the government

can't say we want to search every house on this block because drugs are coming from this block. They have to have some reasonable basis for suspecting that the individual establishment or house they're going to search has a nexus to drug distribution. Is that sort of -- a very wonky analogy, but is that sort of what you're saying, like they can't just come in here and say we're going to look at the voting records of every state to see if the states are doing what they're statutorily required to do, without some evidence the states are not doing what they're required to do?

MR. ARGUIN: I think your Honor is right on the right track. The purpose of the statute, the CRA has its own statutory provisions for how you obtain these records, right, and those provisions specifically say you must state the basis and the purpose, and then they also add it also must be pursuant to appropriate process; and neither of those conditions are met here.

THE COURT: The government is going to say our basis is HAVA and the National NAVA (verbatim) and our purpose is to make sure that the State of Rhode Island is complying with HAVA and NAVA.

MR. ARGUIN: But all of the cases on which they rely, again going back to *Lynd* and the other Fifth Circuit cases as examples of this, they all

included a statement of the basis and the purpose that was far beyond the boilerplate statement that's been presented to the Secretary of State here. They actually stated that they had suspicions of racial practices in the registration process or in voting, and they narrowed that in most of those cases to circumstances that were in a particular county; not a statewide request for an entire voter registration list. They were looking at practices that interfered with the right to vote, and they specified those reasons in their decisions. There's simply nothing comparable here.

And the other, turning to the purpose that, yeah, all -- what they cite is we want to assess whether the State is complying with the list maintenance requirements imposed by the NVRA and HAVA, two entirely different statutes that have their own enforcement provisions. NVRA and HAVA give the Attorney General the right to bring a civil action -- again, not a summary process -- for if there is any suspected violation of a state of its compliance with NVRA and, with the NVRA and HAVA. And those provisions are in 52 U.S.C. 2111 and 52 U.S.C. 20510(a). The first one is HAVA; the second one is the NVRA.

There's no explanation here for why DOJ did not

invoke those provisions, except for the fact that even in the statement of purpose and the basis that they've provided in their September 8th demand letter to the Secretary of State, that they don't have one. They just want to see what is there. They don't have and they are not alleging any violation of the State's or the Secretary of State's list maintenance responsibilities; and so they're searching for one. That kind of fishing expedition is not allowed under the ordinary Rules of Civil Procedure, and certainly it should not be allowed with respect to highly-sensitive confidential information on 750,000 active registered voters in Rhode Island. There's simply no basis for it.

And one other thing I would point out. The NVRA and HAVA, which are the listed maintenance statutes that require the Secretary of State to set up a general program for list maintenance and undertake reasonable efforts to ensure that the names of deceased voters or voters who are moved are timely removed from the active list. Those statutes expressly place that responsibility squarely on the State, and they make clear in the statutory language that that enforcement of those provisions, the reasonable efforts, the general programs are specifically within the discretion

of the State. And that, I think, is another key point here, and that's because what DOJ is attempting to do is interfere with the State's responsibility to carry out tasks that Congress has assigned to it; and the fact that Congress assigned it to the State, not the federal government, is also consistent with Article I -- Article I, Section 4 of the Constitution which recognizes the primary role of the States in election and registration processes.

THE COURT: How do you respond to what I think the government is saying, which is how can we -- that we accept the Elections Clause does what the Elections Clause does, but it also allows Congress to sort of set some rules into place and how are we, the DOJ, supposed to enforce the Rules if we're just supposed to take it on faith that the States are doing what they're supposed to do.

MR. ARGUIN: Two things. Again, the primary responsibility, the balance that Congress struck, the balance that the Framers of the Constitution struck was to preserve local control over elections unless Congress specified otherwise. That's the preemption issue.

But here, as I've already said, the NVRA and the HAVA, which are the two statutes that deal specifically

with list maintenance responsibilities, specifically give that discretion, raw discretion to the States. There's no mention of the Department of Justice or the federal government unless and until those penalty provisions that we were just speaking of came in, where they can bring a civil action if there is a violation. But there's no violation here.

THE COURT: So looking at sort of the original intent of the Framers and the intent of Congress and the sort of the text of the statutes, it would seem that adhering closely to what's there, that the Department of Justice wouldn't have the role that it's seeking to have here. Is that correct?

MR. ARGUIN: I think that that's absolutely correct. The Department of Justice's role has to be conferred by Congress. And this gets back to one of the points I made earlier. What they're doing is cherry-picking a records demand provision from now 65 years ago and using that, to the exclusion of the very statutes they're seeking to enforce that deal specifically with the issue of voter list maintenance, and that also completely ignore the privacy protections that Congress enacted in the Privacy Act and in the E-Government Act to specifically protect the right of individual citizens to not have their personally

identifiable information swept up in some omnibus request, which your Honor well knows is not just here in Rhode Island; it's across the country.

And we still -- and going back to the statutory purpose, there is absolutely no way the Court could read, as they say, look at just the language on the page. Well, that's not true. I mean a basic rule of statutory construction is you have to understand the context in which a statute is enacted. The Civil Rights Act of 1960 was enacted for a different purpose, as we talked about, dealing with the interference with the right to vote, preventing people from voting.

The HAVA and the NVRA have a fundamentally different purpose. It's to encourage the right to vote. That's in the findings that Congress itself made. They tried to make it easier to vote, and they afford multiple protections that require the Secretary of State to proceed with caution and follow specific procedures before any person is removed from the active list. And as I've already said, they also provide protections consistent with the Privacy Act, the E-Government Act, and state law on what information can and cannot be shared with the public or in response to a request. They protect confidentiality.

THE COURT: There is anything in the Civil

Rights Act or Title III that precludes the State from redacting personally-identifying information or sensitive information?

MR. ARGUIN: There is absolutely no language in the Civil Rights Act of 1960 that would preclude it.

And the other point to keep in mind when we talk about context, and I think they cite this in support of their plain language argument, that it's only the words on the page that matter. But that case, I think it's *Buckman*, the Supreme Court decision in *Buckman* is very clear what they're talking about there is you have to interpret words according to the usage at the time. You look at the words used through the lens of what Congress intended when it enacted the law.

Now in 1960 when the Civil Rights Act was enacted, they were dealing with a very different issue. This was Jim Crow South where they were excluding people based on race. That was the purpose. And the Civil Rights Act of 1960 was intended to fill a gap in the predecessor statute of the Civil Rights Act of 1957 where records relating to these discriminatory practices and other records relevant to intimidation connected with the right to vote were being destroyed.

This 1960 Act was passed specifically to make sure those records were preserved so they would be

available in the event there were suspicions of any kind of discriminatory or other prohibited practices that interfered with the right to vote.

THE COURT: Let's say we were in an environment that was similar to the 1960s and the Department of Justice had a belief that, you know, women were being precluded from voting in Rhode Island and they had some basis for that. Could they then utilize the Civil Rights Act to come here and ask for those documents in order to enforce the amendment allowing women to vote, for example?

MR. ARGUIN: If they had a proper purpose and stated a proper basis and that was presented, then I think that would comply with the Civil Rights Act. That, of course, is not the situation here.

And one other thing to note. When we look at the statutes through the eyes of the Congress that enacted it, which is the 1960s Congress, you know, the statute, the CRA specifically says, okay, if you state a proper -- the basis and the purpose, and you follow the appropriate process, those records can be produced. But they also said what they allowed for in the statute in 2073 -- 21073 was that be allows onsite inspection and reproduction. And why is that? Because they didn't have electronic data being amassed by states or

private parties or the federal government. It didn't exist. That's exactly why it's wrong to just cherry-pick one statute and say it trumps from the 1960s, say it trumps all these later enactments. That's not the rule how statutes are interpreted. Statutes have to be interpreted as a whole in the context, and the court has to balance the congressional expressions in various statutes that deal with the same subject matter.

And here, we're talking about voting records, specifically registered lists, voter registration lists, but also the privacy interests that are implicated by that kind of collection of data. And it's an entirely different thing to say you can come and inspect the registered voter lists and make a copy of it than saying here is, what they want is an unredacted database with all the fields unredacted, with all of that information put out there for a purpose that is not yet clear. And let me get to the purpose issue.

THE COURT: Can I ask one more question before you do.

MR. ARGUIN: Sure.

THE COURT: Do we know in 1960 what data was contained within voting rolls?

MR. ARGUIN: Well, what we know is the obligations imposed by the HAVA and NVRA didn't exist. They didn't come until many years later.

So the records that we're talking about here could not have been in the minds of Congress when it enacted the Civil Rights Act of 1960; and, in fact, that's exactly how two other district courts in the Central District of California and the District of Oregon have interpreted this.

But getting back to the purpose, your Honor asked, well, don't they need some of this information to do whatever, whatever kind of assessment they want to do with respect to the State's list maintenance responsibility. The answer has to be categorically no. The Secretary has already offered to provide them with the publicly-available list, which includes a host of information about relative, you know, about voter, registered voters in Rhode Island, including their names, their full names, their full dates of birth, residential addresses, mailing addresses, party affiliation if they elect to provide it and, I'm sorry, there's others if I find my list. But all of that information is available. The only information --

THE COURT: When they vote; right?

MR. ARGUIN: And where they vote, how they

registered. And it also includes, as required by HAVA, a unique identifier, voter identifier number for every active voter in Rhode Island. Unlike some states, it's not only assigned if you don't have a Social Security number or a driver's license; Rhode Island assigns a unique HAVA identifier to all registered voters. All of that information is in the public record, I mean is publicly available pursuant to Rhode Island law and also, is also made available under the NVRA through its public inspection provisions.

The only information that the Secretary of State has withheld are the last four digits of the Social Security number and individual state driver's licenses, and he did that because of the requirements of State law that say that information cannot be disclosed; and also is consistent with First Circuit's decision in *Bellows*, which other circuits, including the Fourth Circuit and other district courts have also endorsed that view, that redaction of that personally identifiable information on individual voters is absolutely appropriate.

So the other point I'll make on this is if they were to say, I think the only answer to that is they say, well, we don't know if it's the same person. But you have all this information available to you through

the publicly-available list to do a very comprehensive comparison, if that's needed; and assuming, again, it's even proper for DOJ to engage in that sort of list maintenance responsibility, when Congress has assigned that task to the discretion of the States.

The last point I make is what we are talking about here are general programs and reasonable efforts to maintain a list. They're seeking line-by-line assessment or analysis of the registered voter lists at one point in time. That does not have anything to do with reasonable efforts or general programs.

THE COURT: So if they had come here and asked for an explanation or information about the procedure that the Secretary of State has used, and I think it's four times a year -- is that quarterly that they cull, or is it monthly?

MR. ARGUIN: It's daily, your Honor.

THE COURT: Daily.

MR. ARGUIN: Anytime -- it's hourly, actually. Any time a person walks into an office, the DMV to register to vote, the voter maintenance, the voter registration list is updated.

THE COURT: Okay. I apologize. So if they'd come in and said we want to know what procedures, are you using the ERIC system, are you using voter,

Motor Voter, I think we used to call it, system, and they had gotten about information how that system, if they had sought information about that system was implemented would they be closer to their directive under the National Voting Rights Act and the...

MR. ARGUIN: If was reason to suppose there was a violation of federal law, then perhaps. But as we put in our Motion to Dismiss, your Honor, we catalog a whole host of the reasonable efforts that the Secretary of State's Office and the Department of State are pursuing to comply with NVRA. And I think that it's very telling that in all that publicly-available information and statutory provisions, there's no response from DOJ suggesting that we're not doing what we're supposed to be doing.

THE COURT: Right.

MR. ARGUIN: And so we get back to the fishing expedition. What is the point of this and how is it consistent with the way Congress has delegated responsibility for list maintenance, and how is it possible to read a statute from now 65 years ago to the exclusion of all the protections that are afforded in these very specific laws that are far more current and far more specific to the issues of this case.

THE COURT: And a moment-in-time snapshot of the

voting lists sort of is necessarily misleading; is that not correct? If I were to die tomorrow or move to another state, preferably -- you know, to die, not to living here but to dying -- then the records of today would be inaccurate, correct, if I registered to vote, you know, in Hawaii tomorrow?

MR. ARGUIN: Absolutely, your Honor. This is the critical point. This is why the list maintenance responsibilities under HAVA and NVRA are far different from the Civil Rights Act of 1960.

These statutes are intended to promote the right to vote, and they have very specific safeguards. The Secretary of State, the Department of State cannot remove an active voter without following a notice and process to confirm that, in fact, the person is dead and that, in fact, the person has moved. That doesn't happen in a day because there's a mailing process and there's response mailings and deadlines set for how much time you have to allow for a person to say hey, I'm still here. That can't happen with a snapshot. So all you're going to get is one picture in time that, following your example, you may have already moved but maybe you're coming back and -- or maybe you have moved and you haven't yet registered.

