No. 26-2217

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

WISCONSIN ELECTIONS COMMISSION, *et al.*,

*Defendants-Appellees*,

COMMON CAUSE, *et al.*,

*Intervenors-Defendants-Appellees*.

On Appeal from the United States District Court for the
Western District of Wisconsin
Case No. 3:25-cv-1036-JDP
The Honorable James D. Peterson

# BRIEF OF *AMICI CURIAE* THE BRENNAN CENTER FOR JUSTICE AND CAMPAIGN LEGAL CENTER IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Andrew B. Garber (NY5684147)*
Brennan Center for Justice at
NYU School of Law
120 Broadway, Suite 1750
New York, NY 10004
Tel: (646) 292-8310
Fax: (212) 463-7308
garbera@brennan.law.nyu.edu

Daniel S. Lenz (WI1082058)
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlenz@campaignlegalcenter.org

*Application for admission pending

*Counsel for Amici Curiae Campaign Legal Center and Brennan Center for Justice*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2217

Short Caption: United States of America v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Campaign Legal Center, Brennan Center for Justice at New York University School of Law

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Campaign Legal Center, Brennan Center for Justice at New York University School of Law

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Daniel S. Lenz Date: 08/20/26

Attorney's Printed Name: Daniel S. Lenz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 1101 14th St. NW, Suite 400

Washington, DC 20005

Phone Number: (202) 736-2200 Fax Number: (202) 736-2222

E-Mail Address: dlenz@campaignlegalcenter.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2217

Short Caption: United States v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Brennan Center for Justice at New York University School of Law; Campaign Legal Center

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
The Brennan Center for Justice at New York University School of Law; Campaign Legal Center

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/ Andrew B. Garber Date: 8/24/26

Attorney's Printed Name: Andrew B. Garber

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 120 Broadway, Suite 1750

New York, NY 10271

Phone Number: (646) 292-8310 Fax Number: (212) 463-7308

E-Mail Address: garbera@brennan.law.nyu.edu

## TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

INTEREST OF *AMICI CURIAE* ..... 1

INTRODUCTION ..... 1

BACKGROUND ..... 3

SUMMARY OF ARGUMENT ..... 4

ARGUMENT ..... 5

I. Appellant did not allege a sufficient purpose under the CRA. ..... 5

A. Appellant's statement of purpose is pretextual. ..... 5

B. Oversight of a state's list maintenance procedures is not a valid purpose under the CRA. ..... 10

C. Appellant's stated purpose for its demand of Wisconsin's SVRL does not satisfy the requirements for a Title III demand because it does not relate to the investigation of violations of individuals' voting rights. ..... 14

II. Appellant failed to properly state a basis for its demand. ..... 16

A. "Basis" and "purpose" are distinct requirements under the CRA... 16

B. "Basis" means a factual basis. ..... 16

C. Appellant's demand for Wisconsin's unredacted SVRL contained an insufficient statement of basis ..... 18

D. Appellant's demand undermines authority over elections that the Constitution reserves for Congress and the States. ..... 20

CONCLUSION ..... 23

CERTIFICATE OF COMPLIANCE ..... 24

CERTIFICATE OF SERVICE ..... 25

## TABLE OF AUTHORITIES

**Cases** **Pages**

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ........................................ 21

*California v. Trump*, No. 1:26-cv-11581-IT, 2026 WL 1826490 (D. Mass. June 25, 2026) ........................................ 1, 22

*California v. United States Department of Health & Human Services*, No. 25-cv-05536-VC, 2025 WL 3751931 (N.D. Cal. Dec. 29, 2025) ........................................ 9

*Center for Taxpayer Rights v. Internal Revenue Service*, 815 F. Supp. 3d 1 (D.D.C. 2025) ........................................ 9

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 25-457 (CKK), 2026 WL 551105 (D.D.C. Feb. 26, 2026) ........................................ 9

*Common Council of Alexandria v. Preston*, 12 U.S. 53 (1814) ........................................ 10

*Community Economic Development Center of Southeastern Massachusetts v. Bessent*, 818 F. Supp. 3d 228 (D. Mass. 2026) ........................................ 9

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024) ........................................ 12

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ........................................ 6

*DSCC v. Donald J. Trump*, No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) (per curiam) ........................................ 21

*Fischer v. United States*, 603 U.S. 480 (2024) ........................................ 12

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ........................................ 17

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ........................................ 17, 20

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ........................................ 19

*League of United Latin American Citizens v. Executive Office of President*, 808 F. Supp. 3d 29 (D.D.C. 2025) (*LULAC I*) ........................................ 1, 20

*League of United Latin American Citizens v. Executive Office of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026) (*LULAC II*) .............................................. 20, 21

*League of Women Voters v. United States Department of Homeland Security*, No. CV 25-3501 (SLS), 2026 WL 1784297 (D.D.C. June 22, 2026) ........................ 7

*Smiley v. Holm*, 285 U.S. 355 (1932) ........................................................................ 2

*Supervalu, Inc. v. United Food & Commercial Workers Unions & Employers Midwest Pension Fund*, 155 F.4th 913 (7th Cir. 2025) ........................................ 10

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988) .............................................................................................. 15

