**No. 26-2217**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

WISCONSIN ELECTIONS COMMISSION, et al.,
*Defendants-Appellees,*

COMMON CAUSE, et al.,
*Intervening Defendants-Appellees.*

---

On Appeal From the United Stated District Court
for the Western District of Wisconsin

---

# BRIEF OF BIPARTISAN FORMER SECRETARIES OF STATE AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES

---


John B. Hill
Samantha Suman
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
ssuman@citizensforethics.org

*Attorneys for Amici Curiae*

Save As | Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2217

Short Caption: United States v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Mary Estill Buchanan, Miles Rapoport, Ben Ysursa, Joan Anderson Growe, John Gale, Phil Keisling, Kathy Boockvar, and Sam Reed

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: John B Hill Date: August 24, 2026

Attorney's Printed Name: John Brent Hill

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: P.O. Box 14596
Washington, DC 20044

Phone Number: (202) 408-5565 Fax Number: N/A

E-Mail Address: jhill@citizensforethics.org

Save As Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2217

Short Caption: United States v. Wisconsin Elections Commission

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Mary Estill Buchanan, Miles Rapoport, Ben Ysursa, Joan Anderson Growe, John Gale, Phil Keisling, Kathy Boockvar, and Sam Reed

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
NA

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
NA

---

Attorney's Signature: /s/ Samantha Y. Suman Date: August 24, 2026

Attorney's Printed Name: Samantha Y. Suman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: P.O. Box 14596
Washington, DC 20044

Phone Number: (202) 408-5565 Fax Number:

E-Mail Address: ssuman@citizensforethics.org

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... ii

INTERESTS OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 2

I. DOJ's demand for Wisconsin's full voter roll violates separation of powers principles. .......... 3

A. The U.S. Constitution mandates the states' role in regulating and administering elections. .......... 3

B. The Constitution prioritizes the states' accountability to voters. .......... 5

C. State officials' election expertise surpasses that of the President. .......... 6

D. The NVRA and HAVA confirm states' authority over voter roll list maintenance. .......... 7

II. DOJ's demands for states' full voter rolls violate the Privacy Act. .......... 12

III. Sound policy reasons support barring DOJ from collecting the personal identifying information in state voter files. .......... 18

IV. States have good reason to collect confidential information, but not share that information with third parties, including federal agencies. .......... 22

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**


*ACA Connects - Am.'s Commc'ns Ass'n v. Frey*,
471 F. Supp. 3d 318 (D. Me. 2020) ....................21

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) ....................2

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ....................4, 6, 10

*Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995) ....................5

*BedRoc Ltd. v. United States*,
541 U.S. 176 (2004) ....................8

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ....................9

*Bellville v. Town of Northboro*,
375 F.3d 25 (1st Cir. 2004) ....................21

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999) ....................14

*Burrage v. United States*,
571 U.S. 204 (2014) ....................8

*Bush v. Gore*,
531 U.S. 98 (2000) ....................5, 7

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) ....................5

*Chapman v. Hou. Welfare Rts. Org.*,
441 U.S. 600 (1979) ....................8

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ....................21

*Dinh Tran v. Dep't of Treas.*,
351 F. Supp. 3d 130 (D.D.C. 2019) ....................17

*Fish v. Kobach*,
189 F. Supp. 3d 1107 (D. Kan. 2016) ....................9

**Cases—continued**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) .......... 20, 21

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) .......... 5

*In re Gordon*,
218 F. Supp. 826 (S.D. Miss. 1963) .......... 21

*Harkless v. Brunner*,
545 F.3d 445 .......... 5

*League of United Latin Am. Citizens v. Exec. Off. of President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 4, 6

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026) .......... 15

*Libertarian Party of Va. v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) .......... 6

*McPherson v. Blacker*,
146 U.S. 1 (1892) .......... 5

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 4

*Pub. Int. Legal Found. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 22

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 .......... 14

*Sandusky Cnty. Democratic Party v. Blackwell*,
387 F.3d 565 (6th Cir. 2004) .......... 9

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 4

*Storer v. Brown*,
415 U.S. 724 (1974) .......... 7

*Thornhill v. Alabama*,
310 U.S. 88 (1940) .......... 18

**Cases—continued**

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) .......... 4

*United States v. Gradwell*,
243 U.S. 476 (1917) .......... 5, 6, 22

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 14, 15, 16

**Statutes, Rules & Regulations**

68 Fed. Reg. 47610 (Aug. 11, 2003) .......... 16

70 Fed. Reg. 43904 (July 29, 2005) .......... 16

82 Fed. Reg. 24147 (May 25, 2017) .......... 16

5 U.S.C. 552a(a)(3) .......... 15

5 U.S.C. (e)(1) .......... 15

5 U.S.C.
§ 552a(a)(5) .......... 14
§ 552a(e)(4) .......... 15, 16
§ 552a(e)(7) .......... 13, 14
§ 552a(e)(11) .......... 15