But we need to make sure that, in fact, the

Secretary of State has to make sure that, in fact, the move actually happened before you're removed from the voter registration, from the active list of voter registration. What often happens is that there's notice of suspicion that someone has died or moved before the confirmation process, the confirmation process puts a hold, they're moved to an inactive list. But then there's a confirmation process, and if it's confirmed that they moved, then they're removed. But if it's not confirmed and they're still here, then they go back on the active list. All of that is to make sure there is no infringement to the right of vote. And without some allegation that the Secretary is applying some sort of practice or procedure that infringes the right to vote or that discriminates against voters because of race or another category, then there's absolutely no basis for relying on the CRA and certainly no basis to read it in isolation from all the other statutes that we've been discussing.

THE COURT: And don't I have to read it in conjunction with *Powell,* --

MR. ARGUIN: Absolutely.

THE COURT: -- which says that information can be redacted; correct?

MR. ARGUIN: Well, the First Circuit said --

THE COURT: I'm sorry.

MR. ARGUIN: -- in *Bellows* says it can be redacted. And certainly all the other courts that have been confronted with this, which to date is the Central District of California, the District of Oregon, and the District of Michigan, have all dismissed DOJ's complaints for many of the same reasons we've been discussing; that they are not within the CRA, that the statement of purpose and demand is not here, and that redaction is perfectly appropriate.

And so for all those same reasons, consistent with the other courts' decisions, the Secretary of State would urge this Court to dismiss DOJ's complaint and deny the parallel Motion to Compel.

THE COURT: Okay. Thank you.

Hang on. Are we going to hear from the Intervenors first, I believe?

MR. NEFF: That makes sense, your Honor.

THE COURT: That way you don't have to argue more than once, unless you want to.

But don't -- let's not tread over ground that's already been covered. You have not been objected to as Intervenors but, you know, so your separate issues are the question here.

MR. SAVITZKY: Understood, your Honor, and may

it please the Court, Ari Savitzky from ACLU for the Common Cause Intervenors. I'll address the two issues before the Court, the two motions before the Court. Before I do I want to acknowledge Ms. Saunders, Cathy Saunders, one of the Intervenors in the courtroom today; Stuart Waldman, one of the Intervenors in the courtroom today; John Marion, the Rhode Island Director of Common Cause, the organizational Intervenors in the courtroom today.

And the reason these voters have intervened and the reason they're here today is because they're intensely concerned that the federal government is making an improper and unprecedented grab for their sensitive personal information. And they're right to be concerned because they have eyes to see and they can see when the Attorney General sends a letter to the Governor of Minnesota demanding the state's voter rolls as a condition for pulling back immigration enforcement. They can see when the Department of Justice admits that DOGE has mishandled voters' sensitive personal information with respect to the Social Security Administration and entered into agreements with outside election-related groups. They can see when former attorneys from the Civil Rights Division tell the New York Times that they were tasked

by the front office, the Department of Justice, with obtaining state voter rolls so that DOGE can look at them. And they can see the Memorandum of Understanding that has been sent to states in conjunction with these data requests that purports to allow the federal government to take charge over who gets to stay on the states' voter laws; contrary to federal law, contrary to the Constitutional order. And so the outcome here is incredibly important to the voter Intervenors and to their fellow Rhode Islanders and to our democracy.

The Court has our papers. You heard from one of the Defendants already. The most important thing I could do I think is to answer and address the questions the Court's raised. I think there are two basic questions for the Court to answer at this point: (1) What are the rules that apply here, what type of proceeding is it. That goes to the Motion to Compel. (2) Is the Complaint that was filed by the United States legally deficient such that this action should be dismissed. I'm going to address this point briefly without being repetitive of what we've going over already and while addressing the Court that the point, the points that the Court has brought up. Excuse me.

Question (1), what are the rules that apply here. The United States initiated this proceeding by

filing a civil action or this Federal Rules of Civil Procedure. Rules 1 and 81 state the Rules apply. The *United States v. Powell*, binding Supreme Court precedent, says that the Rules apply. And the CRA by using the term "appropriate process" says that the Rules apply.

What *Powell* says, and this is Footnote 18 of *Powell*, extremely clear, When a statute grants the court jurisdiction to enforce some government demand for information by appropriate process, but "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." That's the end of it.

Now, how fast an action moves, how much discovery might be needed, where -- whether the case can be resolved on summary judgment; those are all questions that are addressed under the Rules. There's flexibility under the Rules. That's what this Court does. But the bottom line is we apply the Rules and we apply Rule 12. That's the first step. We look at the Complaint, is it legally sufficient.

*Lynd*, if I can address the question the Court asked for, was not to the contrary. *Lynd* is a case where there's two years of litigation, endless motions and attempts by the state defendants to not address the

government's demand. That's not what is happening here.

The Motion to Compel says give us these documents, give us the State's voter rolls with all the confidential personal information of Rhode Island voters, without even consideration of whether or not the demand is legally valid or whether there's an improper purpose. And just one other point on the Motion to Compel piece. Even -- and your Honor raised the analogy to the criminal context. How about the analogy to the administrative subpoena context; right?

This is a full-on civil action. They filed a Complaint. But sometimes there'll be an administrative subpoena in another context and someone will run to federal court, the person who received the subpoena, and they'll move to quash; right? That's also a scenario that happens. And even in those circumstances courts apply the teaching of *Powell*. The First Circuit does this. One of the cases cited in the briefing is an administrative subpoena case about gender-affirming care I think at Mass General Hospital in Massachusetts, from the District of Mass last year.

Even when you go to court on a motion to quash, not a full-blown federal action filed under by Complaint, the court considers is there an improper

purpose, is there a proper legal basis for the demand; right? And in that administrative subpoena case I referred to, 800 F.Supp. 3d, it's at page 237, the relevant discussion, (Reading) When there's not an iota of suspicion of --

THE COURT: Can you slow down just a smidge; I'm sorry.

MR. SAVITZKY: When there's not an iota of suspicion of any specific or particularized wrongdoing, the court quashes. Now, again, that's in the administrative subpoena context.

And again, here we have a Complaint filed under the Rules. So there's no possible way and there's no precedent and there's no analogy when you grant a Motion to Compel without considering these questions, considering whether there's a legal basis to grant the demand. And then also considering is there improper purpose; there's plenty of evidence of that here as well.

So just to address the other question here, right, so now we're at Rule 12. We have a Complaint. Is it legally deficient? It is. We have to dismiss. Statute requires a written demand for the information that states the basis and the purpose for the request.

And it's in the briefing already so I will

address only very briefly the numerous different ways in which this demand, encapsulated by the September 8th letter sent to the Secretary, is legally deficient. First of all, did the Attorney General state the basis for the request? No. It's an easy one, there's just zero statement of the basis; and that's the ground in which the California and Oregon courts dismissed. It's not in writing, which is what's required. You state the basis in writing.

And by the way, look at that *Lynd* case; right? What did the Department of Justice under RFK think you were supposed to do when this statute was actually in use? Footnote 6, page 229 of *Lynd* --

(Court Reporter requests clarification)

MR. SAVITZKY: -- it quotes what the written demand said. (Reading) This demand is based upon information in the possession of the Attorney General tending to show the distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.

That's the basis. That's the factual basis. That was the original understanding of the basis that was required.

There's nothing like that here. Pure fishing expedition. That is all you need to hold to say that

the demand is legally deficient under the CRA.

Another independent ground, do they state the purpose. There's a conclusory sort of general statement, Oh, the purpose is to ascertain compliance with HAVA and the NVRA. There's no discussion, no pleadings, no meat on the bones.

What do HAVA and the NVRA actually require? HAVA requires states to collect a person's voter -- driver's license number, Social Security number. Rhode Island is doing that. They didn't ask, well, what do you do? Do you collect that? Did you look at the voter registration form? I brought copies. They asked for it. So if the United States simply wanted --

(Court Reporter requests clarification)

MR. SAVITZKY: If the United States wanted to simply ascertain whether that information is being collected, it doesn't need Rhode Islanders' confidential personal information to do that.

And same with the NVRA. The NVRA, and I won't repeat it because Mr. Arguin has mentioned, it tasked the states with voter list maintenance. It doesn't task the federal government with doing that. And it certainly doesn't say that the federal government should replicate the thing that the State does, let alone do it with a snapshot. So there's no purpose

that's stated as plausible and there are no pleadings to sort of flesh out what would be the plausible purpose.

And then you get to pretext. Because even if a purpose, a sort of general conclusory purpose is stated, is it the purpose. We know from the Supreme Court's decision *in Niz-Chavez* against *Garland,* which we cite in the papers, the use of the definite article matters. You need to state the purpose; not any purpose, not a purpose, not some purpose.

And here, there's plenty of evidence, massive evidence that the purpose has not been stated. I mean just look at the MOU that DOJ has offered to the states that aggrandizes for the federal government for first time ever, in violation of federal law, the role a voter list maintenance to the federal government to say the federal government can look at individual voters and demand that they be removed from the voter rolls within 45 days, which is a violation of the NVRA. And we have an extensive roundup of all this in our brief; I won't repeat it here. And I think what the Court may hear today in response are answers like we've heard in some of the other proceedings in some of the other states; and what we haven't heard in those proceedings is an unequivocal disavowal of this ulterior purpose.

In Minnesota an attorney at the Department of Justice said, I don't know the answer, to whether the Attorney General could use state voter files to look at every person who voted in the country. In Connecticut last week an attorney said, I simply can't state what the Attorney General's purpose may be at some other time.

So I would just say if you ask about that, your Honor, I would suggest listening very carefully to whether there's a true and unequivocal disavowal of that purpose, contrary to all the evidence that we see, that voters can see. And I don't think you'll hear that. I don't think you can hear that, given the representations that have been made and given the evidence that's out there. And that is also an independent ground to dismiss the Complaint, because if you don't state the purpose, you haven't complied with the statute.

On the last ground, which is the privacy, I won't address again the issues around the Privacy Act. They're in the briefing. I'll only say there are also constitutional privacy issues at stake that have to do with the chilling effects of releasing voters' confidential personal information without adequate safeguards and making that the price of the franchise:

If you want to be on the voter rolls, then you have to be okay with your personal identifying information going to DOJ and to whatever other federal agencies they share it with for whatever purposes.

That is exactly what the voter Intervenors here and what so many Rhode Islanders who care about a vibrant democracy are concerned about.

And your Honor, if the Court has no further questions, I'm happy to address any further issues. But I think there are multiple grounds to dismiss, and I think that's the right course here.

THE COURT: Thank you.

(Pause)

MR. GOLAN-VILELLE: Good morning, your Honor.

THE COURT: Good morning.

MR GOLAN-VILELLE: My name is Robert Golan-Vilelle on behalf of Intervenors SEIU District 1199NE, the Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Zack Mezera. These Intervenors are membership organizations and Rhode Island registered voters who are deeply concerned with DOJ's unprecedented efforts to obtain their and their members sensitive personal information in this lawsuit.

We, of course, agree with the State and the Common Cause Intervenors that this action must be

dismissed. I won't repeat all the points that they've made, but I'd like to add points on three specific issues that reinforce why they are correct that dismissal is required here. Those are the issue of basis, the issue of purpose, and the fact that Rhode Island is entitled to redact the sensitive information at issue here, which is the entirety of the case, given that it has already offered to disclose the public list.

First, on the issue of basis, this is the simplest and most straightforward ground on which this case can be resolved. I won't repeat everything the State has said, but the statute has two requirements: basis and purpose. They each must have independent meaning. DOJ has understood it to -- each of them to have separate meanings in all of the 1960s cases that they rely on; and all three courts to have addressed this issue today have understood "basis" to mean factual basis. And that makes sense because it is the only meaning that makes sense in the statutory scheme.

So DOJ's actual position in its briefing that is put forward here is that the Civil Rights Act itself is the basis for its Civil Rights Act demand. That simply cannot be right as a matter of law because it would automatically be satisfied in every single case and,

you know, that would render the provision meaningless; well understood that Congress does not enact meaningless statutes and that we don't read statutory language to be superfluous.

And as the State and the other Intervenors have said, the DOJ's September 8th letter simply provided no basis at all. It doesn't use the word "basis." It doesn't provide anything that could be understood as a factual basis, and this straightforwardly requires dismissal here. And the most important thing is that it requires dismissal under any level of review. You know, no matter -- even leaving aside the issue of what type of proceeding is this, are we under *Lynd* or *Powell*, even, even under the most hands off, you know, even under the most hands-off level of review, at a bedrock minimum this Court needs to assess whether a basis was provided at all; and it plainly was not here, and that is enough to dismiss this case on its own.