*United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I 2026) ........................ 6, 13, 14, 17

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) ............................................ 16

*United States v. Benson*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (mem.) ........................................................................ 7

*United States v. Board of Elections*, No. 1:25-cv-1338 (MAD/PJE), 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ....................................................... 14

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026) ................................. 17

*United States v. Gradwell*, 243 U.S. 476 (1917) .......................................................... 2

*United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) ......................................................... 11, 12, 13, 14, 17, 19

*United States v. Oliver*, No. 1:25-cv-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026) ................................................................... 16, 17, 20

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026)................ 3, 6, 13, 14, 17

*United States v. Scanlan*, No. 25-cv-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026)............................................................................... 17

*United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026)........................................................... 6, 14, 17, 23

*United States v. Warner*, No. 2:26-cv-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026) .......... 14

*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 3, 6, 13, 16, 17, 20, 22, 23

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) .......... 15

**Statutes and Codes**

52 U.S.C. § 20507(a)(4) .......... 10

52 U.S.C. § 20507(c)–(d) .......... 10

52 U.S.C. § 20509 .......... 10

52 U.S.C. § 20510 .......... 10

52 U.S.C. § 20703 .......... 5, 10, 16

52 U.S.C. § 21083(a)(1)(A) .......... 11

52 U.S.C. § 21083(a)(2) .......... 11

52 U.S.C. § 21085 .......... 11

52 U.S.C. § 21111 .......... 11

Wis. Admin. Code ch. EL .......... 18

Wis. Stat. § 5.061 .......... 18

Wis. Stat. ch. 5-10, 12 .......... 18

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1 .......... 20

U.S. Const. art. I, § 4 .......... 1

U.S. Const. art. I, § 4, cl. 1 .......... 20

**Other Authorities**

Appendix, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) .................. 7

*Basis*, Black's Law Dictionary (8th ed. 2004) .......................................................... 17

Camilo Montoya-Galvez, *Reports of airport immigration arrests come amid increased TSA-ICE collaboration, sources say*, CBS News (July 29, 2026), https://perma.cc/36MT-N7AM ......................................................................... 9

Complaint, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025), Dkt. No. 1 .................................................................... 21

Complaint, *United States v. Simon*, No. 25-cv-03761 (D. Minn. Sep. 25, 2025), Dkt. No. 1 .................................................................... 21

Complaint, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025), Dkt. No. 1 .................................................................. 21

Debate in Massachusetts Ratifying Convention, *in* 2 The Founders' Constitution (Philip B. Kurland & Ralph Lerner eds., 1987) .................................................. 20

Donald J. Trump (@realDonaldTrump), TruthSocial.com (Aug. 18, 2025), https://perma.cc/R3KM-525Z ........................................................................ 22

Erica L. Green, Michael Gold & Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, New York Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html ..................................................................................................................... 22

Executive Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ................................ 8

Executive Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025) .............................. 8

Executive Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) .............................. 8

Executive Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) .............................. 8

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated Aug. 17, 2026), https://perma.cc/GVC7-BVYP ....................................................... 2

Nicholas Kerr & Elise Spenner, *System that DHS is urging states to use to assess voter rolls known to return faulty results: reports*, ABC News (July 19, 2026), https://perma.cc/5YBE-LRW6 .......................................................................... 7

Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data To Build a Digital Watchtower*, Center for American Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower/ ...................................... 9

Wisconsin Elections Commission, *Filed Complaints*, https://elections.wi.gov/filed-complaints (last visited Aug. 17, 2026)................................................................. 18

## INTEREST OF *AMICI CURIAE*[1]

The Brennan Center for Justice at New York University School of Law[2] is a nonprofit, nonpartisan think tank and public-interest law institute that seeks to improve systems of democracy and justice. Since its founding in 1995, the Brennan Center's work has focused extensively on protecting the right to vote using empirical, historical, and legal research. It participates in voting rights and election law cases around the country, both as counsel and *amicus curiae*.

Campaign Legal Center (CLC) is a leading nonpartisan, nonprofit organization that has been working for more than 20 years to advance democracy through law. CLC engages in litigation, policy development, and advocacy to protect voting rights and ensure broad and equal access to the ballot.

## INTRODUCTION

The Constitution delegates election administration primarily to the states, subject to regulation by Congress. *See* U.S. Const. art. I, § 4. The executive branch has only a small role in elections and enjoys only the authority Congress grants it. *See League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 41–42 (D.D.C. 2025) (*LULAC I*) (permanently enjoining parts of March 2025 executive order on elections); *see also California v. Trump*, No. 1:26-cv-11581-IT, 2026 WL 1826490, at *3 (D. Mass. June 25, 2026) ("The Constitution does not grant the

---

[1] Counsel for all the parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no other person contributed money intended to fund this brief.

[2] This brief does not purport to convey the position of New York University School of Law.

President any specific powers over elections."). States' authority to administer their elections is broad, encompassing rules "not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also United States v. Gradwell*, 243 U.S. 476, 484 (1917) ("The policy of thus [e]ntrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the government to our day . . . was proposed by the makers of the Constitution, and was entered upon advisedly by the people who adopted it . . . .").