52 U.S.C.
§ 20507(i) .......... 20
§ 20507(a)(4) .......... 8, 9
§ 20507(a)(4)(A) .......... 11
§ 20510(A) .......... 11
§ 20701 .......... 20
§§ 20701-20706 .......... 21
§ 20703 .......... 20
§ 21083 .......... 12, 20
§ 21083(a)(1)(A) .......... 9
§ 21083(a)(4)(A) .......... 9
§ 21083(a)(5)(A) .......... 18
§ 21111 .......... 12

**Other Authorities**


Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025)........................................27

*America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025) ..........................................................................................25

Brian E. Humphreys, Cong. Rsch. Serv., IF10677, *The Designation of Election Systems as Critical Infrastructure* (updated Sept. 18, 2019) ..........................................................................................24

Confidential Mem. of Understanding between DOJ and Alaska Div. of Elections at 5, (Dec. 19, 2025) ..................................................11

*Cyber Threat Snapshot*, House Committee on Homeland Security .......................24

Cybersecurity & Infrastructure Security Agency, *Election Security*.......................24

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025).................17, 18

*The Federalist* No. 59 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ..........................................................................................6

*Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024)..........................................................25

Jana Winter & A.J. Vicens, *Iran-linked hackers breach FBI director's personal email, publish excerpts online*, Reuters (Mar. 27, 2026).....................24

Kaylie Martinez Ochoa, Eileen O'Conner & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Mar. 18, 2026)..................................................17

Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017)...........................................26

Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025) ..........................................................................................27

Mem. Op. for the Assistant Attorney General, Civil Rights Division, *Authority to Obtain and Share Statewide Voter Roll Data* (May 12, 2026) ..........................................................................................10

Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025)...............................23

**Other Authorities—continued**

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025)....9

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025)....18, 19

Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act (2016)....15, 16

Office of the Minnesota Secretary of State, *Other States with Programs Like Safe at Home*....19

Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017)....26, 27

3 *Records of the Federal Convention of 1787* 391 (Max Farrand ed., 1911)....6, 23

S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 - S. 3418 (Pub. L. No. 93-579), Source Book on Privacy (1976)....13

Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025)....7

Tierney Sneed, Sean Lyngaas, & Evan Perez, *Trump Admin Tries to Rebuild Election Security Infrastructure it Gutted as Midterms Near*, CNN (July 31, 2026)....25

Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. (last updated July 1, 2017)....26

U.S. Const. art. I, § 4, cl. 1....4

U.S. Dep't of Just., Overview of the Privacy Act of 1974 (2020 ed.)....12, 13

U.S. Election Assistance Commission, *Availability of State Voter File and Confidential Information* (updated October 29, 2020)....19

U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation* (2024)....23

**Other Authorities—continued**

*US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025) .......... 23

*US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters (Oct. 15, 2025) .......... 23

White Paper delivered to National Association of Secretaries of State, *Securing Elections Critical Infrastructure* (2020) .......... 24

William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993*, The American Presidency Project (May 20, 1993) .......... 10

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are a bipartisan group of former state secretaries of state. As the District Court for the District of Columbia concluded in granting *Amici* leave to file a similar amicus brief in election-related litigation there, "[a]s former state election officials, [A]mici offer a unique perspective not presented by the parties. And their proposed brief is relevant and helpful." Minute Order, *League of United Latin Am. Citizens v. Exec. Off. of President*, No. 25-cv-946 (D.D.C. Apr. 24, 2025).

Although Amici may not always have agreed about what constitutes the best election policies, Amici nonetheless share a commitment to ensuring elections are free and fair, and are unified in their understanding of states' pivotal role in enacting and executing election laws. Amici are (1) Mary Estill Buchanan, former Republican Secretary of State for the State of Colorado, (2) Miles Rapoport, former Democratic Secretary of State for the State of Connecticut, (3) Ben Ysursa, former Republican Secretary of State for the State of Idaho, (4) Joan Anderson Growe, former Democratic Secretary of State for the State of Minnesota, (5) John Gale, former Republican Secretary of State for the State of Nebraska, (6) Phil Keisling, former Democratic Secretary of State for the State of Oregon, (7) Kathy Boockvar, former

---

[1] All parties have consented to the filing of this brief amicus curiae. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these amici curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.