On the issue of purpose, I won't rehash all the ground that the State went over. We agree with them that a proper purpose under the Civil Rights Act has to deal with an individual's ability to register to vote and cast a vote freely. That is, again, what all of the 1960 cases actually involved. That is what the entire subject matter of the statute deals with. And

I'd just like to add -- I'd just like to point the Court to one additional authority that reinforces not just why this interpretation of the statute is correct; but specifically why the purpose that DOJ has put forward here is not an appropriate one, and that case is *Kennedy v. Bruce*. The cite for that is 298 F.2d 860. This is one of the Fifth Circuit 1960s cases that DOJ relies on. And there's an extended discussion in this case about a particular county in Alabama where there are two particularly notable facts.

First, in this county, of the roughly 6,000 Black citizens of voting age, not a single one was registered to vote. And then there was also for the white citizens, there was a number that was greater than 100 percent of the white citizens who were registered to vote. And the court actually goes on to say, I'm quoting, "Obviously such a figure indicates that there have been failures to purge voters who have moved away or had died, a matter which does not bear any particular importance to the present inquiry."

And this is particularly striking because it means at that point in time, even when a court had its, had in front of its face facts that would suggest what today we would call list maintenance issues, it simply did not think that this bore any relevance to

Title III. The court was not concerned with the more than 100 percent of white citizens who were registered to vote. It was extremely concerned with the zero Black citizens who were registered to vote and the overwhelming societal problem in (indecipherable).

THE COURT: But isn't the Department of Justice saying, well, since then HAVA and the National Voting Rights Act, NVRA, have sort of modified the landscape. Isn't that what they're saying?

MR. GOLAN-VILELLA: That is what they are saying. We don't think it's correct and because it's basically assuming their premise. It's assuming that the Civil Rights Act was meant to be a sort of all-encompassing such that any time, you know, Congress enacted a subsequent law that had anything to do with the voting, that would sort of automatically be a proper purpose under the law. But there's nothing in the Civil Rights Act that suggests that.

We agree that with, you know, what the State has said in terms of, you know, the better reading is that it should have some tether to the purposes for which the Civil Rights Act was enacted. And, you know, the *Bruce* opinion we think matters because, you know, it's the best indication of when you have the actual facts at issue that, you know, today we would call list

maintenance issues. You know, the court went out of its way to say that this has no particular relevance.

So we think all of this collectively, you know, the text and context of the law, the actual case law and past practice of how it's been used, ordinary principles of statutory interpretation, we think all of that points in favor of the State's position and in favor of the proposition that this simply was not a proper purpose here.

And then, finally, I'll move on to the issue of whether Rhode Island can redact the sensitive information at issue here. So as your Honor asked in a previous question, there is nothing in the Civil Rights Act at all that prevents redactions. Rhode Island law prohibits the disclosure of the sensitive information at issue here. I don't believe DOJ has contested that; and DOJ has the burden of showing that that law has been preempted and simply has not met that burden.

There is simply no reason to conclude that the Civil Rights Act preempts these privacy protections, for a few reasons. There's no express preemption provision. As the State I believe noted, this information was not even required to be on applications at the time; and there's an overwhelming consensus of courts that you can redact under the NVRA, including

here in the Fifth Circuit under the *Bellows* decision.

DOJ's only argument here that the Civil Rights Act contemplates the production of sensitive material is to point to 52 U.S.C. 20704, which puts limits on the further disclosure of information received under a Title III demand.

But there's simple no reason to conclude that that means Congress at that time must have contemplated that that includes sensitive information. And the best way to look at this is to look at the Privacy Act. The Privacy Act prohibits disclosures under various circumstances even when the information is public and not particularly sensitive. It just has to be contained in a system of records and be identifiably about specific people. And that's linked to the purposes of Privacy Act, which is that we think there ought to be, you know, some limits on controls on when the government and when specific arms of the government have possession of specific information.

So there is simply no reason to conclude that the Civil Rights Act preempts the Rhode Island law here, as the Oregon court also concluded as an alternative reason for dismissal in that case. And that is why, you know, even if DOJ were entitled to the list, you know, at all, Rhode Island would be able to

redact the sensitive information which, again, is the entirety of the dispute here.

So for all of these reasons and all the others in our briefing, we'd ask that you dismiss this case.

THE COURT: Thank you.

We're going to take a 15-minute break so that we can get through the government's argument without interruption, and we'll about back in 15 minutes to hear from you, Mr. Neff.

(Recess)

THE COURT: Whenever you're ready.

MR. NEFF: Good morning, your Honor. May it please the Court, Eric Neff, on behalf of the United States.

This case ask about transparency, transparency in our elections enforced with the CRA. The CRA is a sweeping bill because it is about transparency.

THE COURT: But is it? Is that what it's for? I mean isn't there transparency when the State offers you their publicly-available information? Why does the government need driver's license numbers and Social Security cards and the Social Security numbers, and what is the purpose that the federal government sees that it has? Is it in maintaining the voter list? Because that's certainly not what HAVA and the National

Voting Rights Act say, is it?

MR. NEFF: Thank you, your Honor. I would direct your Honor's attention to the Ford-Carter Report, the bipartisan report that was done in the wake of the 2000 election and is the Blue Ribbon Report that led to the passage of HAVA. The Ford-Carter Report said, and I quote from Section 3, "An added identifier, an added numerical identifier is desirable, given various spellings and clerical errors that frustrate reliance only on a given name and address." Further down, "We suggest that States obtain the last four digits of this number as an added identifier." The Federal Election Commission has made the same recommendation.

The Help America Vote Act went further, knowing that the Social Security number implicated concerns that people might have. It wrote directly in the statute that the SSN-4 is not a Social Security number for purposes of the Privacy Act.

THE COURT: When you say the SSN-4, what do you mean?

MR. NEFF: Thank you, your Honor. The last four digits of a Social Security number.

THE COURT: So, but back up a little bit, okay, because this report, the Carter, the Ford-Carter Report

isn't before the Court. It's the government asking through the use of Title III to get records under HAVA and the National Voting Rights Act. So tell me how -- forget about purpose, forget about transparency. For a minute just tell me what your basis is for getting this information from each individual state, and do you have a factual basis?

MR. NEFF: Our basis is the CRA. The United States' position --

THE COURT: You can't say the CRA requires me to give a basis and so our basis is the CRA. That's circular logic; right?

MR. NEFF: I would posit the United States would say no, that we're only required to state a legal basis. However, if your Honor was inclined to require a more specific basis, it would be what the United States reviewed before it pursued the voter rolls here, and that would be the EAVS data published by the EAC, which is reviewed extensively by the Voting Section, and the EAVS report was cited in our Complaint.

For example, in the case of Rhode Island, Rhode Island self-reports to the Election Assistance Commission that they do not do eligibility audits. That's a concern of the Voting Section. We want to make --

THE COURT: Explain what you mean by that, because my understanding of Rhode Island's procedure as they've outlined it in their Motion to Dismiss is that they take information from the prison I think daily and cull the rolls for people who are incarcerated; that they provide the information to that ERIC system that 25 states put together that has masked identifiers for individual voters; that they received daily reports of voting. And the ERIC system compares the data with other states to make sure that somebody is not registered to vote in two jurisdictions, that they -- what's the word I'm looking for -- that they also get information from each individual Board of Canvassers in the 39 cities and towns here.

So what do you mean that they don't, they don't cull ineligible voters? What are you trying to say here? Because if they're collecting a Social Security number and a driver's, or a Rhode Island ID number, and then they're required, then those things are -- if they're required for registration then by definition the registration is an open eligible voter, isn't it?

MR. NEFF: Your Honor, the United States is not saying that Rhode Island does not cull ineligible voters.

THE COURT: What are you saying?

MR. NEFF: What we are saying is that we don't need to allege that. We -- as the *Lynd* court said, the Attorney General's, quote, right to records does not require that the A.G. show that the A.G. could win without them. We do not need to allege a violation of a specific statute.

I was only raising the lack of a particular audit and, again, this was self-reported by Rhode Island as a concern that the Voting Section had.

There are also certain numbers that raise concerns with the Voting Section, as Rhode Island self-reported having 60,000 inactive registrations. They reported having 60,000 duplicate registrations. This is out of about 800,000 registered voters. That's also a 90 percent registration rate of the adult age voting population.

THE COURT: I believe it's 700-and something thousand voters; but your point is taken.

But I guess what's the DOJ's, what horse do you have in this race? Is it that you're trying to double-check the work of all of the states, or is it that you're trying to assert an outsized role for the federal government in the running of elections?

MR. NEFF: Certainly not outsized role, your Honor.

THE COURT: It seems that way from your filings in all of these states. So what's your purpose?

MR. NEFF: The United States is in a trust but verify mode as it relates to voter list maintenance countrywide. It is --

THE COURT: So let me ask a question then because I think 11 -- well, originally three jurisdictions just provided the list to DOJ: Texas; I don't know, North or South Carolina; somebody else. What did you do with those lists?

MR. NEFF: So we kept all the lists that we received -- at this point it's been 17 states have been kept in separate compartmentalized files that only very limited people have any access to.

THE COURT: And what did you do to verify those lists?

MR. NEFF: We've not done anything yet because we've not --

THE COURT: Why not? If you need to verify those lists, if you have an oversight role why haven't you taken -- some states have said here, here's all our data. And you've gotten it, and by my understanding you got some of it back in the summer of last year. Why haven't you done anything with those states' data?

MR. NEFF: Well, we're talking as to the

non-public lists; correct?

THE COURT: Right.

MR. NEFF: Okay. The United States is taking extra concern to make sure that we're complying with the Privacy Act in every conceivable way, and there are still a couple steps we have to go through before the United States is comfortable proceeding and comfortable representing to this Court that we're in full compliance with the Privacy Act.

THE COURT: What steps have you taken and what steps need to be taken with those states that have complied? Because to me, the states that have complied are traditionally more conservative states. Texas just gave you their list, let's say. Why not go through Texas's list to make sure that only eligible voters are on their list?

MR. NEFF: I can only go into the United States delivery of process so much, you Honor, but what I can say is that the United States is evaluating, for one, an opinion out of the D.C. Circuit that analyzed DHS's SORN, and also the United States is -- we are certainly going to be proceeding with running this, our intention is to run this against DHS's SAVE database.

THE COURT: Which database?

MR. NEFF: The SAVE database that runs, that

essentially is a, it's called like a fetching system that seeks information from other databases to cross-check whether the data set on a roll is either a deceased person or a noncitizen.

THE COURT: And what's the accuracy rate of data that you've run against that system?

MR. NEFF: The accuracy rate we've been told --

THE COURT: By whom?

MR. NEFF: -- by DHS, and it's particularly the SAVE personnel that run the system is that it is in effect 100 percent accurate.

THE COURT: That's not the reporting; right? I mean isn't the reporting that people have been run through that SAVE Act and not for voting but for other things have been kicked out as noncitizens when they were, in fact, citizens?

MR. NEFF: There's an important note that the SAVE database has been around, the SAVE Act, essentially states have been able to submit their information to SAVE for about 30 years. But SAVE has also changed drastically in the last few months. It's been I would call upgraded and the process they go through, we can go into that if your Honor wants to, but essentially when any flagged voter comes back, it's then run through a very comprehensive confirmation

process to make sure that the, quote, like problematic registration is, in fact, not just --

THE COURT: What's the process?

MR. NEFF: DHS has about 200-odd employees who are trained for a minimum of six months each and know various databases that are accessible to the federal government through use and shared agreements to be able to essentially access important naturalization files and other data that can establish whether the person is a citizen, because there are holes in the process.

THE COURT: What are the holes?

MR. NEFF: The holes, the most common hole would be when someone is -- someone who came to the United States is a parent and has children who are U.S. citizens and then naturalized; like the most common hole of that is that it's actually rather expensive to go through the full, quote, documentation process. A common, cheaper shortcut that people will just do is just go get a passport.

THE COURT: By "people," do you mean the children or the parent?

MR. NEFF: The parents, your Honor.

THE COURT: Because the children are derivative citizens under that scenario, so even if the children are born outside of the United States; correct?

MR. NEFF: Correct. And I'm talking about the parent in this scenario as the most common problematic scenario; that the child is not a problem. That would not come up as any issue. It's the parent that potentially would and --

THE COURT: If they're naturalized they can't vote?