The U.S. Department of Justice (DOJ) is attempting to upend the constitutional framework that governs elections by demanding full voter registration lists—including sensitive data like driver's license and partial social security numbers—from at least 48 states.[3] Most have refused. Appellant has sued election officials in Wisconsin and 29 other states, plus the District of Columbia, over such refusals. Every court that has decided the issue has dismissed these complaints. That is unsurprising.

DOJ's unprecedented requests for sensitive voter data is beyond its statutory authority and represents an incursion into states' roles administering elections—an overreach that upsets our constitutional structure surrounding elections. Courts

[3] Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Aug. 17, 2026), https://perma.cc/GVC7-BVYP.

addressing this effort have concluded that DOJ's demands amount to an "overreach and misuse" of its role in election administration beyond constitutional limits. *United States v. Oregon*, 828 F. Supp. 3d 1092, 1108 (D. Or. 2026); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1195 (C.D. Cal. 2026) ("[T]he Executive may not unilaterally usurp the authority over elections . . . ."). Moreover, DOJ's desire to collect confidential voter information is not about enforcing federal voting statutes at all. Instead, it seeks to centralize as much data about Americans as possible to pressure states unlawfully to remove people from the voter rolls and assist with aggressive immigration tactics. Our constitutional system does not authorize DOJ to take those steps.

*Amici curiae* urge this Court to affirm the decision of the district court dismissing the complaint.

## BACKGROUND

On June 17, 2025, DOJ sent a letter to the Wisconsin Elections Commission (WEC), demanding various types of data about Wisconsin voters and elections, including how Wisconsin complied with certain provisions of the Help America Vote Act (HAVA). DOJ's letter also requested a copy of the "the current voter registration list" including "both active and inactive voters." Doc. 3-1 at 2–3.[4] WEC promptly responded, including by providing detailed information about Wisconsin's list maintenance procedures and by providing information about how DOJ could access

[4] Documents from the district court record cited herein are referenced as "Doc. __." The Supplemental Appendix filed by Intervenors-Defendants-Appellees Common Cause *et al.* is referenced as "Supp. App. __."

publicly available voter data. *Id.* at 5–9. Five months later, on December 2, DOJ emailed WEC, demanding that WEC provide an electronic copy of the state voter registration list (SVRL), including voters' social security numbers and driver's license numbers. Doc. 3-1 at 11. The email stated: "This request is for the purpose of ensuring compliance with minimum standards and routine voter registration list maintenance." *Id.* Neither DOJ's June 17 letter nor its subsequent email referred to the Civil Rights Act of 1960 (CRA) or any statute other than HAVA. WEC responded again on December 11, 2025 explaining that Wisconsin state law prohibited the release of the unredacted voter registration list and providing additional information about Wisconsin's list maintenance practices. *Id.* at 13–18.

On December 18, 2025, Appellant sued, alleging a single violation of the CRA. Doc. 1. The district court dismissed Appellant's complaint on May 21, 2026, Doc. 89, and this appeal followed.

## SUMMARY OF ARGUMENT

This Court should look closely at Appellant's unprecedented demand for the sensitive voting data of millions of Americans; the record in this case and similar cases across the country show that justifications for the requests are pretextual. Not only are the alleged basis and purpose Appellant puts forward to attempt to satisfy its statutory obligations legally inadequate, but they are also plainly contrived. This Court should therefore affirm the decision below because Appellant failed to meet the requirements of the CRA.

## ARGUMENT

While the district court correctly found that that Wisconsin's SVRL is not a "record" or "paper" that comes into WEC's "possession" and therefore is not a record subject to disclosure to the Attorney General within the meaning of the CRA, Appellant's demand suffers from two other fatal flaws which the district court did not address. The CRA requires that the Attorney General submit a "demand in writing" containing both the "basis" and the "purpose" of the demand. 52 U.S.C. § 20703. Appellant complied with neither requirement—its purpose is both pretextual and insufficient, and it provided no factual basis for its demand. Instead, Appellant's demand, and similar demands it has made across the country, represents an intrusion into the type of election administration determinations the Constitution delegates to the states. Dismissal of its CRA claim was therefore appropriate on those grounds as well.

### II. Appellant did not allege a sufficient purpose under the CRA.

Appellant has failed to state the purpose for its demand for the unredacted voter list because its stated purpose is pretextual, list-maintenance oversight is not a valid purpose under the CRA, and access to the unredacted voter list would not serve Appellant's claimed purpose.

#### A. Appellant's statement of purpose is pretextual.

The record in this case, as well as statements and actions from key government officials, shows that Appellant's purported "purpose" of assessing compliance with federal law is a pretext. Accordingly, its demand does not meet the requirements of

the CRA. "Accepting contrived reasons would defeat the purpose of" judicial review. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). When agency action is "incongruent with what the record reveals about the agency's priorities . . . [a court] cannot ignore the disconnect between the decision made and the explanation given." *Id.* Courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (citation modified).

Public actions and statements from federal officials reveal that DOJ is on a "nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1184; *see also Oregon*, 828 F. Supp. 3d at 1106 (same); *United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026) ("Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement."); *United States v. Amore*, 831 F. Supp. 3d 149, 158 (D.R.I 2026) (rejecting the United States' effort to "conduct the kind of fishing expedition" it seeks with its demands).