Democratic Secretary of the Commonwealth of Pennsylvania, and (8) Sam Reed, former Republican Secretary of State for the State of Washington.

**INTRODUCTION**

Amici faithfully oversaw elections across the "laboratories" of electoral democracy—the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states authority to enact election laws and administer elections, as set forth in the Elections Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (citation modified).

In this action, the United States seeks an order directing the Wisconsin Elections Commission to turn over to the U.S. Department of Justice a computerized voter registration list of nearly five million registered voters, inclusive of "all fields." ECF 1 (Complaint ("Compl.")) ¶ 20. That action would upend our constitutional framework by interfering with Wisconsin's management of its voter registration system and protection of sensitive voter information, including driver's license and

social security numbers. The Government's demand is contrary to the federalism and separation of powers principles codified in the Constitution's Elections Clause and contrary to federal law.

Amici therefore submit this brief to protect these fundamental Constitutional principles and to ensure the integrity of Wisconsin's voter registration records. Amici respectfully request that the Court affirm the District Court's judgment of dismissal.

## ARGUMENT

### I. DOJ's demand for Wisconsin's full voter roll violates separation of powers principles.

#### A. The U.S. Constitution mandates the states' role in regulating and administering elections.

The Constitution explicitly gives states, not the federal government, the primary responsibility to enact election laws and administer elections. The Elections Clause establishes: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added).[2]

[2] A state's "duty" under the Elections Clause "parallels the duty" described in the separate but related Electors Clause, Article II, Section 1, Clause 2 of the U.S. Constitution. *See U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 804-05 (1995).

The Constitution thus empowers the states with "sweeping" authority to enact election laws, subject only to other provisions of the Constitution and preemption by Congress. *League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*, 780 F. Supp. 3d 135, 158 (D.D.C. 2025). The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*, 570 U.S. 1, 8-9 (2013) (emphases added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [and 2] upon Congress it confers the power to alter those regulations or supplant them altogether." *ITCA*, 570 U.S. at 8 (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995)); *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (states hold "constitutional duty to craft the rules governing federal elections"). "In other words, only Congress has the power to adjust state election rules." *California v. Trump*, 786 F. Supp. 3d 359, 379 (D. Mass. 2025).[3]

[3] Similarly, the Electors Clause empowers state legislatures—not the President or the federal government—to determine the rules for appointing electors. The state's power under the Elector's Clause is "plenary" within constitutional limits. *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Congress is empowered to determine the time of choosing the electors and the day on which they are to give their votes . . . ; but

In addition to assigning states the primary responsibility to regulate elections, the Elections Clause also "places the burden of administering federal elections on the states." *Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008 (quoting *Edgar*, 56 F.3d at 796); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures."), *aff'd sub nom. ITCA*, 570 U.S. 1. In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," subject only to Congress' power "to regulate such elections . . . by positive and clear statutes." *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

**B. The Constitution prioritizes the states' accountability to voters.**

The Elections Clause reflects the Framers' view that, given state officials' accountability and proximity to local needs, states are well-situated to regulate and administer federal elections, subject only to Congressional preemption. "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian*

---

otherwise the power and jurisdiction of the state is exclusive[.]" *McPherson v. Blacker*, 146 U.S. 1, 35 (1892).

*Party of Va. v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments as being best acquainted with the situation of the people." 3 *Records of the Federal Convention of 1787* 391 (Max Farrand ed., 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." *The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *accord Gradwell*, 243 U.S. at 484-85; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 780 F. Supp. 3d at 159. Although the Constitution allows Congress to act as a check on a runaway state legislature's regulation of elections, nowhere does it authorize the President to do so without clear authorization from the legislative branch. *See generally Gradwell*, 243 U.S. at 484–85. There is no such authorization here. In fact, as discussed below, Congress has prohibited the federal government's attempted actions.

### C. State officials' election expertise surpasses that of the President.

In practice, the Elections Clause creates a regime in which state officials, like Amici, possess unique expertise in local election procedures that the federal government, including the President, does not have. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order,

rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Unlike the federal government, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* Consequently, state and local officials like Amici—*i.e.*, those charged with developing and enforcing those comprehensive election codes—possess the "expertise" necessary to implement such complex systems. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

### D. The NVRA and HAVA confirm states' authority over voter roll list maintenance.

Congress and the President recognized this truth when they adopted the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). The NVRA, enacted in 1993, helps increase voter registration by, among other things, requiring states to offer voter registration opportunities when individuals apply for or renew a driver's license. *See, e.g.*, Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025). HAVA, enacted in 2002, helps states modernize their election systems in response to voting problems in the 2000 presidential election. *Id.* at 12. Both statutes reaffirmed the states' authority over election management. Although the NVRA and

HAVA provide federal assistance to state election officials, they do not limit the states' plenary authority over election management.