MR. NEFF: Explaining to your Honor when an immigrant is naturalized, sometimes that's not immediately available in naturalization documentation databases. So what these 200 people are doing is they're going to other ways to verify that that person a citizen. One common way is going to the Department of State and confirming that they have a passport.

THE COURT: Gotcha. So what you're saying, what you're asserting here is the federal government's role in that process. That's not what the Framers envisioned, is it? The Framers gave in the Elections Clause the responsibility for maintaining elections to the individual states, with some congressional oversight or some congressional barriers or, what do you call them, check points.

But it's not a federal government role to maintain -- to run elections. It never has been. I mean we're supposed to look at what the original intent

of our Founders was when they wrote these documents, and they were pretty clear that states have the responsibility of running elections. And actually the HAVA and National Voting Rights Act sort of reiterates that; right.

MR. NEFF: In their own sphere, yes. But when Congress intervenes it has preemption and, in fact, they have a stronger right to preemption than they would in any other sphere. The Electors Clause broadens Congress's power in elections.

THE COURT: Understood. I understand the preemption difference with the Elections Clause. But tell me where you get from that to this request for all this personally-identifying information that goes beyond what's publicly available for the voting lists in 50 states, when you have some of them for eight or nine months and you've done nothing with them.

MR. NEFF: It would be right in the Help America Vote Act that says that this is the data that the states need to maintain for each registrant, --

THE COURT: Right.

MR. NEFF: -- and that the Attorney General is charged with enforcing that the statute.

THE COURT: What have you done to find out whether the State of Rhode Island is maintaining or not

maintaining that, besides asking for a list of all of the voters?

MR. NEFF: That's how we are going to ensure that they have the proper identification as to each and every voter.

THE COURT: So every state is under suspicion of not doing it unless and until you verify that they've done it.

MR. NEFF: That's the Attorney General's designated role under the Help America Vote Act.

THE COURT: It's not really though. Their role is to enforce the Help America Vote Act, but the states have a role in that Act. The outsize role belongs to the states; right?

MR. NEFF: The role for executing the Rules belongs to the states, yes. The job of oversight falls on the Attorney General.

THE COURT: And what is it about -- I'm going to let you make your argument, go ahead, without asking you more questions about that.

But I want to go back to what the basis and the purpose is because I don't know that, in fact, I don't think that you've provided anything that says there's a basis individually for Rhode Island that we need these for this reason. And frankly saying, you know, we're

going to get it from every state and hold onto it and we're going to decide whether you're in compliance or not based on putting data that is personally identifying information through yet another database that we don't know anything about, that apparently is only a couple months old, to me it says that you are asserting the role that HAVA gave to the states.

MR. NEFF: The United States respectfully disagrees, your Honor.

THE COURT: Well, tell me how I'm wrong.

MR. NEFF: The statute of HAVA itself gives the United States, the United States and the Attorney General specifically the authority to enforce the statute.

THE COURT: And how is the publicly-available information not enough for you to ascertain whether states are complying with the statute?

MR. NEFF: Going further into the problem that was identified in the Ford-Carter Report, the HAVA identifier actually protects voters because what they found was happening was that with someone with a common name was very often falling off of the rolls because he was being wrongly identified as someone that -- maybe someone reported, a John Smith reports himself to have moved out of specifically Florida where this became an

issue, --
THE COURT: Uh'huh.
MR. NEFF: -- and Florida then dropped a John Smith off the rolls that was not the John Smith. And so that's why Ford-Carter Commission recommended have a HAVA, what I'm calling a HAVA number; but last four of SSN or driver's license in the first order.
THE COURT: But the HAVA number, well, now I'm thinking of the ERIC number, which is a different number that's assigned to each individual voting record; right?
MR. NEFF: We are not involved in ERIC. I don't know specifically what numbers they generate or don't. That's a private organization that the states are choosing to give the states' private voter registration info too.
THE COURT: Actually it's a nonprofit that the states together have put together, right, so it's a closed loop with the other states.
MR. NEFF: Well, it is a nongovernmental organization --
THE COURT: Correct.
MR. NEFF: -- that does also I believe self-admittedly distribute it to third parties so, I mean --.

THE COURT: So, well, so you're saying trust the government, but go ahead, and not the private industry, but all right.

MR. NEFF: Well, I would say that ERIC is not mentioned in HAVA. ERIC is not mentioned in the CRA. The Attorney General is.

THE COURT: But the CRA doesn't mention HAVA because it didn't exist, and it doesn't mention databases because they didn't exist. It says go copy them at the Secretary of State's Office. Why can't you do that?

MR. NEFF: It's important to read our election statutes as in harmony, not at war with each other. That's not what was intended by them. It's right there in the National Voter Registration Act, 52 U.S.C. 20510(d)(1) says that this law is meant to be read in addition to all other rights. The NVRA expands rights; so does HAVA. HAVA merely imposes certain minimum requirements on states such that their rolls are clean. That's all the United States is interested in here. That's why we stated that as our basis and purpose. We're interested in clean rolls. We're interested in HAVA-compliant voter rolls.

THE COURT: Right. But it seems like you've jumped a bunch of interim steps, but go ahead.

MR. NEFF: What the *Lynd* court said at pincite 226, that all that's required is a simple statement from the Attorney General to the court satisfying the elements above; and it's just have we stated a written demand, have we stated a basis and purpose, was that to an officer of election, and did the state refuse.

THE COURT: So what's the basis?

MR. NEFF: The basis is the Civil Rights Act.

THE COURT: So that circular thing again. What's the purpose?

MR. NEFF: The purpose is to ensure that Rhode Island is complying with all provisions of the NVRA and the HAVA.

THE COURT: So you're saying that the Department of Justice doesn't need any more indication than that. So if another president comes in and says, you know what, I lost this state and this state in the last election; I'm going to look at their voting rolls. You would have no objection to that.

MR. NEFF: No, your Honor; it is true that the CRA is a sweeping authority. It's a very short statute. It provides broad authority within a limited scope. And it's important for your Honor to make sure that the requests are within that scope and that they

are appropriate under the statute, however, as the *Lynd* court explained.

THE COURT: I know, but you're talking about a Fifth Circuit case from before I was born, and I think I might be one of the oldest people in this courtroom so let's just remember that.

MR. NEFF: I'm not trying to push upon your Honor that it is anything more than persuasive here.

THE COURT: But I have to look at it with respect to what has happened since 1960; right?

MR. NEFF: Yes. And I appreciated your Honor's discussion that got right into *Powell* which followed, --

THE COURT: Right.

MR. NEFF: -- and *Powell* happened since and where the -- your Honor correctly characterized the Defense's argument that *Powell* tacitly overrules *Lynd*. That couldn't be further from the case.

THE COURT: Okay.

MR. NEFF: The only question in *Powell* was what type of review does a particular statute call for.

THE COURT: Right. And it uses that statute in question in that case, and I understand that it's a separate statute, but it uses the exact same language. And *Powell* says you have to have some basis that's not

just the law says I can do it so therefore I'm doing it; right? Isn't that essentially *Powell*?

MR. NEFF: No, your Honor, it doesn't use the same language. And that's the sleight of hand the Defense does as well as they're committing the same error that the Oregon court did by just calling the statutes the IRS statute and the CRA substantially similar. It's not true. 26 U.S.C. Section 7605(b) prohibits the U.S. from subjecting a taxpayer to "unnecessary examination and investigations." Those are the words that are being examined. Those are the words that are not -- that are in that fashion are not in the CRA.

THE COURT: But doesn't it say that you have to have a purpose, a basis and purpose for seeking the information?

MR. NEFF: Yes, and that is appropriate for your Honor to review.

THE COURT: And you're saying basis and purpose not appropriate in this case?

MR. NEFF: No, we are saying we stated -- it appears we have a difference with your Honor that we've stated a sufficient basis and purpose, but we would say that and we've specifically alleged in both our letter and the Complaint that we have stated a basis and

purpose.

THE COURT: Okay. And why have you -- why did you choose to file a Complaint in federal court? Why not an administrative subpoena?

MR. NEFF: Thank you, your Honor. That was as part of the U.S.'s efforts towards transparency in this case. We understand the many concerns that many parties may have and we -- what I would humbly submit is that the Defense can't have it both ways. They can't both say you shouldn't have filed a Complaint, you surrender your right to an expedited proceeding; but then also say you can't exclude the Federal Rules of Civil Procedure in cases where it's inappropriate in this action because you're denying us procedural protections. The *Lynd* court made clear that the Federal Rules of Civil Procedure do not apply to CRA proceedings. That doesn't mean your Honor can't reference the Federal Rules of Civil Procedure when appropriate.

THE COURT: I think though that if the courts had no role in reviewing anything and we're just to rubber stamp anything the Department of Justice does for any reason that they state, for any basis, for any purpose, that would render, that would read out the language of the court's, you know, reviewing or

enforcing those requests.

So what I'm wondering is where was your basis stated? Is it in the Complaint or was it in the letter, and what specific language did you use?

MR. NEFF: It was stated in the letter, your Honor. I could reference, well, I can quote the letter to which we said this is pursuant to the CRA, the purpose of this request is to -- and this would be the purpose -- ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and the HAVA. That is in the record, our Motion to Compel, declaration doc 2-2 at page 41. It's also cited in the Complaint doc 1 at page 5.

THE COURT: So your argument is you don't need a factual basis; you can just go on what the Defense is calling a fishing expedition and get everybody's list to check their work, so to speak.

MR. NEFF: Consistent with the various Fifth Circuit case law. While we understand your Honor's --

THE COURT: This isn't the Fifth Circuit. So let's talk First Circuit, because doesn't *Bellows* in the First Circuit allow for redaction?

MR. NEFF: *Bellows* was a case that involved a private party bringing an action under the NVRA.

This is a much different procedural scenario.

We have the Attorney General bringing a CRA action. It was appropriate under the NVRA for there to be redactions giving a list to a private party. That is not applicable to the analysis here.

THE COURT: So Department of Justice can give this list to anybody else, or no?

MR. NEFF: No.

THE COURT: No other department of the federal government? So you can't give it to HHS, Homeland Security, whatever they call themselves.

MR. NEFF: Your Honor, I meant -- to be clear, I meant to deny that it is true that we can just give the list to anybody. That's certainly not the case.

THE COURT: What can you do?

MR. NEFF: We can give it for, as pursuant to uses that we've published in our systems records notices, which generally folds into law enforcement and governmental purposes. There are routine uses that are statutory purposes given to us by Congress.

THE COURT: But not under Title III and not under HAVA or the National Voting Rights Act; right?

MR. NEFF: Incorrect, your Honor, because specifically the HAVA, NVRA, and CRA are mentioned in the systems of records notices as routine uses for the Voting Section to use these lists for.

THE COURT: What I'm saying is can you take this list and send it to Homeland Security and say, hey, check this out to see if any of these people are not citizens.

MR. NEFF: In compliance with all federal laws, yes, and we intend to do so.

THE COURT: How?

MR. NEFF: We intend to first off enter a use agreement with them, which we've already done, an appropriate use agreement. Second, we intend to make sure that our SORNs are fully applicable to --

THE COURT: How? How are you going to control what they do?

MR. NEFF: Thank you, your Honor, that's a good question. In the Department of Justice we have a little-known agency, the Office of Civil Liberties and Privacy. We've had -- we've been working with them every step of the way. In fact, the head of that office, Mr. Winn, is a longtime AUSA and practiced in this field, has extended an open invitation to all the courts to even come and testify or be at counsel table if needed to explain all of Privacy Act actions that the United States is taking in preparation for properly sharing this data with DHS or SAVE, making sure that it's only being used in the proper manner and that

everyone's privacy protections are protected.

THE COURT: So what can it be used for?

MR. NEFF: For list maintenance; for our routine uses that are described in the SORNs, which is essentially the statutes that Civil Rights Division enforces, which are listed in the CFRs, specifically Section 0.50 and 0.51.

THE COURT: So not for ICE going to people's homes and arresting them; right?

MR. NEFF: No.

THE COURT: Are you sure?

MR. NEFF: Good question, your Honor, because the Civil Rights Division cannot promise what any other agency will or will not do. However --

THE COURT: Isn't that why Rhode Island doesn't want to give you the driver's license and Social Security numbers, because you can't promise what other people are going to do?

MR. NEFF: If that were the case, your Honor could fashion an order that would order that the data be given and be shared only in the manner that we are properly allowed to use it for.

THE COURT: What if I said you can't share it at all.

MR. NEFF: Can't share it even to run through --

THE COURT: Even within any other department of the federal government or any state or local government.

MR. NEFF: One thing I can promise for sure --

THE COURT: Or any political campaign or political entity --

MR. NEFF: One thing I can promise for sure, the Civil Rights Division is going to comply with every order this court gives, no questions asked.