In this expedition, DOJ demanded unredacted voter rolls from nearly every state in the country and filed lawsuits against 30 states and Washington, D.C., showing that it is engaged in a sweeping effort to amass data, rather than targeted assessments of list maintenance practices.[5] Appellant's descriptions of its plans for

---

[5] *See supra* note 3.

this data have changed over time, revealing their pretextual nature. DOJ's lawyers admitted at multiple hearings that the United States plans to run voter data through the Systematic Alien Verification for Entitlements (SAVE) program.[6] Supp. App. 62:17–23 ("[O]ur intention is to run this against DHS's SAVE database."); App. at 123:21–23, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) ("To the extent that that data may be run against other databases, again, that's something that's been routine . . . ."); *see also United States v. Benson*, No. 26-1225, 2026 WL 2364306, at *12 (6th Cir. Aug. 14, 2026) (mem.) (Thapar, J., dissenting from denial of reh'g en banc) ("The Attorney General then planned to compare the voter file to federal databases . . . ."). Thus, before even receiving any of the information it seeks, Appellant has admitted it will use the data for purposes far afield from assessing compliance with HAVA. *Cf.* App. Br. at 27.

As recently as July 17, the Secretary of the Department Homeland Security (DHS) threatened to withhold funds and possibly prosecute state officials unless they "scrub" their voter rolls in line with DHS's demands, after apparently running several states' voter rolls through the SAVE program.[7] And recent Executive Orders call for

[6] On June 22, 2026, however, a district court in the District of Columbia found that the expansion of SAVE, particularly its inclusion of information from the Social Security Administration, was unlawful. *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *1 (D.D.C. June 22, 2026) (finding the SAVE program expansion had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable"). The court also found the federal government had trampled on the privacy rights of American citizens in a manner that threatens the sacred right to vote. *Id.* Thus, at this time DOJ may not run Wisconsin's SVRL through SAVE.

[7] Nicholas Kerr & Elise Spenner, *System that DHS is urging states to use to assess voter rolls known to return faulty results: reports*, ABC News (July 19, 2026), https://perma.cc/5YBE-LRW6.

the creation of federal voter lists and attempt to establish unconstitutional federal executive oversight over state registration and voting procedures. The President's March 31, 2026, Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections" (the Mail Voting EO), directed DHS to create lists of citizens eligible to vote using information from U.S. Citizenship and Immigration Services, the Social Security Administration, and "other relevant Federal databases." Exec. Order No. 14,399, 91 Fed. Reg. 17125, 17125, § 2(a) (Mar. 31, 2026).

The Mail Voting EO follows other Executive Orders issued last year that established centralized data-keeping systems and ordered agencies to give "full and prompt access to all unclassified agency records, software systems, and IT systems," Exec. Order No. 14,158, 90 Fed. Reg. 8441, 8442, §§ 1, 4(b) (Jan. 20, 2025); required federal agencies to "ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases," Exec. Order No. 14,243, 90 Fed. Reg. 13681, 13681, § 3(b), (c) (Mar. 20, 2025); and directed DHS to provide state and local officials access to government systems to verify citizenship and coordinate with the "DOGE Administrator" to "identify unqualified voters registered in the States," Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14006–07, § 2(b), 2(b)(iii) (Mar. 25, 2025).

These orders make clear that the current data aggregation mission is part of the Administration's wider effort to centralize Americans' data. The Administration directed the Internal Revenue Service to provide confidential tax information to

Immigration and Customs Enforcement (ICE) until courts found it unlawful. *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 815 F. Supp. 3d 1, 18–20 (D.D.C. 2025); *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 25-457 (CKK), 2026 WL 551105, at *3 (D.D.C. Feb. 26, 2026); *Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent*, 818 F. Supp. 3d 228, 234–35 (D. Mass. 2026), *appeal docketed*, No. 26-1329 (1st Cir. Apr. 6, 2026). The Centers for Medicare & Medicaid Services agreed to provide ICE extraordinary levels of detail about Medicaid recipients, including social security numbers, birthdays, sex, phone numbers, localities, ethnicities, and race, until a court order narrowed the available information. *California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536-VC, 2025 WL 3751931, at *3 (N.D. Cal. Dec. 29, 2025). The Transportation Security Administration reportedly signed an agreement with ICE and has been providing ICE with travelers' information for use in immigration enforcement.[8] In these ways and others, over the past several years, the administration has regularly reappropriated and centralized information about Americans, engaging in unauthorized "secondary use[s]" of data, "where information that an individual has given to one agency for a specific purpose is later reused by that agency or by another agency or entity for an entirely different purpose without the individual's consent."[9] The administration has only stopped this unlawful seizure of data when ordered to do so by the courts. Further, as explained in Section I.B,

[8] Camilo Montoya-Galvez, *Reports of airport immigration arrests come amid increased TSA-ICE collaboration, sources say*, CBS News (July 29, 2026), https://perma.cc/36MT-N7AM.

[9] Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data To Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower/.