Under both the NVRA and HAVA, the states—not federal agencies—are responsible for voter roll list maintenance. In interpreting the NVRA and HAVA, the courts must "interpret the words of these statutes in light of the purposes Congress sought to serve." *Chapman v. Hou. Welfare Rts. Org.*, 441 U.S. 600, 608 (1979); *see also Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might accord with good policy." (citation omitted)). A court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Here, the text of both the NVRA and HAVA is unequivocal: *States* are responsible for voter roll list maintenance. The NVRA provides that "each ***State*** shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). The NVRA's "text unambiguously mandates that the *states* maintain a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things: death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019) (emphasis added) (quoting 52 U.S.C. § 20507(a)(4)). The same is true regarding HAVA, which

requires states to define, maintain, and administer voter lists. 52 U.S.C. § 21083(a)(1)(A), (a)(4)(A).

Because the text of the NVRA and HAVA makes clear that states are charged with voter roll list maintenance, any interpretation to the contrary must be rejected. Further, "[n]owhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004).[4] The NVRA, which primarily achieves its objectives by "creating national registration requirements for federal elections," *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1113 (D. Kan. 2016), *aff'd*, 840 F.3d 710 (10th Cir. 2016), likewise authorizes, and relies on, the states to implement and facilitate its provisions. Specifically, the very "purpose of the federal [voter registration] form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); William J. Clinton, *Remarks on Signing the National Voter*

[4] As Senator Mitch McConnell explained: "[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols." Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections.").

*Registration Act of 1993*, The American Presidency Project (May 20, 1993), https://perma.cc/AHT3-H4S8 (describing NVRA's "implementation by States").

In short, through the NVRA and HAVA, Congress granted *states,* not the federal government, authority to administer voter roll lists. This Court must give full effect to Congress' intent.

### E. Countenancing DOJ's proposed use of states' voter rolls here would violate the NVRA and HAVA as well as the separation of powers.

According to DOJ, it is seeking Wisconsin's full voter roll to ascertain the state's compliance with the requirements of the NVRA and HAVA. Compl. ¶ ¶¶ 19, 23-24. And if DOJ's review of the voter roll "reveals that an alien unlawfully has registered to vote or voted in an election, the [Civil Rights] Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both." Mem. Op. for the Assistant Attorney General, Civil Rights Division at 5, *Authority to Obtain and Share Statewide Voter Roll Data* (May 12, 2026), https://perma.cc/VRJ2-4PPF. Indeed, DOJ has executed Memoranda of Understanding with at least three states providing that DOJ will notify the state of "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns [] the Justice Department found when testing, assessing, and analyzing your state's VRL [voter registration list] for NVRA and HAVA compliance, i.e., that [the] state's VRL only includes eligible voters," and purporting

to commit the states, "within forty-five (45) days of receiving the notice from the Justice Department" to "remov[e]" putatively ineligible voters. *See*, *e.g.*, Confidential Mem. of Understanding between DOJ and Alaska Div. of Elections at 5, (Dec. 19, 2025) https://perma.cc/5N8N-3H8J.

DOJ's representations to courts in litigation with states like Wisconsin—that have refused to turn over their unredacted voter rolls—likewise confirm that DOJ intends to "run these lists against other databases to be able to tell if there are bad registrations on their rolls." Hr'g Tr. at 70:12-2, *United States v. Amore*, No. 25-cv-639 (D.R.I. March 26, 2026). If DOJ identifies a voter with a purportedly "bad registration," DOJ will contact the states to "verify . . . they have removed [that voter] from the rolls." *Id.*

Neither the Elections Clause, the NVRA, HAVA, nor any other statute contemplates DOJ conducting voter roll list maintenance on behalf of the states. And to the extent that the NVRA and HAVA permit DOJ to play a supervisory role, it may enforce states' programmatic list maintenance obligations through *litigation*, not by fly-specking states' voter registration lists. *See* 52 U.S.C. §§ 20507(a)(4)(A), 20510(A) (under the NVRA, permitting DOJ to bring litigation for declaratory or injunctive relief to carry out states' obligation to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters"); *Id.* §§ 21083, 21111 (under HAVA, permitting DOJ to bring

litigation for declaratory or injunctive relief to carry out states' obligation to "implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list" and "perform list maintenance with respect to the computerized list on a regular basis"). At bottom, permitting DOJ to sift through Wisconsin's entire voter registration list would not only violate the Elections Clause, but also the voter roll list maintenance regime the states and Congress have erected pursuant to their Constitutional prerogative.