THE COURT: I kind of doubt that, but okay. So -- but that's sort of the cart before the horse.

Let's go back to the basis. So even if I were to follow *Lynd* in the Fifth Circuit case, wouldn't the Defendants be able to redact the information that's personally identifying individual people before it gives you the list? Doesn't *Bellows* allow that and doesn't it require it on some level? Rhode Island law requires it.

MR. NEFF: No, on both counts, your Honor. First off, again, it's necessary to read the election statutes in harmony with each other, not as at war with each other. The HAVA specifically mentions that this is data we need to properly do our job, and furthermore that's true just as a practical matter.

As to Rhode Island law, my friends on the other

side gloss over in the law that they cite, Rhode Island statute 20-00-19.5(i), that under voter registration form and confidentiality to the extent permitted by law, this says the SSN-4 is confidential. It falls right back into the supremacy argument.

To the extent that federal law has specified that we get this, which it has, the Rhode Island law allows for us. And, in fact, further later down in the law in a law not -- again, not cited by Defendant, Rhode Island law 20-00-19 which states the purpose of these laws, it says that the purpose of these laws is "implementing the voter registration requirements of both federal and state laws".

THE COURT: All right. Let's back up. Your basis is the CRA.

MR. NEFF: Yes.

THE COURT: Is there a factual basis?

MR. NEFF: As I've explained with the EAVS data there is, your Honor. However, we're not required to state it and it's not appropriate for this Court to review it, consistent with the same letters that --

THE COURT: Don't I have to determine whether you have a basis or not?

MR. NEFF: You have to determine whether we have a basis, that's correct.

THE COURT: Whether it's a lawful basis. If your basis is I don't want women voting in Rhode Island, then that's okay, I still have to give you the list; they have to give you the list?

MR. NEFF: No, your Honor. You do, you are able to review it in a facial sense. Is it facially compliant with the purposes of the CRA. Remember, the CRA is culled Federal Elections Records. The point here is falling right under Federal Elections Records is the Attorney General's duty to conduct oversight, to trust but verify as to whether these states are doing what they need to be doing, to doing things like removing 60,000 inactive registrations, like removing --

THE COURT: But Rhode Island removed 105,000 registrations or some odd number like that in the last whatever period of time that they cited in their briefing.

Why is your oversight role satisfied by a snapshot in time of the voter records?

MR. NEFF: So this is an ongoing obligation, and the United States is entering this in good faith, absolutely just wanting clean voter rolls and free and fair elections. I would agree as to the snapshot issue that the most important voter role is the one that is

the snapshot right in time that is used for an actual election.

THE COURT: But isn't your role more effectively -- and I'm not going to pretend to tell the Department of Justice how to do their job. But why would you not be looking at the processes that states are using, as opposed to the list? The list gives you nothing except a snapshot in time. The process tells you whether or not they're complying with HAVA and the National Voting Rights Act.

MR. NEFF: We look at both, your Honor, and --

THE COURT: Why does the list help?

MR. NEFF: Because the United States has the capability to run these lists against other databases to be able to tell if there are bad registrations on their rolls.

THE COURT: So if I -- I'm registered to vote in Rhode Island. If I move to Oregon and register, and you get the list where I'm still in Rhode Island, then that somehow says Rhode Island's list is inaccurate, even if I never voted here after I moved.

MR. NEFF: No, your Honor. It just leads to a scenario where we can check with Rhode Island, do our constitutional and statutory duty to verify with Rhode Island they have removed you from the rolls.

THE COURT: But how do you know that I need to be removed from the rolls? What is your role in this?

MR. NEFF: Our role is oversight and so if we knew -- in your hypothetical, if we knew that you had moved to Oregon and we also knew that Rhode Island had not removed you from the rolls --

THE COURT: But you wouldn't know that based on this list because you're getting a snapshot. You're getting the day before I moved.

MR. NEFF: I understand, your Honor, and there may be, like there can be holes in list maintenance, but that's why there's oversight.

THE COURT: But that's why we have ongoing list maintenance; right? So if you don't check it every day, all 50 states, all Boards of Canvassers, every single -- and the District of Columbia every single day, then, you know, if your oversight is inaccurate; right?

MR. NEFF: No, I wouldn't concede that. It's the Attorney General's prerogative as to how she's going to go about her oversight role and how often and in what manner.

THE COURT: But then doesn't -- okay. Go ahead.

MR. NEFF: Going into the, essentially the details of Rhode Island's election process, and what

they've done is exactly what the Fifth Circuit has warned against saying that Title III properly is purely investigative. That's *Alabama ex relatione Gallion v. Rogers*, 187 F.Supp. 848 at 854; *Coleman v. Kennedy*, 313.F.2d 867 at 868. The purpose of Title III is only looking into possible violations of a federal statute, and that that language is clear and unambiguous.

THE COURT: So what are the possible violations that you're alleging here?

MR. NEFF: The possible violations would be in noncompliance with the NVRA and HAVA, and we're back to what the letter --

(Indecipherable crosstalk)

THE COURT: -- logic then; right? We're asking because we don't have any information but we want the information so that we can figure out whether there is evidence; right?

MR. NEFF: Which is exactly what the court warned against. The Attorney General's right to records does not require that she know that she could win without them. That's why this is an investigatory tool. The whole point is for us to be able to check, and if something is wrong we need not prove that something is wrong; we need not even allege that something is wrong.

THE COURT: But I think you do. That's where you have a basis, a factual basis. We come into court all the time and you're required to have a factual basis under the Federal Rules of Civil Procedure so that you're not going on a fishing expedition. And you chose the forum here; you chose to file a civil complaint as opposed to a request for an administrative subpoena.

MR. NEFF: I'd refer your Honor, if you want more current analysis, it would be the *Benson* court's analysis in the Michigan case where --

THE COURT: You're talking about the Sixth Circuit.

MR. NEFF: Correct, where that court's analysis was that such a basis and purpose was sufficient for the purposes of the statute.

THE COURT: Also not mandatory authority; right?

MR. NEFF: Correct.

THE COURT: Okay. Go ahead.

MR. NEFF: And less persuasive than the Fifth Circuit, we would posit to you, because it is a district court, not a court of appeal.

THE COURT: Correct. But more recent.

MR. NEFF: That's true.

THE COURT: As is Oregon and the Central

District of California; correct?

MR. NEFF: Correct. And the Central District of California and Oregon rely heavily on that misreading of *Powell,* where even in *Powell* reaffirms what we're talking about here where it said that even with the language of the Internal Revenue Code that had the statute that has the, that gives the U.S. the ability to send these subpoenas or these requests for investigation; the U.S. does not depend on a case or controversy for this. It can send them even just because it wants assurances that it is not true, that a crime did not happen, that a violation did not happen.

In other words *Powell* doesn't overrule *Lynd*, doesn't even cast out on it; it reaffirms it.

*Powell* further explained that the judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine, "If the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation," which relates directly back to the language that is present in Section 7605(b) and not in the CRA, and that is preventing subjecting a taxpayer to "unnecessary examination or investigations."

Clearly if that language was in the CRA we would be in a completely different scenario.

THE COURT: But *Benson* construed the demand as an administrative subpoena and dismissed it anyway.

MR. NEFF: That's correct.

THE COURT: And so if we follow *Benson*, why is this case different?

MR. NEFF: Because the reason for the *Benson* court's dismissal was, as the court stated itself, overly pedantic and it just doesn't, it doesn't pass muster as far as the textual interpretation of the statute. The *Benson* --

THE COURT: So now we get back to textualism and the Elections Clause; right?

MR. NEFF: I would more say it's just a simple issue of statutory interpretation: What do the words mean? What does "comes into possession" mean? It's a pretty -- it's actually just a basic concept. There's nothing in the text that suggests that it matters whether the document was generated externally or internally.

THE COURT: I guess what I'm lost on here is what the government's argument seems to be is that Title III of the Civil Rights Act, as well as the HAVA Act and the National Voting Rights Act sort of empower

the federal government through rhe Department of Justice to take a second crack at maintaining voter lists for individual states; and it's sort of like why wouldn't Congress have said that in those Acts, and I think it was Justice Scalia who said Congress doesn't hide elephants in mouse holes.

Aren't you arguing that they sort of have this elephant hidden in the mouse hole and you actually have the ability to double-check not just the process, that they're complying with the process, but check their work?

MR. NEFF: No. The NVRA and HAVA are quite explicit that the Attorney General is charged with enforcing what the, the limited purpose it was attempting to accomplish.

THE COURT: Which is?

MR. NEFF: In the NVRA's case there are multiple purposes of the NVRA, but if we're going to sum it up in a few words it would be ensuring access to voter registration.

THE COURT: Okay. And how does this ensure access to voter registration?

MR. NEFF: As stated previously, when you don't have a HAVA identifier it actually poses a great risk that people will be inaccurately removed from the

rolls.

THE COURT: But so you're saying you think Rhode Island is removing too many people from the rolls.

MR. NEFF: Again your Honor is going into breaking down whether it's actually true or not. We can't know until we have the list to be able to do our check --

THE COURT: And the elephant is in the mouse hole again. Okay. Go ahead.

MR. NEFF: And so if I were then going to give a five-word explanation of the HAVA, it would be imposing certain list maintenance requirements on the states and, again, the Attorney General is posed with enforcing that. That's -- to what extent it's been done in the past is not of concern to this court. What matters is what the law says and what it says our duty is, and is what we're doing consistent with that. And providing the HAVA number is just very clearly right there in the statute.

THE COURT: It says the Department of Justice is entitled to the HAVA number?

MR. NEFF: No. It says the State is required to maintain it and that the Attorney General is charged with enforcing the statute.

THE COURT: The State is in charge of the

numbers and the rolls, and the government is in charge of making sure that the states are doing their job.

MR. NEFF: Yes.

THE COURT: Not checking their work.

MR. NEFF: Well, I think that might be a distinction without a difference. We are making sure that they're doing the work that they're required to be doing.

THE COURT: No, you're not, because the voting rolls that you're asking for are a snapshot in time. If you were making sure that they were doing what they're supposed to do under HAVA, you'd be looking at the systems and the processes and you'd be auditing whether or not they're applying those systems and processes consistently across time.

MR. NEFF: Judge --

THE COURT: You're looking for the voting records. You want a list of all -- is the purpose to get a national voting database?

MR. NEFF: No.

THE COURT: Really? You're destroying these after you've giving them a look-over?

MR. NEFF: Again, we have a number of laws we have to comply with. One of them is the Federal Retention Records Act, so we have certain mandatory

requirements. We can't just destroy them immediately. But we are going to be complying with all applicable federal laws, including privacy laws, and your Honor will be well within her authority to issue an order consistent with both the CRA and its concerns as to the protection of the data.

THE COURT: Okay.

MR. NEFF: I want to just make one note as far as the, my friends' briefing that says that a racially discriminatory purpose is required under the CRA; when -- first off, not only is that not in the text, but it's abundantly clear from text around it that it was purposely excluded.

First off, the title of the law is Federal Election Records. Most importantly, one needs only look in other titles of the Civil Rights Act to see that when Congress intended to put in racial discrimination as an element, it knew how to, it knew how to use those words. It's right there in Section 601, which is codified as amended Section 52 U.S.C. Section 10101 where it used "on account of race or color".

Furthermore, in multiple acts passed in the similar time, Title VII of the Civil Rights Act of 1964; Section 2 of the Voting Rights Act; the Fair

Housing Act, which was then part of the Civil Rights Act of 1968, all language including race and color were used as qualifiers.

It is not in Title III. That's because of what Title III is.

THE COURT: But Title III talks about poll taxes, so we have to read Title III in the time context, don't we?

MR. NEFF: Yes. But what -- it is using terms that is all acts requisite to voting, which a voter roll and maintenance of a voter roll is clearly an act requisite to voting.

THE COURT: Can't we construe the HAVA and the National Voting Rights Act as modifying to some degree --

MR. NEFF: Well...

THE COURT: -- the Title III?

MR. NEFF: Yes, but the question is in which direction. And the National Voting Registration Act specifically tells you again, Section 20510(d)(1), this is in addition to other rights. The National Voter Registration Act and the Help America Vote Act are working in congruence with each other to have a coherent scheme where the states will have clean voter rolls and have fair and accurate elections. To read

them as in conflict with each other and preventing anyone from looking at what the states do is just not consistent with the text or fair reading of the statutory scheme.