*infra*, acquiring the confidential voter rolls is not necessary for DOJ's claimed purpose. Appellant's claim that it is seeking voters' confidential data solely to pursue oversight for compliance with federal voter registration law is therefore implausible and cannot constitute "*the* purpose" of its demand under the CRA. 52 U.S.C. § 20703 (emphasis added); *Common Council of Alexandria v. Preston*, 12 U.S. 53, 55 (1814) (discussing use of the definite article "the"); *Supervalu, Inc. v. United Food & Com. Workers Unions & Emps. Midwest Pension Fund*, 155 F.4th 913, 920 (7th Cir. 2025) (same). DOJ's efforts to acquire unredacted state voter rolls are, instead, part of the executive branch's larger data consolidation project.

### B. Oversight of a state's list maintenance procedures is not a valid purpose under the CRA.

Appellant's effort to use HAVA's[10] list maintenance requirements as the requisite "purpose" under the CRA also fails because HAVA entrusts list maintenance responsibilities to the states and provides for enforcement in instances of noncompliance. HAVA, among other things, obliges chief election officials to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list"; calls for that

[10] While Appellant recognizes, as it must, that Wisconsin is exempt from the requirements of the National Voter Registration Act (NVRA) and certain related requirements of HAVA, App. Br. at 6, 38–39, it nonetheless suggests that determining whether a given jurisdiction is complying with the NVRA may constitute a proper purpose under the CRA. App. Br. at 26. For the same reasons Appellant's arguments regarding HAVA fail, so too do any implicit arguments about the NVRA, which establishes a comprehensive statutory scheme for voter list maintenance and, just as importantly, delegates the administration of that scheme to the states, not the federal government. *See* 52 U.S.C. §§ 20507(a)(4), 20507(c)–(d), 20509. And, like HAVA, the NVRA establishes a limited role for DOJ in enforcing its requirements, and does not authorize widespread data grabs. 52 U.S.C. § 20510.

list to be "defined, maintained, and administered at the State level"; tells "appropriate State or local election official[s] [to] perform list maintenance"; and directs that "[t]he specific choices on the methods of complying . . . shall be left to the discretion of the State[s]." 52 U.S.C. §§ 21083(a)(1)(A), 21083(a)(2), 21085. And as Appellant concedes, HAVA's delegation of authority for NVRA-exempt states like Wisconsin is even more comprehensive, providing only that removal of registrants must be done "in accordance with State law." App. Br. at 6 (quoting 52 U.S.C. § 21083(a)(2)(A)(iii)).

HAVA includes a limited role for DOJ: to bring civil enforcement actions for instances of noncompliance. 52 U.S.C. § 21111. It does not give DOJ limitless authority to conduct audits, question removal rates, or access confidential information. "Congress did not confer a general auditing power to the DOJ over state election officials" in HAVA. *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *5 (C.D. Ill. July 31, 2026) (citing *West Virginia v. EPA*, 597 U.S. 697, 721–23 (2022)). States alone are responsible for doing such line-by-line maintenance, and the federal government's role is limited to reviewing the general programs of list maintenance through the enforcement mechanisms that HAVA provides. The government cannot establish a legally sufficient purpose under the CRA by claiming to enforce a statute that does not provide the government with the authority it seeks. "If the Attorney General could simply justify his demand with a statement of any purpose whatsoever, the requirement that he specify his purpose . . . would be pointless and it would provide him with unfettered authority to demand voting

records." *Matthews*, 2026 WL 2212877, at *5. That would make the CRA's "purpose" requirement superfluous and contradict the foundational canon that a court must "give effect, if possible, to every clause and word of [the] statute." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

Thus, Appellant's reliance on HAVA undermines its case because that statute limits DOJ's investigatory authority to the oversight responsibilities Congress delegated to it. HAVA does not grant the federal government unfettered power to obtain confidential voter information. *Cf.* App. Br. at 10, 35. Notably, the portions of HAVA that Appellant quotes describe only the rules placed on states, and do not provide DOJ with authority to do anything. Neither the Constitution nor Congress has delegated the power to superintend state voter rolls to the executive branch—DOJ gets to choose which permissible purpose to pursue in a Title III demand, but that does not expand DOJ's authority in ways not otherwise envisioned by federal law. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) ("Where two laws are merely complementary . . . our duty lies not in preferring one over another but in giving effect to both.").

HAVA also postdates the CRA, meaning that Congress knew the limits of DOJ's authority under the earlier statute and chose to leave them in place. If Congress wanted to refer to the CRA in HAVA, or otherwise grant DOJ supervisory authority over list maintenance (or any free-ranging authority to gather unredacted SVRLs), it would have. But when Congress specified election administration rules for

states to follow in HAVA (and likewise in the NVRA), its silence about the CRA—and its inclusion of other disclosure mechanisms in the NVRA—undermines the notion that the CRA overrides those newer, more specific statutory schemes.