## II. DOJ's demands for states' full voter rolls violate the Privacy Act.

The Privacy Act of 1974 restricts a state's ability to share sensitive information with federal agencies. Congress passed the Privacy Act in response to the Watergate and Counterintelligence Program (COINTELPRO) scandals, which exposed the dangers of unchecked government domestic surveillance and data collection. The Privacy Act was designed to place "limits upon what the Government can know about each of its citizens." U.S. Dep't of Just., Overview of the Privacy Act of 1974 at 1 (2020 ed.), https://perma.cc/26QS-5WHE (citation omitted). Accordingly, the Privacy Act "sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy." *Id.*

To that end, the Privacy Act sought to prevent the federal government from creating "formal or *de facto* national data banks" or "centralized Federal information systems" that would consolidate sensitive personal data of Americans stored at

separate agencies. S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976), https://perma.cc/DZ4J-Y2TE. Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system." *Id.* at 884, 217.

DOJ's efforts to maintain and use Wisconsin voter data contravene many of the Privacy Act's requirements. First, the Privacy Act forbids federal agencies like DOJ from collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7).[5] Here, DOJ explicitly requested "all fields" from Wisconsin's electronic Voter Registration List. Compl. ¶ 20. By requesting all fields, DOJ sought

---

[5] Although § 552a(e)(7) includes an exception for collecting records "pertinent to and within the scope of an authorized law enforcement activity," nothing in DOJ's complaint identified such a specific "authorized law enforcement activity." To the contrary, the complaint made clear that the purpose of the demand under the CRA was to "test, analyze, and assess states' SVRLs for proper list maintenance and compliance with federal law." Compl. ¶¶ 24.

information describing how Wisconsin voters exercise their rights guaranteed by the First Amendment. *See* 5 U.S.C. § 552a(e)(7); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026) ("[V]oter registration [and] participation in elections [] are all types of political expression protected by the First Amendment.") (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69(1990)). The request thus violated the Privacy Act.

Second, the Privacy Act imposes procedural guardrails on what federal agencies like DOJ must do prior to establishing or modifying a "system of records," defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Any time the federal government "maintain[s], collect[s], use[s], or disseminate[s]" such, records, it *must* abide by notice-and-comment requirements and safeguards against data misuse, and follow information-security mandates. *Id.* § 552a(a)(3), (e)(1)-(12). Critically, when an agency establishes or revises any system of records, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records," *id.* § 552a(e)(4), called a System of Records Notice ("SORN"). At least 30 days *prior* to such publication, an agency must publish a "notice of any new use or intended use of the information in the

system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

Issuance of a SORN is not mere window-dressing. *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2026 WL 1784297, at *27 (D.D.C. June 22, 2026) ("'The Privacy Act's public notice and comment structure is an essential component of the Act and an essential piece of American democracy.'") (citing *Weber*, 816 F. Supp. 3d at 1193). SORNs "shall include" nine categories of information. 5 U.S.C. § 552a(e)(4). These crucial details provide much needed transparency about how the federal government is protecting both the information in the system of records and how it intends to use the information. And publishing a SORN is mandatory. Guidance issued contemporaneously with the Privacy Act is unequivocal: "*In no circumstance* may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following *Federal Register* publication." Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016), https://perma.cc/QZZ3-EB67 (emphases added). Moreover, agencies "shall" not only solicit but also review any "public comments on a published SORN" to "determine whether any changes to the SORN are necessary." *Id.* The "requirement for agencies to publish a SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act—fostering

agency accountability through public notice." *Id.* at 5.

Here, DOJ has not published a SORN nor any other notice describing how it intends to use the state voter roll data it is attempting to collect. DOJ has cited three pertinent SORNs in an attempt to demonstrate its compliance with the Privacy Act: 68 Fed. Reg. 47610, 47611 (August 11, 2003), 70 Fed. Reg. 43904 (July 29, 2005), and 82 Fed. Reg. 24147 (May 25, 2017). DOJ Br. at 43. But in contending those SORNs contain adequate detail about DOJ's routine uses of voters' data, DOJ relies on a daisy-chain theory of incorporation. *See id.* (stating SORNs refer to the CFR which in turn states only that the Civil Rights Division is responsible for '[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting.'"). That is insufficient to identify the "the categories of records maintained in the system," 5 U.S.C. § 552a(e)(4)(C), *i.e.*, millions of Americans' confidential voter data. *Accord Weber*, 816 F. Supp. 3d at 1193-94 ("[N]one of the SORNs" for the Central CRT Index File put the "American public on notice that specifically, their voter registration data is going to be collected [by DOJ] on an unprecedented level and used for a plethora of government activity . . . as required under the Privacy Act."). Simply put, DOJ's view of the amount of detail that must be included in a routine use would leave the system of records unbounded—effectively swallowing the protections of the Privacy Act by reading elephants into mouseholes. *Cf. Dinh Tran v. Dep't of Treas.*, 351 F. Supp. 3d 130,