I want to emphasize again that *Lynd* specifically talked about the pleadings issue in which it said that pleadings are -- that when they're not filed the whole procedure does not have to satisfy usual notions under the Federal Rules of Civil Procedure, and that that was then was upheld by *Powell*, which even followup with Supreme Court jurisprudence to *Powell* made clear that *Powell* was not meant to impair summary enforcement proceedings because summary enforcement proceedings are different than actual action. They're -- this is purely an investigative tool that needs, and it needs to be done in short order; it's just, it follows from elections. Elections have some of the shortest time frames.

We need to get started as soon as we can to make sure that the voter rolls are accurate and maintained properly in advance of each coming election.

THE COURT: But does this get you there?

MR. NEFF: It's one step towards it, and essentially to say, well, we could be -- you could also be doing this, you could also be doing that, is to

outside what's in this case.

THE COURT: Yeah, but I'm not -- but you have to have a purpose that is met by your demand.

MR. NEFF: That's true.

THE COURT: Okay. So you're saying your purpose is to make sure that the voting rolls are accurate for the next election.

MR. NEFF: Largely, yes. And that's consistent with the list -- I want to stick to the text that we put on the letter, but your Honor is accurately describing what that entails.

THE COURT: Okay. How is that served by asking for a voter list for more than a year before the next election?

MR. NEFF: Fair question. If we can flag some now, flag some registrations now that are very distinctly problematic, we can get started now with the State to get those removed in time.

As we get closer to the election there are other limitations that come into play. You've got, first off, the election offices get more busy; second, we have Purcell issues. So there's all kinds of reasons why we have to start earlier.

THE COURT: But -- okay. All right. I understand what you're saying; I just don't think that

your request gets you there.

So what is the limit to the purpose that can support the records demand? Does it have to be related to voting records?

MR. NEFF: Yes, it would have to be related to federal election records. That's the most signification limitation that there -- the second most limitation would be the 22 months provision.

THE COURT: So fair for the State to say I'm culling everybody who's never voted in a federal election before I give you my list.

MR. NEFF: I'm sorry, I didn't hear.

THE COURT: They're pulling off everybody from the list to somebody -- people who've only voted in state elections or who have never actually voted, they don't have to give you that information.

MR. NEFF: Not if they're registered to vote in this coming election because the record is the voter registration list; it is not who, when they registered. There is a list that exists right now that Rhode Island will be using as an act requisite to vote.

THE COURT: Hasn't Rhode Island offered to give you, but for the last four of the Social Security number or the driver's license number, and you refused that; correct?.

MR. NEFF: No, we don't refuse that. They're free to upload it if they like, but we would still be here because we can't do our job without that.

THE COURT: Now, if I don't follow *Lynd*, okay, and I evaluate the basis and purpose advanced in the A.G.'s demand, and if the Court determines that the stated purpose is pretextual, shouldn't the Court dismiss the case?

MR. NEFF: No.

THE COURT: So you can have a pretext.

MR. NEFF: It would be inappropriate for your Honor to analyze whether it was a pretextual motive or not.

THE COURT: But I have to determine whether there's a basis and a purpose, and you're saying if you come here and you give me a clearly phony basis or purpose, I still have no ability to deny your request.

MR. NEFF: While that's true, I'd also say that's not -- that doesn't need to be a concern of your Honor because that's not the case here. There's not basis for it. The closest thing to a basis is the *Weber* court bringing in anonymously-sourced media articles into a judicial opinion.

There is no record here to support that the Civil Rights Division would be doing anything other

than what it states it will be doing.

THE COURT: Hasn't the Department of Justice and the President issued all kinds of statements about a national vote, you know, one of them was the Republican Party should take over the voting; but putting that aside, that the federal government should take over voting management, that all of these things that are clearly unconstitutional, and am I supposed to just ignore those and say trust me?

MR. NEFF: There have been a number of statements that have been made --

THE COURT: Correct.

MR. NEFF: -- extraneously. What I would impress on the Court is that once you look first and foremost at what the Civil Rights Division said --

THE COURT: And what are you saying? We're going to take these, we're going to look at them, and we're going to flag people we don't think should be voters in Rhode Island.

MR. NEFF: And we will then approach the states with that data.

THE COURT: Okay. And then the State is going to say to say to you I know, but that was a moment in time and we've culled our data 30 times since then. And then you're going to say?

MR. NEFF: And we've all done our jobs.

THE COURT: Have you?

MR. NEFF: Yes.

THE COURT: Because they could still have false information on there. You haven't done your job.

MR. NEFF: It's definitely trust but verify. But if they're able to show us the list that doesn't have that inaccurate registration on it, then it's good.

THE COURT: Why don't they show you the process?

MR. NEFF: Because we have to confirm that they're actually following their own processes.

Also, I want to be clear here, based on their self-reported information to EAVS, we don't believe they have been following best practices. As we -- the EAC lists five categories of audits that Rhode Island could be doing, and Rhode Island self-reports they only do two of them. I commend them for doing logic and accuracy testing and risk-limiting audits, but there are several more that can be done.

THE COURT: Such as?

MR. NEFF: Such as specifically eligibility audits, legal audits, and post-election tabulation audits.

THE COURT: Tell me what you mean by those.

MR. NEFF: For example, I mean it varies state by state, but the most -- eligibility might be, for example, submitting the data to SAVE. There's nothing stopping these states from doing it themselves, in fact, they're invited to; and SAVE will run it for them, will give it back to them and will give them the data --

THE COURT: And this is the new and improved SAVE database, not the one that was wildly inaccurate --

MR. NEFF: Correct.

THE COURT: -- six months ago.

And we're supposed to just take Department of Justice or Department of Homeland Security's word that now we're accurate?

MR. NEFF: No, your Honor. Everyone has their own role in this. And the federal -- the Civil Rights Division's role is to ensure that the lists are clean and that the states are doing what processes they should be doing to make sure that they are clean.

THE COURT: So if you find states that are making it difficult for certain classes of people to register to vote, then you're going to go right down to that state and say you have to enable people, give people the opportunity to vote.

MR. NEFF: That would be a appropriate concern for the Civil Rights Division Voting Section, yes.

THE COURT: How would you find that in this mechanism?

MR. NEFF: We have an open, a decade-long process for complaint sifting. Every complaint that's sent to us goes through a various -- goes through a review process that is then elevated. This is what we do, your Honor.

THE COURT: Okay. All right. Is there anything further?

(Pause)

MR. NEFF: No, your Honor, absent further questions, we submit.

THE COURT: Okay.

Any rebuttal?

MR. ARGUIN: If I could briefly, your Honor.

THE COURT: Sure.

MR. ARGUIN: Thank you. Special Assistant Attorney General James Arguin on behalf of the Rhode Island Secretary of State.

Just a few points in response to what we heard this morning. First of all, for the first time we've heard reference to alleged discrepancies in what's called the EAVS report submitted by the State. The

last one was done in 2024 following the last election.

THE COURT: And just -- I don't want to interrupt you, but that wasn't cited in their demand --

MR. ARGUIN: Absolutely, and that was my point. Absolutely not. The September 8th, 2025 demand letter at ECF 2-2 made absolutely no mention of this.

Now, as my brother mentioned, the Complaint does make a reference to it. It says they looked at it, and that's in some of the earlier paragraphs of their Complaint they've said they had reviewed the EAVS reports. But they provided no conclusions that they drew from the EAVS report that could ever come close to stating a proper basis or purpose, as required by the CRA. They just made reference to the report.

THE COURT: So the first time that you're finding out what they think you should have done under the EAVS report is today.

MR. ARGUIN: Is this morning. And I think also the other point I would make about the EAVS report is what matters is not a passing reference in the Complaint. Under the CRA what matters is the statement of the basis and purpose in the written letter; and there is absolutely nothing in the demand letter to the Secretary of State, no references at all.

And furthermore, even if that passing reference

in the Complaint were somehow sufficient, it doesn't state what they said today. And as we're (indecipherable), what we're looking at when you look at voter registration lists, which as we established during our first conversation, those are updated by the minute and there are safeguards in place specifically to make sure no one is falsely removed. So there are sometimes things captured in those reports that are subject to corrective action or are in process of being corrected pursuant to the State's obligations under the NVRA.

THE COURT: So that gets to the purpose, I think, which is the moment-in-time issue. It's a moment in time. It doesn't, my -- if the purpose is to make sure the State is complying with HAVA and the National Voting Rights Act, then I'm not sure how we get there with a moment-in-time snapshot, unless they're calling it like a minute audit; but they would have to do it every day, every minute, every hour in order to really determine, and for all 50 states.

MR. ARGUIN: Exactly. Or set up their own shadow (indecipherable).

THE COURT: Which is not permitted, which is not what the federal Elections Clause or the Elections Clause of the Constitution says. It says states -- not

the Department of Justice -- shall maintain and process.

MR. ARGUIN: That's precisely right. And I think even the Fifth Circuit cases that they referenced as support under the CRA -- and my colleague mentioned one of them. The *Bruce* case is instructive because in *Bruce* that was exactly what the court was examining, whether there was a violation of the CRA, whether, you know, that was actionable or that required the records to be (indecipherable). And it specifically distinguished the alleged violation of the CRA from the state's alleged failure to purge voters who had --

(Court Reporter requests clarification)

MR. ARGUIN: Specifically distinguished it from the list maintenance activities of purging voters who had moved away or died. It said it wasn't relevant to the CRA.

The other point that's also I think --

THE COURT: And that's a contemporaneous Fifth Circuit case, correct, the *Kennedy v. Bruce*?

MR. ARGUIN: Yeah, that was contemporaneous, you know, a year or two after the Civil Rights Act was --

THE COURT: And *Lynd*, contemporaneous --

(Indecipherable crosstalk)

MR. ARGUIN: -- the *Lynd* line of cases, and it's

cited in our materials.

The reason why I think the argument as just presented highlights the need for an accurate statement of the basis and the purpose is the assertion today -- which, again, comes as a surprise -- that DOJ does plan, in fact, to share this data with the Department of Health -- Department of Homeland Security to run it through the SAVE database for immigration checks. Again, while we heard that this is all about transparency, that was never disclosed. And what's more, it certainly is not provided in the notice provided to the Secretary of State.

And it also conflicts with their representation to this Court in their reply at EC-33, that they said there was an affirmative duty on them not to disclose this information beyond the purposes they were requesting. Now, the statute on which they're relying allows them to share with other agencies; but, nevertheless, this is sort of a moving target. So what are we -- why do we need these lists, and how is this purpose of putting them through the SAVE database relevant to whether or not Rhode Island is complying with its list maintenance responsibilities? And clearly it is not, it is a different purpose, and it's another purpose that is not within the Civil Rights

Act, which is another reason why it should be denied.

One other point that was made is this repeatedly emphasis that all we need to do is state the legal basis and not the factual basis. But again, the very cases on which they rely under the Fifth Circuit line of cases specifically rejected that. Take, for instance, *In Re: Gordon*, 218 F.Supp. 826, a 1963 case from the Southern District of Mississippi. It specifically said that the CRA is not an unlimited discovery device which may be employed and used without restraint. Then also another case from that era, *In Re: Coleman,* similarly said that requests under CRA are not made based on speculation or idle curiosity.

And let's get back to *Lynd,* the principal case on which they rely. It specifically noted that the records it was talking about were public records, and it said nothing here is confidential -- which is why they proceeded to make that express distinction that they were not talking about confidential or private information. So clearly they did not anticipate the release of Social Security numbers or state driver's license numbers.

The other point that was made is that the Ford-Carter Commission that led to the HAVA required states to provide these unique HAVA identifiers. Well,

as we have already discussed, that is in the publicly-available information that Rhode Island has offered to provide. Those HAVA identifiers are part of the public access provision provided by state law, and they're available.

THE COURT: I want to clarify this because I think that it got a little conflated in the Department of Justice's argument.

I understood them to be arguing the last four of the Social Security number and the HAVA number were the same thing. Perhaps I misunderstood. But what the HAVA number is, is that sort of computer-generated unique identifier.

MR. ARGUIN: It's a unique identifier generated as part of the registration process. It is not the Social Security number. It is not a driver's license. It's a unique identifier that HAVA requires the states to do. Many states do it only if the other numbers aren't available; if there's no Social Security number or if there's no driver's license.

But Rhode Island assigns a HAVA, a unique HAVA identifier to every voter. But, you know, that doesn't raise the same confidentiality and privacy issues as a Social Security number, I would point out, given all the financial and other records that are associated

with Social Security numbers and driver's license numbers. HAVA is unique to voting.

THE COURT: And I think that since HAVA is unique to voting, it more closely aligns with the purpose that the Department of Justice is seeking. Does the court --. So those numbers are different numbers. They're not -- the HAVA number might be generated as a result of the Social Security number, the driver's license number, the address, the date of birth, all of those things, which are publicly available -- well, not the Social Security number and driver's license. But all of those records create or cause the creation of the HAVA number. Is that accurate?