And even if the CRA *could* be used to demand records for HAVA oversight, Appellant's asserted purpose for its request of Wisconsin's unredacted SVRL would nonetheless fail because the unredacted SVRL would not enable Appellant "to ascertain whether a jurisdiction engages in practices that violate the CRA or HAVA (as well as the NVRA)," App. Br. at 26. WEC's responses to DOJ's letters in 2025 provide the information needed to ascertain Wisconsin's compliance with HAVA's list maintenance requirements by explaining how Wisconsin conducts list maintenance as required by federal and state law. The SVRL, on the other hand, provides only a snapshot of current registrations, and provides no additional information about how Wisconsin operates either its initial registration process or its list-maintenance systems. Partially redacted versions of the voter rolls are publicly available, and Appellant has not said why confidential information is needed. *See Weber*, 816 F. Supp. 3d at 1184 ("And there was no explanation for why unredacted voter files for millions of Californians, an unprecedented request, was necessary for the DOJ's investigation.").

DOJ must give a legally valid reason of need that connects to a legally valid result. *See Amore*, 831 F. Supp. 3d at 157; *Oregon*, 828 F. Supp. 3d at 1105; *Matthews*, 2026 WL 2212877, at *5. Exceeding the agency's authority under HAVA to get data

that does not address Wisconsin's compliance with HAVA—which accords it a great deal of discretion in list-maintenance procedures to the states—does not suffice.

### C. Appellant's stated purpose for its demand of Wisconsin's SVRL does not satisfy the requirements for a Title III demand because it does not relate to the investigation of violations of individuals' voting rights.

Appellant's purported desire to investigate Wisconsin's HAVA compliance is also insufficient because the CRA can only be used to investigate violations of individuals' voting rights. *Oregon*, 828 F. Supp. 3d at 1105 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights."); *Amore*, 831 F. Supp. 3d at 157–58 (same) (quoting *Oregon*); *United States v. Warner*, No. 2:26-cv-00156, 2026 WL 2018877, at *7 (S.D. W. Va. July 13, 2026) (same) (quoting *Oregon*); *United States v. Bd. of Elections*, No. 1:25-cv-1338 (MAD/PJE), 2026 WL 1999921, at *8 (N.D.N.Y. July 10, 2026); *Schmidt*, 2026 WL 1850016, at *1–2. Assessing state compliance with routine election administration in the absence of potential voting rights violations is not a legally valid purpose for a Title III demand. *Matthews*, 2026 WL 2212877, at *5.[11]

Appellant asserts that limiting demands to the protection of voting rights is to "is not supported by the [CRA] itself" App. Br. at 33, but this gets the analysis

[11] Appellant's assertion that the United States has previously used demands under the CRA to "evaluate compliance with the NVRA, including that Act's list maintenance requirements[,]" App. Br. at 26, is unpersuasive because the cases it cites resulted in settlements. That prior parties chose to settle does not create binding law. Appellant's attempt to find recourse in settlements regarding the NVRA, however, underlines the inadequacy of its claims to Wisconsin's SVRL under the CRA, a separate statutory scheme.

backwards.[12] A "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (citation omitted). "Statutory construction . . . is a holistic endeavor" and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). It would turn the CRA on its head to divorce the purpose requirement from the rest of the statute—which Appellant concedes exists to promote voting rights, not list maintenance, App. Br. at 3—and allow for purposes that have no relation to, and perhaps even undermine, the statutory scheme. Thus, because Appellant's purported purpose for its CRA demand of Wisconsin's unredacted SVRL was to assess the State's list maintenance practices—and not to investigate violations of individuals' voting rights—Appellant cannot use the CRA to obtain the SVRL.

[12] Appellant also suggests HAVA compliance protects voting rights by preventing the dilution of votes cast by lawfully registered voters. App. Br. at 35. But it never explains how acquiring Wisconsin's SVRL will protect voters. An unsupported claim that this Title III demand will prevent vote dilution does not meet the purpose requirement. This argument also fails on the basis prong because Appellant has not put forward an iota of evidence that noncitizen voting is warping federal elections in Wisconsin, or any reasonable explanation of how someone could be a "victim" of "HAVA non-compliance" in such circumstances. App. Br. at 44.

## II. Appellant failed to properly state a basis for its demand.

Appellant failed to state a sufficient basis for its Title III demand, and this Court should affirm for that reason as well.

### A. "Basis" and "purpose" are distinct requirements under the CRA.

The CRA requires that the Attorney General's "demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The inclusion of the article "the" before each of the words "basis" and "purpose," as well as the use of the conjunctive "and" between them—the basis *and* the purpose—show that the statute requires the statement to contain a specific basis and, separately, a specific purpose. *See, e.g.*, *United States v. Benson*, 179 F.4th 470, 483 (6th Cir. 2026) ("The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose. . . . [A]ny demand must contain both."); *United States v. Oliver*, No. 1:25-cv-01193-JCH-JFR, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026) ("Section 20703 requires the Attorney General outline both the discrete factual and the legal motivations underlying the request."). To require only a generalized statement would collapse those two requirements into one, a reading that cannot be reconciled with the statutory text.