136-37 (D.D.C. 2019) (rejecting "far-reaching," "open definition" of term in SORN's routine use, noting its failure to "provide adequate notice" and that "reliance on such overboard terms . . . frustrates [the Privacy Act's] publication requirement"), *aff'd sub nom. Tran v. U.S. Dep't of Treas.*, 798 F. App'x 649 (D.C. Cir. 2020).

Failure to issue such a notice is, itself, a Privacy Act violation. This privacy concern is not confined to Wisconsin. DOJ has sent at least 48 states and Washington, D.C. requests for their complete voter registration lists, and DOJ has already sued 30 states and D.C. for declining to provide such data. *See* Kaylie Martinez Ochoa, Eileen O'Conner & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Mar. 18, 2026), https://tinyurl.com/ypf63y95. These actions are consistent with DOJ's broader effort to build a "national voter roll." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://tinyurl.com/yc26r3r5. But doing so contravenes the Privacy Act's prohibition on national data banks and violates its transparency requirements. *See id.* ("The effort to essentially establish a national voting database, involving more than 30 states, has elicited serious concerns among voting rights experts . . . . The initiative has proceeded . . . seeking data about individual voters across the country, including names and addresses, in a move that experts say may violate the law.").

## III. Sound policy reasons support barring DOJ from collecting the personal identifying information in state voter files.

There is no question that each state's voter files contain sensitive nonpublic information about voters, which states have both a right and an obligation to protect. Federal law requires that every voter registration application for registration in a federal election contain *at least* the voter's driver's license ("DL") number, the last four digits of the voter's social security number ("SSN"), or other unique identifying information. 52 U.S.C. § 21083(a)(5)(A). In addition, voter files commonly include additional nonpublic information about voters, such as addresses, phone numbers, birth dates, and full SSNs. *See, e.g.*, National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/5xmzmaku (aggregating information about the contents of state voter rolls). This information generally is not publicly available; states have an interest in protecting such information from disclosure. *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) ("[T]he duty of the State" to protect privacy of its residents "cannot be doubted.").

Many states have enacted statutes either prohibiting disclosure of confidential information contained in the voter file or limiting the use of such information, including four of the states from which Amici hail.[6] Requiring disclosure of

[6] National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/3jr9w6a3; *see also* U.S. Election

confidential information contained in the voter file would thus violate not only voters' privacy rights, but also state privacy laws.

In addition, 44 states and the District of Columbia have either an address confidentiality program ("ACP") or a "Safe at Home" law that provides additional confidentiality protections for certain groups of voters, such as victims of domestic violence, sexual assault, stalking, and other crimes. *See* Office of the Minnesota Secretary of State, *Other States with Programs Like Safe at Home*, https://perma.cc/4YR5-HPMH (listing states that have created ACPs or enacted Safe at Home laws). These voter groups are at elevated risk of harassment, violence, and other harms if the confidential information in their voter files is disclosed, and states have a heightened interest in protecting their citizens from these harms by keeping confidential voter information private.

Moreover, there is nothing in the NVRA or HAVA that supersedes—or even conflicts with—these state confidentiality rules. The NVRA's public disclosure provision contains no mention of confidential information and no requirement that such information be disclosed. *See* 52 U.S.C. § 20507(i) (public disclosure provision of NVRA, which contains no mention of production of voters' confidential information). Nor does HAVA conflict with state confidentiality rules. That statute

---

Assistance Commission, *Availability of State Voter File and Confidential Information* (updated October 29, 2020), https://perma.cc/45W2-XGJZ.

does not even contain a public disclosure requirement, let alone a requirement that state agencies turn over confidential voter information to the federal government. *See generally* 52 U.S.C. § 21083 (no disclosure requirement). Thus, states can comply with their obligations under the NVRA and HAVA without acceding to federal demands for confidential information.