MR. ARGUIN: Well, as I understand it, your Honor, as part of the -- once the registration is submitted and the application is submitted, a unique identifier is assigned to that voter.

THE COURT: Okay. And then Rhode Island goes through a process too where it verifies voting information periodically.

MR. ARGUIN: Absolutely. Yes.

THE COURT: Tell me about that because --

MR. ARGUIN: Not only at the time -- it's detailed in our Motion to Dismiss, but it's certainly

at the time one registers proof of citizenship, you know, they have to swear an attestation of citizenship, they present their residence application, proof of identification, all the material is submitted.

Periodically there are other updates done through mailings. In fact, just in 2025 the Department of State sent out a mass mailing to the active voter registration list to confirm addresses. And of course daily, you know, they're reviewing and comparing the Social Security death index, whether or not persons have died. And there's reporting also from the State Office, the Medical Board or the corner, whoever is in charge of statistics or vital statistics, the Office of Vital Statistics to confirm, to compare death records with the database, and all that information is subject to verification and processing.

And as you mentioned, the State also participates in a multi-state effort, ERIC, which is shared information with other states to reconcile discrepancies with voters who have moved to another state. So all of that information is compiled to maintain the most accurate listing.

THE COURT: But let me just ask a question. When the Secretary of State is verifying, say, vital statistics, people who have died, they don't give the

voting list to Vital Statistics; is that correct? They get the death records from Vital Statistics --

MR. ARGUIN: Exactly.

THE COURT: -- so that the integrity of the voting list is maintained by the Secretary of State.

MR. ARGUIN: Absolutely correct. They're receiving information to enter into the database. So someone who died, someone who becomes incarcerated, that information is shared by other state agencies, compared to other available information, for instance the Social Security Death Index, and the system is updated with that information on a regular basis.

The other point that's somewhat concerning is also even though we say that the Department of Justice said that they're going to run this through the SAVE Act and use it for immigration purposes; but even more problematic was the concession that the Civil Rights Division can not really promise what it's going to do with the information. Now, that is really troublesome when talking about 750,000 eligible voters in Rhode Island who all have their own concerns about privacy and informational data security. And that's --

THE COURT: I'm sorry. And Rhode Island law as well as federal law requires certain protections of that data because of the increase in online kind of

scams and financial fraud and all of those things.

MR. ARGUIN: The court's own electronic filing rules are clear, don't put that in a publicly filed document; and it's exactly the same reason. These kinds of concerns about data security didn't exist in 1960s; it wasn't that prevalent. But now data security is a fact of life, and someone gets your Social Security number or your driver's license number that's used for multiple programs and services and identification needs, it's problematic, and that's why both state and federal law protect it.

There was a passing reference that DOJ says they've complied with the Privacy Act because they've issued a bunch of SORNs. There is a couple SORNs our there; they've cited three or four in their Complaint. None of them serves the fundamental purpose of giving any citizen adequate notice that the data that they've supplied to vote and to exercise their First Amendment rights is somehow going to now be shared with the Department of Homeland Security to run immigration checks; and perhaps who knows what else because we won't specify what it is. That's really concerning. And I think that's exactly why there was some discussion of, well, just put a protective order in place and we'll abide by that. That in no way

addresses the State's concerns. The Attorney General of Rhode Island and the Secretary of State of Rhode Island have a duty to uphold public interest, which is to protect the rights of the citizens to their confidential -- to make sure their confidential and private information that is shared with the government to register to vote is not distributed without a valid and clear legal purpose.

And what's more, that right -- although it's the Secretary of State and the Attorney General who enforce it -- belongs to the citizens of Rhode Island, the 750,000 people who are going to have their personal, private information shared for what unknown or unlimited list of reasons.

And it's not speculation to say that this type of immigration check that they've only confirmed today is exactly what they're planning to do, or for some other purposes. The Executive Order that President Trump issued, 14248 just last year, specifically says we want to obtain the voter registration list from all of the states so we can run it through the Department of Homeland Security to run immigration checks.

It's exactly consistent with what we heard today. And what's more, that order, which has been enjoined by the District of Massachusetts, is still a

public statement from the head of the Executive Branch disclosing that they intend to use the data not for any purpose related to the CRA and even not for any purpose related to the HAVA or the NVRA.

THE COURT: So you're saying that notwithstanding the assurances that Mr. Neff gives the Court that the Civil Rights Division of the Department of Justice is planning to use it for the limited purpose contained within the statutes; you're saying he has no control over that and the evidence is to the contrary from above his pay grade.

MR. ARGUIN: Well, with all deference to Mr. Neff, I take him at his word, but his word was equivocal: I don't know; I don't know what's planned; I don't know what will happen. And this was the point one of my colleagues made.

So I think all of that reinforces the Secretary of State's concerns relating to DOJ's failure to provide a clear and accurate statement of the basis and the purpose for its demand for an unredacted version of the State's voter registration list.

And just one more point. If your Honor reviews all of the Fifth Circuit cases, and I'm talking about *Lynd*, *Bruce*, *Coleman* that's been cited, they all had the statement of the basis and purpose. I'm not saying

it was used in detail, but it at least related to the statutory purpose, and it wasn't something like.

THE COURT: And it didn't say my basis is the law. It gave a factual basis.

MR. ARGUIN: Absolutely correct. Absolutely correct.

And so with that, your Honor, for all those additional reasons, we request the Complaint be dismissed and the Motion to Compel be denied.

THE COURT: Is there anything further?

MR. SAVITZKY: Your Honor, if I could be heard extremely briefly, although very slowly and articulating.

THE COURT: Yes.

(Laughter in courtroom)

MR. SAVITZKY: Just again, not very much to add at all, but just on a couple of points that were raised. First of all with respect to *Powell*, there was an argument made that I don't think was in the briefing that actually *Powell* is about Section 7605 of the IRS statute and therefore it's distinguishable. That's not right. And the section of *Powell* that really controls is III, it's on page 255 of 379, United States Reports, and that's really the section that talks about what do we do where the United States District Court is given

jurisdiction by any appropriate process. And the court answers the question and says, well, when there's -- when the procedures isn't specified, you use the federal rules. And above the line that's in Footnote 18, (indecipherable) the line that says there will be a hearing and you can challenge the demand on any appropriate ground, any appropriate ground.

The idea that you could ever demand -- use government power to demand this sensitive information and there would be no substantive consideration of whether it is lawful and whether the purpose is improper is foreign to the law and inconsistent with the cases not just from the IRS. I mean the case we talked about, about the hospital in Boston last year, that's HHS. So we know that's not true.

On the merits, I want to point the Court to 52 U.S.C. 21085. This is from HAVA, it's part of HAVA. And there was a lot of discussion with counsel from the Department of Justice about the federal government's role, the designated role.

What that section of the provision says as part of HAVA is the specific choices on the methods of complying with HAVA are left to the discretion of the states. Congress -- end quote.

Congress could not have been clearer about the

discretion given to the states and the limited role of the federal government vis-a-vis the states and their process.

One other point, and I won't get into the basis and the purpose that's been discussed at length on the SAVE database specifically, and just to this point of there's been basically no disavowal this data could be shared, no attempt to cabin what other federal agencies might do.

But as I read the specific SORN, or System of Records Notice, that governs the SAVE Act and data that's put into that -- not the SAVE Act, excuse me -- the SAVE database, which is different. As I read it, it's 90 Federal Register page 48954 into 55; I believe that's the cite. But as I read that, it's contemplated when you put information into that SAVE database it is then retained for up to 10 years. So the idea that there are any real limits on what other federal agencies are going to do with this data once the Civil Rights Division gets it, I think is belied by what you've heard today.

The Department of Justice may think it's a good policy or good idea to run the data in this way, even though it could jeopardized naturalized citizens' right to vote like Ms. Sanches, who is an Intervenor here.

Texas may think it's a good idea. But nothing in federal law requires that; nothing about ascertaining compliance with federal law means that must happen, and therefore there's no basis or purpose for this request. The Complaint should be dismissed.

THE COURT: Anything else?

MR. GOLAN-VILELLA: Nothing further from us, your Honor.

THE COURT: Mr. Neff.

MR. NEFF: Briefly, your Honor.

THE COURT: Very briefly.

MR. NEFF: Keeping my comments to what was mentioned in rebuttal, I specifically heard my friend say that there was no exclusion that this could be used for immigration purposes or check. I want to correct the record. To the extent that I gave that impression, I did not mean to. This is not being used for immigration purposes.

THE COURT: By you.

MR. NEFF: Correct. And I think this is something that is getting lost here in this rebuttal discussion. The question that is being posed by my friends -- and it's not a fair question -- is why can't you give us 100 percent assurances as to what other federal agencies will do in the future regardless of

what steps you take now. That's never a fair question. It's not an appropriate question for this Court. The question is --

THE COURT: But isn't it when you're asking for such extraordinary information and they're offering you most information redacted down just slightly. Why isn't that sufficient? It seems that in -- Rhode Island gives everyone a HAVA number. Why doesn't that satisfy your...

MR. NEFF: I would dispute your characterization, your Honor. The redaction of the last four of the Social Security is what we need to do effective list maintenance. And furthermore, no one has taken a step back here --

THE COURT: You don't need to do list maintenance. You need to verify that they're doing list maintenance.

MR. NEFF: Correct.

THE COURT: So you don't need to do list maintenance, and that's not the Department of Justice's role. In fact, Congress specifically gave that, assigned that role to the individual states. So that's not your role.

MR. NEFF: Noted correction, your Honor. That's right. We need the SNN in order to conduct our list

maintenance oversight.

THE COURT: Why can't you use the HAVA number?

MR. NEFF: That's a good question. I think the terms are getting conflated and unhelpful here.

It's important to note that HAVA is, does not put those -- when it lists the numbers that the State is required to keep, it doesn't list it in the disjunctive; it lists them actually in an order. First the State is required to identify the voter with the driver's license number. Only if a driver's license number does not exist or is somehow not available is the State then allowed to move to the SSN-4, and, in an emergency case, issuing a HAVA-specific identification.

THE COURT: But Rhode Island specifically gives everybody a HAVA-specific ID, so why isn't that enough?

MR. NEFF: It would not be enough under the HAVA statute.

THE COURT: Why?

MR. NEFF: It would be a facial violation of the statute actually because they would not be -- if they're not attaching the driver's license to every voter.

THE COURT: They're attaching the driver's license number, but they're saying what's publicly available, what's available to you, Department of

Justice, which should serve your purpose is the HAVA number.

And unlike other states, we don't just collect the last four of the Social Security number or the driver's license number; we give everybody a HAVA number, and you can have that. Why isn't that enough?

MR. NEFF: In that case the federal government would be charged with ensuring that they are keeping the driver's license number, and so therefore it would be appropriate for the United States to ask to see the list with the driver's license number.

THE COURT: Do you have any evidence that the State of Rhode Island is not doing what it says it's doing?

MR. NEFF: We can't know what they are or aren't until we've seen the list.

THE COURT: So the answer is no.

MR. NEFF: That's correct.

THE COURT: Okay.

MR. NEFF: And I would, going back to what my question -- what I think the question needs to be, it's have we taken all necessary and prudent steps and are those steps consistent with federal law. Here, there is an MO -- let's not lose sight of the fact there is an MOU in place. I signed it myself on January 20th

with DHS that limits the use of the data to votes-specific purposes --

(Indecipherable crosstalk)

MR. NEFF: -- maintenance.

THE COURT: Okay. Let's say fast-forward five years, you're not in your job anymore. Are they bound by that MOU?

MR. NEFF: Yes, pursuant to this data, yes. And furthermore your Honor can bolster that.

THE COURT: But that's not my role here. My role is to say are you entitled to what you're seeking, which is sort of a broad swarth of personally identifying information that frankly is a lot different now than it was in 1960. I don't know how many spam calls you get a day, but I can tell you that I get lots of them and they're, you know, all kinds of fraudulent types of calls even to my government cell phone, which I find funny.

And so, you know, it's a different landscape. You have to acknowledge that. Not acknowledging that is burying your head in the sand, so your purpose needs to include some understanding of that.

When you're just saying the HAVA number is not enough, I need the driver's license and Social Security number, then they're saying why, and your answer is I

don't have to tell you why, essentially.