### B. "Basis" means a factual basis.

Title III requires the Attorney General to establish a factual basis for his demand. *Cf.* App. Br. at 26–28. "Basis" and "purpose" are distinct requirements, with the former meaning the factual support for DOJ's investigations. *See Weber*, 816 F. Supp. 3d at 1182–84 ("The basis is the reasoning provided by the DOJ regarding the

evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). Every court to consider the issue has found the same. *See, e.g.*, *Oliver*, 2026 WL 2031479, at *9; *Amore*, 831 F. Supp. 3d at 156–57; *United States v. Galvin*, 830 F. Supp. 3d 122, 129–30 (D. Mass. 2026); *Oregon*, 828 F. Supp. 3d at 1104; *United States v. Scanlan*, No. 25-cv-371-JL, 2026 WL 1864054, at *8 (D.N.H. June 29, 2026); *Schmidt*, 2026 WL 1850016, at *1; *Matthews*, 2026 WL 2212877, at *4. At a minimum, the "basis" requirement compels DOJ to describe factual information in its possession that tends to show the law has been violated. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *Amore*, 831 F. Supp. 3d at 156–57; *see also Basis*, Black's Law Dictionary 161 (8th ed. 2004) ("an underlying condition").

The requirement that DOJ state a factual basis for a record demand is a meaningful safeguard that Appellant may not flout. *See Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 828 F. Supp. 3d at 1102–03. It ensures that the federal government uses the CRA as a tool to conduct properly predicated investigations rather than a blank check to get wide swaths of documents about voters beyond its statutory authority. *See In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("[T]his Act merely provides for a limited exploration and discovery as to the validity of the election processes employed and pursued in such Federal elections after May 6, 1960."). Failure to meet this standard is fatal to Appellant's CRA claim.

### C. Appellant's demand for Wisconsin's unredacted SVRL contained an insufficient statement of basis.

DOJ did not provide sufficient factual basis here. Appellant claims three forms of basis: (1) that it noted "several complaints regarding [WEC's] compliance with HAVA, including . . . list maintenance"; (2) that it believed "[WEC] ha[d] refused to provide any administrative complaint process or hearing regarding HAVA"; and (3) "'to determine if WEC is complying with HAVA's list-maintenance requirements." App. Br. at 32. The first two claimed bases are easily dismissed—vague references to unnamed and entirely unexplained "complaints" establishes nothing. DOJ alleged no actual facts beyond the existence of the complaints, not even what those complaints said and why DOJ had found them credible. Similarly, the process by which WEC hears administrative complaints under HAVA, *see* Wis. Stat. § 5.061, is a function of Wisconsin election law and WEC's administrative rules, which are matters of public record. *See* Wis. Stat. ch. 5-10, 12; Wis. Admin. Code ch. EL.[13] Both claims have no logical connection to the SVRL. To the contrary, DOJ's original June 4, 2025 letter to WEC and the U.S. Election Assistance Commission (EAC) did not request a copy of the SVRL or any other information, nor was it based on an analysis of such data, but nonetheless concluded that WEC was not complying with federal law and threatened to withhold funding. Doc. 5-5. Appellant now argues that, two weeks later, it needed the SVRL to make such an assessment.

[13] WEC also publishes its complaints and their outcomes. Wis. Elections Comm'n, *Filed Complaints*, https://elections.wi.gov/filed-complaints (last visited Aug. 17, 2026).

Appellant's third claimed basis—"to determine if WEC is complying with HAVA's list-maintenance requirements"—is no basis at all. If the Attorney General could compel election records from states anytime he had an open-ended question about compliance, with no legitimate factual support, then the CRA's reach would be limitless. That would upend the limited oversight scheme Congress created. *See Matthews*, 2026 WL 2212877, at *5 ("Title III requires a factual basis for the demand which could include the evidence behind the Attorney General's investigation into the state's suspected noncompliance with federal law.").

In both its July 2 and December 11, 2025 letters, WEC thoroughly explained Wisconsin's list maintenance procedures, including how the state addresses voters who are inactive, move, die, reside in a condemned structure, request deactivaction, are adjudicated incompetent by a court, or are ineligible due to a conviction, as well as how it handles duplicate and online voter registrations. *See* Doc. 3-1 at 5–9, 15–17. Instead of attempting to explain why those explanations were insufficient, DOJ sued for the full SVRL, again without explanation as to how that will assist in any subsequent analysis. If DOJ does not need any factual underpinning for its demands, it would allow Appellant to get any election record without having shown any likelihood of a legal deficiency in a state's processes. That would take all meaning out of the CRA's basis requirement.

Appellant's conclusory statements of basis contrast with the lawful demands for election records by the Attorney General in the 1960s. In *Kennedy v. Lynd*, the demand referenced information "tending to show that distinctions on the basis of race

or color have been made with respect to registration and voting." 306 F.2d 222, 229 n.6 (5th Cir. 1962); *see also Kennedy v. Bruce*, 298 F.2d at 861 (same). "These cases also show that the DOJ wrote statutorily compliant demand letters sixty years ago." *Oliver*, 2026 WL 2031479, at *8; *see also Weber*, 816 F. Supp. 3d at 1182–83 ("In the past, the DOJ has routinely stated . . . [a] basis related to alleged civil rights violations . . . ."). The Attorney General sixty years ago had to have evidence of racial discrimination to acquire election records, and Appellant must present a similarly sufficient factual basis here. It cannot.

### D. Appellant's demand undermines authority over elections that the Constitution reserves for Congress and the States.