Similarly, states need not disclose confidential information about their voters to comply with the Civil Rights Act of 1960 ("CRA"). The CRA allows the United States Attorney General to request inspection of state voter rolls for the purpose of investigating "alleged discriminatory practices." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *see also* 52 U.S.C. §§ 20701, 20703 (retention and inspection provisions of the CRA). But the federal government did not allege any discriminatory practices. Even assuming the Attorney General can request inspection of voter rolls in these circumstances, there is no reason to believe that states cannot comply with the CRA's inspection provision while also protecting the confidentiality of sensitive voter information. Nothing in the text of the CRA's records provisions preempts state privacy protections, and preemption is not implied. *See generally* 52 U.S.C. §§ 20701-20706 (no mention of preemption). There is "a strong presumption against implied federal preemption of state law," which is strongest "in fields of traditional state regulation." *ACA Connects - Am.'s Commc'ns*

*Ass'n v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citation omitted). "Privacy regulation is just such a field." *Id.*; *see also Bellville v. Town of Northboro*, 375 F.3d 25, 31 (1st Cir. 2004) ("The states, of course, are free to accord their citizens rights beyond those guaranteed by federal law."). There is no authority suggesting that a state cannot take appropriate steps to protect confidential information about its residents while also complying with the CRA.

The CRA and voter confidentiality protections are not contradictory and are properly read in harmony. The purpose of the CRA was to allow the Attorney General to investigate the alleged disenfranchisement of voters based on race. *Gallion*, 187 F. Supp at 854. It does not give federal officials an unfettered right of access to confidential information about voters in general. *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("It is . . . a mistaken view to assume that [an] investigation of [state voting] records is an unlimited discovery device which may be employed and used without restraint . . . ."); *see also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (recognizing exception to inspection right "when the purpose is speculative, or from idle curiosity"), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). As courts have repeatedly recognized in other contexts, states can comply with the CRA while also protecting confidential voter information. *See, e.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (allowing redaction of sensitive personal information in voter file when complying with

disclosure requirements of NVRA). This principle applies here as well, allowing states to comply with appropriate inspection requests by the Attorney General while also redacting or withholding confidential information in the voter file in accordance with state privacy rules.

## IV. States have good reason to collect confidential information, but not share that information with third parties, including federal agencies.

As described above, because states administer elections, state law governs the circumstances and authorized officials who must collect voters' confidential information as part of the voter registration process. It does not follow that just because states possess voters' confidential information, the federal government is authorized to access it, nor that voters want that information shared with any other third parties, including the federal government.

As the founders recognized, state governments are "best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity and prevent its own dissolution." *Gradwell*, 243 U.S. at 484 (quoting 3 *Records of the Federal Convention of 1787* 311 (Max Farrand ed., 1911)). There are also practical concerns with states sharing and the federal government aggregating sensitive voter information. There always is a risk that electronically stored data could be hacked, breached, or stolen. But each time data is shared, that risk necessarily increases, both during the transfer process and because each custodian of records adds an additional target.

The federal government's efforts to create a first ever national voter roll compound the risk of exposing private voter information. Moreover, the federal government is an especially attractive target for hackers, particularly for those working on behalf of nation-states. Federal agencies reported over 30,000 security incidents in fiscal year 2022 alone. U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation* 1 (2024). The threat of such attacks is only growing. *See US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters (Oct. 15, 2025), https://perma.cc/E8E2-ZEGX; *see also* Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025), https://tinyurl.com/5vsxpvy4 ("A new report . . . is challenging the idea that federal institutions are more secure than local governments against cybersecurity threats."). Indeed, recently, both the U.S. Congressional Budget Office and FBI Director were breached by hackers. *US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025), https://perma.cc/Y64D-JMQN/; Jana Winter & A.J. Vicens, *Iran-linked hackers breach FBI director's personal email, publish excerpts online*, Reuters (Mar. 27, 2026), https://tinyurl.com/4e9myyva.

In addition to federal targets being particularly sought after by hackers, the Department of Homeland Security designates election infrastructure as "critical

infrastructure," which "recognizes that the United States' election infrastructure is of such vital importance to the American way of life that its incapacitation or destruction would have a devastating effect on the country." Cybersecurity & Infrastructure Security Agency, *Election Security*, https://perma.cc/U6MC-F3C3 (last visited Nov. 18, 2025). In making that designation, DHS "cited cyberattacks on American systems as potentially more sophisticated and dangerous than ever, and elections as a primary target of cyber criminals." White Paper delivered to National Association of Secretaries of State, *Securing Elections Critical Infrastructure* 3 (2020), https://perma.cc/48MC-C49D; *see also* Brian E. Humphreys, Cong. Rsch. Serv., IF10677, *The Designation of Election Systems as Critical Infrastructure* (updated Sept. 18, 2019), https://www.congress.gov/crs-product/IF10677.