MR. NEFF: Far from acknowledging the new era we're in, we're embracing it. This is just a first step to sifting down to where there are problematic registrations. I think it would fair for someone to state that in today's day and age it's extremely hard to comply with all the provisions at the HAVA at the scale the Secretaries of the State are being asked to do right now. We can work as a partner with them. This is only a first step to seeing where some of the problems may be; and so because of such a large number as Rhode Island themselves has said, we need to be able to do our initial check so that we can start whittling down where maybe some of the problems are. We're not saying there are problems. That's not what we're talking about at this phase. We're just talking about doing the initial screening that is necessary, given the scale of a voter registration list.

THE COURT: But the Department of Justice kind of came in hot and asked for all the information. They didn't say, hey, let's partner, how can we help you, what are you doing? They came in and said give us all your information because we need to verify that you're doing what you're supposed to be doing, so offering a partnership now seems a little hollow.

MR. NEFF: If they're willing to come forward -- and I would strongly suspect they're not, that's why with here -- with exactly what they've offered plus just, and I say "just" the last four digits of the Social Security number which are not --

THE COURT: But that's the issue.

MR. NEFF: -- not the Social Security number --

THE COURT: They are --

MR. NEFF: -- giving it to the federal government, then there wouldn't be an issue.

THE COURT: Ane if you were to come forward and say those records will be destroyed the day after we get them and run them through, they probably would have less of a problem with it. So we can't live -- you know, my mother-in-law used to say, If "if" were a skiff, we'd all go for a boat ride. So it's kind of a silly analogy, like to say if they were to give us this, then we wouldn't have a problem. You're asking for what they don't want to give you and that they are arguing they're not required to give you.

MR. NEFF: That goes to exactly what we're asking for your Honor to do, is to issue the order, the Motion to Compel, and then you can appropriately set a next hearing in order to fashion how that order is going to look.

THE COURT: Why do you need the last four of the Social Security number? Why is it four?

MR. NEFF: Because it's all that's -- thankfully it's all that's needed in order for database management analysts to be able to get accurate information.

THE COURT: And can they get that information -- can somebody hack in your computer system, get that information and use it for some nefarious purpose? They don't need any more than the last four; right?

MR. NEFF: If you're talking about the Civil Rights Division, I can say Civil Rights Division goes above and beyond to ensure the security of the data that it has. We have yet to have a data breach in our history.

THE COURT: In your history of the Civil Rights Division since 1960.

MR. NEFF: That we're aware of, that's correct. I did run, I did make best efforts to where I can represent to the Court we're not aware of one and we believe we would be.

And our MOUs reflect, deal with people -- institutions are dealing with privacy issues all the time, and that includes clauses what to do if something happened. These can all fashioned, again, like consistent with we have an entire office devoted to

making sure not just that we're complying with federal law; that's not the Attorney General's only interest. The Attorney General's other interest is to make sure people's privacy are protected.

THE COURT: But if somebody has your Social Security, the last four of your Social, don't the first three and the middle two tell you date and place of birth to some degree or at least within a range?

MR. NEFF: Well, we don't -- that's why the HAVA statute specifically defined it as not a Social Security number. It's only the last four is the identifier, and that's all we need to get to essentially accuracy that makes it possible for us to do our oversight.

THE COURT: Okay. But first we have to accept the premise that you need this list to do your oversight.

MR. NEFF: Correct. Yes.

THE COURT: Okay. Is there anything else?

MR. NEFF: Thank you, your Honor. On that I would submit, unless your Honor has further questions.

THE COURT: No, no further questions.

We are in recess, and I will issue an order shortly, probably not today or tomorrow but hopefully next week.

(Adjourned)

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Denise P. Veitch_
Denise P. Veitch, RPR
Federal Official Court Reporter

March 20, 2026
Date

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION, *et al*.,<br><br>Defendants. | Case No. 1:25-cv-00596-ELH |

## NOTICE OF CORRECTIONS TO THE RECORD

Defendant Social Security Administration ("SSA") has reviewed records of and relating to data access of SSA's former DOGE Team for audit and litigation purposes. Based on its review of records obtained during or after October 2025, SSA identified communications, use of data, and other actions by the then-SSA DOGE Team that were potentially outside of SSA policy and/or noncompliant with the District Court's March 20, 2025, temporary restraining order ("TRO") (ECF 48). SSA notified the undersigned Department of Justice ("DOJ") attorneys on December 10, 2025, of its concerns. Following further diligence and review by SSA into these matters, which were necessary for SSA and the undersigned counsel to understand the facts surrounding the SSA DOGE Team's actions, Defendants now respectfully notify the Court as follows. For the avoidance of doubt, undersigned counsel clarify that the information contained in this Notice was relayed to the undersigned counsel by SSA representatives. Counsel will promptly inform the Court if the information within their possession changes.

## I. Clarification Regarding Timeframe of Compliance with TRO.

On March 24, 2025, SSA submitted a declaration executed by then-Commissioner Dudek to accompany Defendants' Status Report and Certification of Compliance with the Court's March 20, 2025, TRO. ECF 56, 56-1. Mr. Dudek stated in his Declaration: "As of Monday, March 24, 2025, SSA revoked all SSA DOGE Team members' access to SSA systems containing personally identifiable information (PII) or systems of record[.]" ECF 56-1 ¶ 4 (footnote omitted). SSA believed that statement to be accurate at the time it was made. SSA has now determined that, during the morning (Eastern Time) of Monday, March 24, 2025, one member of the then-SSA DOGE Team ran PII searches on SSA's copy of the Numident (SSA System of Records Notice 60-0058) within the Enterprise Data Warehouse ("EDW"), with the last search occurring on or about 9:30am ET. DOGE Team members' access to all PII within SSA systems was terminated on or about Noon that same day on March 24, 2025, before the filing of the declaration at ECF 56.

## II. DOGE Team Member's Possible Transmission of SSA PII to U.S. DOGE Temporary Organization Employee.

Mr. Dudek's March 24, 2025, declaration also stated that: "The DOGE Defendants have never had access to SSA systems of record." ECF 56-1 ¶ 4. SSA believed that statement to be accurate at the time it was made, and SSA believes it to be accurate today. However, SSA has determined that on March 3, 2025—three weeks prior to entry of the TRO—an SSA DOGE Team member copied Mr. Steve Davis, who was then a senior advisor to Defendant U.S. DOGE Temporary Organization, as well as a DOGE-affiliated employee at the Department of Labor ("DOL"), on an email to Department of Homeland Security ("DHS"). The email attached an encrypted and password-protected file that SSA believes contained SSA data. Despite ongoing efforts by SSA's Chief Information Office, SSA has been unable to access the file to determine exactly what it contained. From the explanation of the attached file in the email body and based

on what SSA had approved to be released to DHS, SSA believes that the encrypted attachment contained PII derived from SSA systems of record, including names and addresses of approximately 1,000 people. It is unclear if the password to access the file was shared with Mr. Davis or the DOL DOGE employee. Therefore, although it was and remains accurate that USDS has "never had access to SSA systems of record," the March 3 communication sent to Mr. Davis contained data derived from SSA's systems of record that Mr. Davis or the DOL DOGE employee could have accessed if provided the password.

## III. DOGE Team Members' (Unused) PII Access During TRO.

SSA's review identified an instance where SSA granted access to PII profiles to a DOGE Team Member after the TRO's issuance, but the access granted was never utilized. Namely, on March 26, 2025, one DOGE Team member was granted access to ten EDW schema containing PII. This access was revoked on April 2, 2025. During the period the access was granted, the employee never used it to search and view any PII. Prior to this grant, SSA informed the employee about the TRO and its restrictions.

SSA's review also identified that a DOGE Team member was granted access to a call center profile that allowed access to PII after the TRO's issuance. This access was granted on April 9, 2025, and revoked on June 11, 2025. This profile is also used for non-PII call center metrics, and it is unknown at this time whether any PII was accessed. Prior to this grant, SSA informed the employee about the TRO and its restrictions.

## IV. Systems of Record to Which SSA DOGE Team Members Had Access.

On March 12, 2025, SSA submitted a declaration executed by SSA's then-Chief Information Officer of the Office of the Chief Information Officer Russo, to accompany Defendants' Opposition to Plaintiffs' TRO Motion. At paragraphs 7 through 17, Mr. Russo described the SSA systems of record to which members of the SSA DOGE Team had been granted

access. SSA believed those statements to be accurate at the time they were made. SSA has now determined that the following additional systems access was in effect as of March 12, 2025, but terminated on or before March 24, 2025, at approximately Noon (Eastern Time), before the filing of the declaration at ECF 56.

a. Three DOGE Team members were granted access to a system containing SSA employee records for agency personnel for workforce initiatives.

b. Two DOGE Team members were granted access to a system containing personnel access information to ensure terminated employees were unable to badge into the building or to access IT systems with their PIVs.

c. Six DOGE Team members were granted access to shared workspace that would have allowed DOGE Team members to share data to which the employees had separately been granted access for fraud or analytics reviews.

d. Two DOGE Team members had access to a data visualization tool that could connect to other data sources, which could provide access to PII.

e. Two DOGE Team members had access to additional EDW schemas beyond those reported as of March 12, 2025.

**V. Scope of SSA DOGE Team's Work.**

Also in his March 12 declaration, Mr. Russo attested that, "[t]he overall goal of the work performed by SSA's DOGE Team is to detect fraud, waste and abuse in SSA programs and to provide recommendations for action to the Acting Commissioner of SSA, the SSA Office of the Inspector General, and the Executive Office of the President." ECF 36-1 ¶ 5; *see also, e.g.*, *id.* ¶¶ 7(d), 7(e), 8–14. Further, in Defendants' TRO Opposition (ECF 36), Defendants argued that the SSA DOGE Team had a need to access SSA records because "the DOGE Team exists under

Executive Order 14,158 to modernize technology and to 'maximize efficiency and productivity'" within SSA. SSA believed those statements to be accurate at the time they were made, and they are largely still accurate. However, SSA determined in its recent review that in March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States.[1] In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

At this time, there is no evidence that SSA employees outside of the involved members of the DOGE Team were aware of the communications with the advocacy group. Nor were they aware of the "Voter Data Agreement." This agreement was not reviewed or approved through the agency's data exchange procedures. SSA first learned about this agreement during a review unrelated to this case in November 2025.

In late December 2025, SSA made two Hatch Act referrals to the U.S. Office of Special Counsel related to the activities described in this Section V.

## VI. Noncompliance with SSA Security Policies.

In the March 12, 2025, declaration submitted in support of Defendants' Opposition to Plaintiffs' TRO Motion, SSA's then-Deputy Commissioner of Human Resources Felix-Lawson stated that the members of SSA's DOGE Team had all completed Privacy and Ethics training. ECF 36-2 ¶ 13. Further, Ms. Felix-Lawson explained, "[e]ach of the detailee agreements contained

---

[1] Email communications reviewed by SSA suggest that DOGE Team members could have been asked to assist the advocacy group by accessing SSA data to match to the voter rolls, but SSA has not yet seen evidence that SSA data were shared with the advocacy group.

Case: 26-2217 Document: 44 Filed: 08/17/2026 Pages: 136

terms clarifying that detailee must not make unauthorized disclosures of SSA information and that detailee must follow SSA rules and policies while working for SSA." *Id.* ¶ 14. Further, in his March 12 declaration, Mr. Russo attested that, "SSA has IT safeguards to ensure no private or commercial servers have been integrated with SSA systems. SSA performs continuous network monitoring that includes identifying unauthorized devices. The agency further has extensive security layers in place ensuring access to all systems and records are controlled and tracked with appropriate profiling (e.g., employee, contractor, supervisor) of the user." ECF 36-1 ¶ 22.

SSA believed these statements to be accurate at the time they were made, and SSA believes them to be accurate today. However, SSA has learned that, beginning March 7, 2025, and continuing until March 17 (approximately one week before the TRO was entered), members of SSA's DOGE Team were using links to share data through the third-party server "Cloudflare." Cloudflare is not approved for storing SSA data and when used in this manner is outside SSA's security protocols. SSA did not know, until its recent review, that DOGE Team members were using Cloudflare during this period. Because Cloudflare is a third-party entity, SSA has not been able to determine exactly what data were shared to Cloudflare or whether the data still exist on the server.

***

SSA and the undersigned counsel bring these matters to the Court's attention to ensure full candor to the Court. A review of the SSA DOGE Team's actions is ongoing, and SSA and the undersigned counsel will continue to ensure that the record and representations made to this Court are accurate.

Dated: January 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

/s/ Elizabeth J. Shapiro
ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

/s/ Marianne F. Kies
MARIANNE F. KIES
/s/ Samuel Holt
SAMUEL HOLT
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Marianne.F.Kies@usdoj.gov
Samuel.Holt2@usdoj.gov

*Attorneys for Defendants*