The Constitution "assign[s] no role at all to the President" in election administration. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 53 (D.D.C. 2026) (*LULAC II*), *judgment entered*, No. 25-CV-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026). Under the Constitution, the states and Congress share responsibilities for regulating election administration. *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 4, cl. 1. The notion that the executive would have the power to regulate federal elections "does not appear to have crossed the Framers' minds." *LULAC I*, 808 F. Supp. 3d at 45 (citing The Federalist No. 59 (Alexander Hamilton)); *see also* Debate in Massachusetts Ratifying Convention, *in* 2 The Founders' Constitution 255 (Philip B. Kurland & Ralph Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)). "Congress, not the President, has the ultimate constitutional

authority over elections." *California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025); *see also DSCC v. Donald J. Trump*, No. 26-5193, 2026 WL 2168617, at *5 (D.C. Cir. July 28, 2026) (per curiam) (finding that the Constitution vests the President with "no express authority over the conduct of elections").

Although the president has no constitutional role in elections, this administration has attempted to use the collection and analysis of data to exert authority over election administration. In the first half-dozen complaints in these thirty cases seeking unredacted voter rolls, Appellant began by identifying the President's March 2025 Elections EO as the cases' catalyst. Notably, Appellant has ceased doing so, including in this action. *Compare, e.g.*, Compl. at 2–3, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025), Dkt. No. 1, Compl. at 1, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025), Dkt. No. 1, *and* Compl. at 1, *United States v. Simon*, No. 25-cv-03761 (D. Minn. Sep. 25, 2025), Dkt. No. 1, *with* Doc. 1 at 1 (solely discussing CRA). That shift is likely due to court decisions concluding that multiple provisions of the Elections EO "are inconsistent with the constitutional separation of powers and cannot lawfully be implemented." *LULAC II*, 818 F. Supp. 3d at 53 (permanently enjoining provisions purporting to impose new requirements for verifying citizenship for people registering to vote or applying for absentee ballots). Appellant's abandonment of its argument regarding the Elections EO further demonstrates the faulty premise and unconstitutionality of its actions.

Although courts had already declared the Elections EO invalid on separation-of-powers grounds, in early February 2026, the President called for a "take over" of voting procedures in many states. The Mail Voting EO illustrates the President's dogged attempt to put these words into action, which courts have continued to hold is unconstitutional.[14] *See California v. Trump*, No. 1:26-cv-11581-IT, 2026 WL 1826490 (D. Mass. June 25, 2026) (enjoining provisions involving USPS and the creation of citizenship lists as *ultra vires* and a violation of the separation of powers). This is an escalation, but not a change in position for this President, who in August 2025 declared that states must do "what the Federal Government, as represented by the President of the United States, tells them" as related to elections.[15] By its own public accounts, the executive's real purpose for collecting sensitive voter data from Wisconsin and other states is to disrupt and take over election processes. Specifically, Appellant seeks to supplant Wisconsin's role in list maintenance by substituting its own judgment and process, which violates the constitutional and statutory assignments of election administration duties. *Weber*, 816 F. Supp. 3d at 1175–76. Appellant's role in enforcing federal statutes does not permit it to engage in list maintenance, but only to ensure that the states comply with federal laws. But, as is clear from its repeated statements, DOJ plans to conduct its own analyses to identify voters it deems should be removed from the rolls. If granted, Appellant's demand

[14] *See* Erica L. Green, Michael Gold & Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, N.Y. Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html.

[15] *See* Donald J. Trump (@realDonaldTrump), TruthSocial.com (Aug. 18, 2025), https://perma.cc/R3KM-525Z.

could make voters less likely to register and turn out to vote, *Weber*, 816 F. Supp. 3d at 1196. "This risk threatens the right to vote which is the cornerstone of American democracy." *Id.*; *see also Schmidt*, 2026 WL 1850016, at *1 ("What, a reader rhetorically may ask, could possibly go wrong?"). As with its other unlawful uses of information, Appellant's goal in obtaining and consolidating massive amounts of voter data is to encroach on the constitutionally mandated role of states in election administration.

## CONCLUSION

For the reasons stated above, *amici* the Brennan Center for Justice and Campaign Legal Center respectfully request the Court affirm the district court's dismissal of the Complaint.

Dated: August 24, 2026

Respectfully submitted,

/s/ *Daniel S. Lenz*
Daniel S. Lenz (WI1082058)
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlenz@campaignlegalcenter.org

Andrew B. Garber (NY5684147)*
Brennan Center for Justice
at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10004
Tel: (646) 292-8310
Fax: (212) 463-7308
garbera@brennan.law.nyu.edu

*Application for admission pending

*Counsel for Amici Curiae Campaign Legal Center and Brennan Center for Justice*

## CERTIFICATE OF COMPLIANCE

I, Daniel S. Lenz, do hereby certify that this document complies with the word limit of Fed. R. App. P. 29(a)(5) and 7th Cir. R. 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,212 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. (32)(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft (Version 2608) in 12-point Century Schoolbook font.

Dated: August 24, 2026 Signature: /s/ *Daniel S. Lenz*

## CERTIFICATE OF SERVICE

I, Daniel S. Lenz, do hereby certify that on this 24th day of August, 2026, I caused a true and correct copy of the foregoing document to be served upon all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

Dated: August 24, 2026 Signature: /s/ *Daniel S. Lenz*