Unsurprisingly, even since that designation, critical infrastructure remains squarely in the crosshairs of hackers. In 2024, roughly 70 percent of all cyberattacks involved critical infrastructure. *Cyber Threat Snapshot*, House Committee on Homeland Security, https://perma.cc/R829-ZN25 (last visited Nov. 18, 2025); *Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024), https://perma.cc/KNV2-7EHP. And concerns about the security of American election infrastructure are even more pronounced now after the federal government recently downsized and cut funding for the Cybersecurity and Infrastructure Security Agency, which is tasked with protecting—among other things—election

infrastructure. *See* Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025), https://perma.cc/XR9D-ZCRT; *see also* Tierney Sneed, Sean Lyngaas, & Evan Perez, *Trump Admin Tries to Rebuild Election Security Infrastructure it Gutted as Midterms Near*, CNN (July 31, 2026), https://perma.cc/87B7-WYAZ ("In a closed-door briefing this month, a CISA official recently assigned to election security told congressional staff that the agency has been so depleted of staff that it wouldn't be able to provide its normal election-security assistance ahead of the midterms, according to a US official.") As a result, by trying to force multiple states to send their otherwise disparate sets of sensitive voter information to the same repository at the DOJ, the federal government is only making the bullseye brighter for bad actors, while at the same time removing obstacles between hackers and their targets.

The concerns do not end there. The federal government has a long and checkered history of infringing on individuals' privacy rights, including confidential voter information. In 2017, the Presidential Advisory Commission on Election Integrity—similarly in pursuit of vague allegations of election vulnerabilities and voter fraud—sent letters to state election officials across the country seeking all publicly available voter roll data, including all registrants' full first and last names, middle names or initials, addresses, dates of birth, political party, last four digits of Social Security numbers if available, voter history from 2006 onward, information

regarding any felony convictions, voter registration in another state, and military status. Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), https://perma.cc/J7TA-ALKV. State officials—sometimes colorfully—expressed grave concerns. Kentucky Secretary of State Alison Lundergan Grimes said there was "not enough bourbon here in Kentucky to make this request seem sensible. . . . Not on my watch are we going to be releasing sensitive information that relate to the privacy of individuals." Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. (last updated July 1, 2017), https://perma.cc/QF7G-MV8G. She explained, "I'm not going to risk sensitive information for 3.2 million Kentuckians getting in the wrong hands, into the public domain and possibly for the wrong reasons, to keep people away from the ballot box." Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017), https://perma.cc/2AEE-AL4E. Mississippi Secretary of State Delbert Hosemann emphasized that states "conduct[] our own electoral processes," and suggested "[the Commission] can go jump in the Gulf of Mexico and Mississippi is a great State to launch from." *Id.*

The same concerns about sharing voters' sensitive and confidential information with the government apply with equal force now, as to states'

justifications for choosing not to do so. Indeed, in a letter to former Attorney General Pam Bondi and former Homeland Security Secretary Kristi Noem, secretaries of state from Arizona, California, Colorado, Maine, Minnesota, Nevada, New Mexico, Oregon, Vermont and Washington—all of which oversee elections in their states—demanded answers on how private voter data was being used by the federal government. Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025), https://perma.cc/3U4N-PWXB. The secretaries noted, among other concerns, that their states' voter registration lists include sensitive voter information, including dates of birth, state driver's license numbers, and the last four digits of Social Security numbers. *Id.* Alarmingly, recent reporting suggests that DOJ is considering sharing the state voter rolls DOJ obtains—including voters' confidential information—with party organizations such as the Election Integrity Network. *See* Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025), https://perma.cc/W8UC-XHRS (quoting employee of EagleAI, a mass voter registration challenge system, as stating "[w]e demonstrated the software to the DOJ. . . . I am in conversation with them about letting us have a task, a federal task, to bring their data into what we're doing and then be able to use the federal data, SAVE data, Social Security data, other data in here as well.").

## CONCLUSION

For the reasons stated above, Amici respectfully request that the Court affirm the District Court's judgment of dismissal.

Dated: August 25, 2026


*/s/ John B. Hill*
John B. Hill
Samantha Suman
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
ssuman@citizensforethics.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and because it contains 6,495 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: August 25, 2026 *_/s/ John B. Hill_*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using its CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 25, 2026 *<u>/s/ John B. Hill</u>*